**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **FOX CORPORATION,** | § | |
| **FOX MEDIA LLC, and** | § | |
| **FOX SPORTS EN ESPAÑOL LLC,** | § | |
| ***Plaintiffs*** | § | |
| | § | **CAUSE NO. 4:25-MC-02271** |
| **v.** | § | |
| | § | |
| **MANUEL ARROYO,** | § | |
| ***Defendant.*** | § | |
| | § | |

**PLAINTIFFS' APPENDIX TO RESPONSE TO ARROYO MOTION FOR RECONSIDERATION**


| Exhibit No. | Title | Page No. |
|---|---|---|
| 1. | Declaration of Marcus R. Tucker | 1 |
| A | Excerpt of Hearing Transcript before the Honorable Jed S. Rakoff in U.S. District Court for the Southern District of Texas on September 5, 2025 in the case Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V., Case No. 25-cv-6703 | 4 |
| 2 | *In re Arroyo*, No. 26-20495 (5th Cir. Sept. 4, 2026) (per curiam) (unpublished) | 10 |
| 3 | *Cassidy v. State Farm Lloyds*, No. 4:22-CV-03890, 2025 WL 4231026 (S.D. Tex. June 10, 2025) | 13 |
| 4 | *StrucSure Home Warranty, LLC v. Sulzbach*, No. 4:20-CV-2915, 2021 WL 3516242 (S.D. Tex. Aug. 10, 2021) | 16 |

| | | |
|---|---|---|
| **5** | ***Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2024 WL 1122430 (M.D. La. Mar. 14, 2024)** | **21** |
| **6** | ***DAC Surgical Partners P.A. v. United Healthcare Services, Inc.*, No. 4:11-CV-1355, 2017 WL 3484507 (S.D. Tex. Aug. 14, 2017)** | **27** |
| **7** | ***ING Bank N.V. v. M/V Portland, IMO No. 9497854*, 2016 WL 3365426 (M.D. La. June 16, 2016)** | **32** |
| **8** | ***Shufeldt v. Baker Donelson, Bearman, Caldwell & Berkowitz, P.C.*, 2020 WL 1532323 (M.D. Tenn. Mar. 31, 2020)** | **45** |
| **9** | ***Tracy v. NVR, Inc.*, 2012 WL 1067889 (W.D.N.Y. Mar. 26, 2012)** | **57** |
| **10** | ***De Hoyos v. Prime, Inc.*, 2015 WL 12803713 (S.D. Tex. Mar. 18, 2015)** | **71** |
| **11** | ***RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 2008 WL 2036816 (S.D. Tex. May 9, 2008)** | **76** |

Respectfully submitted,

**PHELPS DUNBAR LLP**

By: *_/s/Marcus R. Tucker_*
Marcus R. Tucker
Federal Bar No. 12769
State Bar No. 20282360
1001 Fannin St., Ste. 2200
Houston, Texas 77002
Telephone: 713-626-1386
Telecopier: 713-626-1388
Email: marcus.tucker@phelps.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

**OF COUNSEL:**

**PHELPS DUNBAR LLP**
D. Michael Hurst, Jr.**
MSB No. 99990
1905 Community Bank Way, Ste. 200
Flowood, MS 39232
Telephone: 601-352-2300
***Admitted Pro Hac Vice*

**STEPTOE LLP**
Katherine A. Petti**
kpetti@steptoe.com
Christopher T. Berg (Bar No. 24082682)
cberg@steptoe.com
633 West Fifth Street. Ste. 1900
Los Angeles, CA 90071
Telephone: 213-439-9400
***Admitted Pro Hac Vice*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| **FOX CORPORATION,** | § | |
| **FOX MEDIA LLC, and** | § | |
| **FOX SPORTS EN ESPAÑOL LLC,** | § | |
| ***Plaintiffs*** | § | |
| | § | **CAUSE NO. 4:25-MC-02271** |
| **v.** | § | |
| | § | |
| **MANUEL ARROYO,** | § | |
| ***Defendant.*** | § | |
| | § | |

**DECLARATION OF MARCUS R. TUCKER**

I, Marcus R. Tucker, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a partner with Phelps Dunbar LLP, counsel of record for Plaintiffs Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC (collectively, "Fox"). I submit this declaration in support of Plaintiffs' Response to Arroyo's Motion for Reconsideration.

2. I am over eighteen years of age. I have firsthand, personal knowledge of the facts set forth below and could competently testify thereto if called as a witness.

3. Attached as **Exhibit A** is a true and accurate excerpt of a transcript of a hearing held before the Honorable Jed S. Rakoff in the U.S. District Court for the Southern District of New York on September 5, 2025 in the case *Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V.*, Case No. 25-cv-6703 (S.D.N.Y.). The excerpt consists of the cover page, pages 14 through 16, and page 30 of that transcript.

I declare under penalty of perjury that the statements in this declaration are true and correct.

Executed this 8th day of September 2026 in Harris County, Texas.

Marcus R. Tucker

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FOX CORPORATION, *et al.*,

Plaintiffs,

v. 25 CV 6703 (JSR)

MEDIA DEPORTES MEXICO, S. de R.L. de C.V.,

Defendant. Hearing

------------------------------x

New York, N.Y.
September 5, 2025
2:00 p.m.

Before:

HON. JED S. RAKOFF,

District Judge

APPEARANCES

ELLIS GEORGE LLP
Attorneys for Plaintiffs
BY: CHRISTOPHER T. BERG
KATHERINE A. PETTI
STEPHEN P. FARRELLY

NASSIRI & JUNG LLP
Attorneys for Respondent Mexico Sports Distribution LLC
BY: JAIME DORENBAUM
KASSRA NASSIRI

MR. BERG: Your Honor, we have made electronic service, and immediately following providing that service we emailed chambers with a copy of that correspondence.

THE COURT: You probably should file that with the clerk of the court as well.

MR. DORENBAUM: Your Honor, regarding the service, there was electronic service to me of the TRO order, but there was no personal service of the contempt order and there has been no proof of any personal service to any of the nonparties of the contempt order, and I don't believe that the contempt order permitted Fox to effect service via email on any of the nonparty entities.

THE COURT: That's interesting. I didn't go back and look. What's your recollection?

MR. BERG: On your August 28 email you asked us to inform counsel for defendant Mexico, which also is counsel for Mexico Sports Distribution, via email regarding the contempt hearing, as well as the notice of moving papers. You did not specifically authorize us --

THE COURT: I know I authorized electronic filing of the original TRO, but I have never authorized electronic filing of the contempt order?

MR. BERG: That's correct, your Honor, not in the contempt order itself.

THE COURT: Well, then I do have a question about

that.

Here is where I'm going. I think the hearing that we will have on September 18 should include anyone who has been properly served or anyone who chooses to appear to challenge service, for that matter. But if I never formally authorized the electronic service on the contempt motion, as opposed to the underlying TRO, then I think I will so authorize it, but it has to be done by early next week. And what you have to do in that service also is inform whoever you're serving that we are going to have a hearing for all of the third parties on the 18th.

MR. BERG: Just to be clear, your Honor, you did authorize electronic service for the contempt hearing, which was provided. So the notice, which is all the local rule requires, it's the service of the contempt order you issued itself that does not say electronic service --

THE COURT: Again, I think, trying to be practical about all this, now that we have the adversary system in operation as to MSD, we might as well take advantage of that and do it the best we can and make sure that any other third party that wants to appear is given another opportunity to appear on the 18th.

MR. BERG: Your Honor, I respectfully would like to resist that for the following reason. The aim that you are trying to achieve is to provide notice and an opportunity to be

heard to oppose a contempt order. That's been provided. Electronic notice has been provided to all the nonparties, subject to your contempt order, and the defendants.

What we have seen in response is continued contempt and violation of the TRO. That is causing damage to Fox on a daily basis, and we intend to present some information about that.

THE COURT: Lurking at the heart of all of this is the seeming conflict between what has been presented to this Court in the United States and what has been presented to the Mexican courts in Mexico. And looking at it realistically, whatever I may provide by way of service or otherwise, the likelihood that anyone is going to appear in this court on behalf of the Mexican entities is, I think, remote and, yes, they have, from one point of view, your point of view, shown utter contempt for this contempt. On the other hand, from their point of view, I'm sure if they were here they would be saying this Court doesn't have jurisdiction and we are relying on what went on in Mexico.

MR. BERG: Certainly judging by their press release, your Honor.

THE COURT: I'll think about it more for a minute, but I think I want to give the third parties at least one more shot.

However, let's talk about the defendant. The

as well, please, your Honor?

THE COURT: Yes.

MS. PETTI: Thank you.

THE COURT: Anything further from MSD?

MR. DORENBAUM: Nothing further. Thank you, your Honor.

THE COURT: Very good. Thanks a lot.

(Adjourned)

# EXHIBIT 2

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

September 04, 2026

Mr. Nathan Ochsner
Southern District of Texas, Houston
United States District Court
515 Rusk Street
Room 5300
Houston, TX 77002

No. 26-20495 In re: Manuel Arroyo
USDC No. 4:25-MC-2271

Dear Mr. Ochsner,

Enclosed is a copy of the judgment issued as the mandate.

Sincerely,

LYLE W. CAYCE, Clerk

By: ____________________
Dantrell L. Johnson, Deputy Clerk
504-310-7689

cc w/encl:
Mr. Christopher Thomas Berg
Mr. David Michael Hurst, Jr.
Ms. Katherine Anne Petti
Mr. Marcos Gutierrez Ronquillo
Mr. Steven R. Shaver
Mr. Marcus R. Tucker

# United States Court of Appeals for the Fifth Circuit

No. 26-20495

United States Court of Appeals
Fifth Circuit

**FILED**
September 4, 2026

Lyle W. Cayce
Clerk

In re Manuel Arroyo,

*Petitioner.*

Petition for a Writ of Mandamus
to the United States District Court
for the Southern District of Texas
USDC No. 4:25-MC-2271

UNPUBLISHED ORDER

Before Smith, Southwick, and Douglas, *Circuit Judges*.

Per Curiam:

IT IS ORDERED that the petition for writ of mandamus is DENIED.

**A True Copy**
**Certified order issued Sep 04, 2026**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# EXHIBIT 3

2025 WL 4231026
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

William and Rachel CASSIDY, Plaintiffs,
v.
STATE FARM LLOYDS and
Christopher Dias, Defendants.

Civil Action No. 4:22-cv-03890
|
Signed 06/10/2025
|
Entered June 11, 2025

**Attorneys and Law Firms**

Jay Scott Simon, Chad Troy Wilson, Chad T. Wilson Law Firm PLLC, Webster, TX, Vickers Lee Cunningham, Jr., Cunningham Law Firm, PLLC, Dallas, TX, for Plaintiff William Cassidy.

Jay Scott Simon, Chad T. Wilson Law Firm, Webster, TX, for Plaintiff Rachel Cassidy.

Maxwell Micah Kessler, Nistico, Crouch & Kessler, P.C., Houston, TX, for Defendant State Farm Lloyds.

**ORDER DENYING MOTION FOR RECONSIDERATION**

Charles Eskridge, United States District Judge

***1** This is an insurance-coverage action brought by Plaintiffs William and Rachel Cassidy related to a hailstorm in the Houston area in January 2022. See Dkt 1 at ¶¶8–10. A previous motion by Defendant State Farm Lloyds seeking summary judgment on all claims was previously denied. Dkt 38; see Dkt 15.

State Farm Lloyds now seeks reconsideration under Rule 54(b) of the Federal Rules of Civil Procedure as to only the extra-contractual claims. Dkt 43. The pertinent facts of record won't be repeated as they haven't changed since the prior ruling.

Rule 54(b) provides that "any order ... that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." A district court in this context is permitted "to reconsider and reverse its decision for any reason it deems sufficient." *McClendon v United States*, 892 F3d 775, 781 (5th Cir 2018), citing *Austin v Kroger Texas LP*, 864 F3d 326, 336 (5th Cir 2017).

The motion proceeds upon apparent assumption that it's appropriate on reconsideration to refine and focus legal argument after decision. It's not. See Charles Alan Wright and Arthur R. Miller, 10 *Federal Practice & Procedure* § 2654 (West 4th ed 2025) (stating "basic purpose of Rule 54(b) is to avoid the possible injustice of a delay in entering judgment on a distinctly separate claim"). Instead, even under the flexible standards pertinent to Rule 54(b), factors similar to those under Rules 59 and 60 may still inform the court's analysis. *Fishman Jackson PLLC v Israely*, 180 F Supp 3d 476, 481 (ND Tex 2016). These include (i) intervening change in law, (ii) availability of previously unavailable new evidence, and (iii) a need to correct a clear legal error or to prevent manifest injustice. *United States v 89.9270303 Bitcoins*, 2021 WL 5203337, *1 (WD Tex) (citation omitted). In short, motions to reconsider are not a do-over. See *Rotstain v Trustmark National Bank*, 2016 WL 8216509, at *6 (ND Tex).

To the extent State Farm Lloyds now cites and attaches decisions in eleven cases, see Dkt 43 at 7–8, not a single one was mentioned in its motion for summary judgment or its reply. See Dkts 15 & 19. And mere assertion by State Farm Lloyds that this a "minor, bona fide coverage dispute that does not implicate bad faith" doesn't make it so. See Dkt 15 at 16; see also Dkt 43 at 2 (asserting that "Plaintiffs' extra-contractual claims arose entirely from a bona fide dispute regarding coverage"). Nor can it, on summary judgment, rebut factual contention by Plaintiffs that their experts have testified that hail damage was "open and obvious," and that a storm occurred "during the Policy period." Dkt 17 at 17; cf Dkt 43 at 2 (asserting "Plaintiffs failed to produce any evidence that State Farm's investigation was unreasonable or that liability was reasonably clear"). In short, whether the position of State Farm Lloyd amounts to dealing in "bad faith" is a question that cannot, on this record, be resolved as a matter of undisputed material fact.

***2** The motion for reconsideration by State Farm Lloyds is DENIED. Dkt 43.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 4231026

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

KeyCite Yellow Flag
Distinguished by BRP Colleague Inc. v. Gillen, N.D.Ga., September 23, 2022

2021 WL 3516242
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

STRUCSURE HOME WARRANTY, LLC, Plaintiff,
v.
Robert SULZBACH, et al., Defendants.

CIVIL ACTION NO. 4:20-CV-2915
|
Signed 08/10/2021

**Attorneys and Law Firms**

Donald Mark Davis, Craddock Davis et al., Dallas, TX, for Plaintiff.

Lawrence Chang, Choate and Associates, Austin, TX, for Defendants.

## ORDER

Andrew S. Hanen, United States District Judge

***1** Pending before the Court is the Respondents', Robert and Sandy Sulzbach (collectively, the "Respondents" or the "Sulzbachs"), Amended Motion to Reconsider (Doc. No. 19) this Court's earlier order compelling arbitration (Doc. No. 17). The Petitioner StrucSure Home Warranty, LLC ("Petitioner" or "StrucSure") responded (Doc. No. 20) and the Respondents replied (Doc. No. 21). The Court held a hearing and ordered further briefing, which the parties supplied (*see* Doc. Nos. 31, 32, 34). After considering the motions, briefing, and applicable law, the Court denies the motion.

### I. Background

Robert and Sandy Sulzbach purchased a new home in Splendora, Texas from Jamera Custom Homes, Inc. ("Jamera") (Doc. No. 1-1 at 2). StrucSure is the administrator of a Limited Warranty for the home. (Doc. No. 9-1 at 2). When the Sulzbachs moved into the home, they discovered a leak, which led to the discovery of mold. (Doc. No. 1-1 at 2). The Sulzbachs notified StrucSure that they were making claims under their Limited Warranty, but StrucSure denied liability. (*Id.* at 4). The Sulzbachs then sued Jamera and StrucSure in Texas state court for breach of contract, breach of warranty, fraud, and other causes of action. *See Robert Sulzbach and Sandy Sulzbach v. Jamera Custom Homes, Inc. and Strucsure Home Warranty, LLC*, Case No. 20-03-04145, 410th District Court, Montgomery County, Texas. StrucSure responded with a Plea in Abatement and Motion to Compel Arbitration, which the Sulzbachs opposed. (Doc. No. 10 at 7).

Thereafter, StrucSure filed a petition with this Court under 9 U.S.C. § 4 [1] asking the Court to compel arbitration between the parties on the Sulzbachs' various claims against StrucSure in the state court action and to enjoin any further proceedings in the state court action. Jamera is not a party to this action. The Sulzbachs did not respond to the motion to compel. The Court granted the motion and compelled arbitration between the parties.

The Sulzbachs have now asked the Court to reconsider its decision to order the parties to arbitration. They argue that, because their home was financed through the Veterans' Administration (VA), their dispute with StrucSure falls into an exception to mandatory arbitration in their warranty agreement.

### II. Legal Standard

Unlike Rule 59(e), which governs reconsideration of final judgments and does not permit consideration of arguments that could have been raised previously, "Rule 54(b) applies to interlocutory judgments and permits the district court 'to reconsider and reverse its decision for any reason it deems sufficient.' " *McClendon v. United States*, 892 F.3d 775, 781 (5th Cir. 2018) (quoting *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017)). Put differently, Rule 54(b) permits a trial court to reverse its earlier decision, "even in the absence of new evidence or an intervening change in or clarification of the substantive *law*." *Austin*, 864 F.3d at 336 (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994) (en banc)). An order compelling arbitration is an interlocutory order, *Cargill Ferrous Intern. v. SEA PHOENIX MV*, 325 F.3d 695, 697 (5th Cir. 2003), so its reconsideration is governed by the "less exacting" standards

of Rule 54(b). *Devabhaktuni v. C.P.S.*, 3:19-CV-1743-N-BT, 2020 WL 4745048, at *1 (N.D. Tex. July 16, 2020), *report and recommendation adopted*, 3:19-CV-1743-N-BT, 2020 WL 4732088 (N.D. Tex. Aug. 14, 2020). Even so, Rule 54(b) motions are disfavored. *Barnett v. Wells Fargo Bank, N.A.*, 4:19-CV-821, 2020 WL 3972535, at *2 (S.D. Tex. July 14, 2020).

### III. Analysis

***2** The Sulzbachs argue that there are good reasons for the Court to reconsider its order compelling arbitration. They argue the dispute falls into an exception to mandatory arbitration provided in the warranty agreement. The ultimate paragraph of the Section 17 ("Arbitration") of the Home Warranty Agreement provides:

> Note: For Homes With FHA/VA Financing Only:
>
> For Homes with the original FHA or VA financing only, and notwithstanding anything written above, You may elect judicial resolution of any disputes as an alternative to the Arbitration provision set forth in this Express Limited Warranty. Note that if you choose arbitration, you are bound by the decision.

(Doc. No. 9-1 at 35). It is undisputed that the Sulzbachs purchased their home using VA financing in August of 2018 and refinanced the home through the VA in June of 2019. (*See* Doc. No. 19-3 ¶ 7–8, Declaration of Robert Sulzbach). The Sulzbachs argue that: (1) originally financing through the VA and then refinancing also through the VA constitutes "original" financing under the arbitration exception above; and (2) even if their current financing is not the "original" financing, the "original" requirement in the clause only applies to "FHA [Federal Housing Administration] financing" and not "VA financing," so their financing does not need to be original as long as it is VA financing. They also argue that, regardless of the exception to arbitration provided in the Warranty Agreement, a regulation in effect at the time they entered into the Warranty Agreement requires that StrucSure provide for judicial resolution of disputes for any person with VA financing.

First, the Sulzbachs argue that their home should still be considered to have "original" VA financing because they refinanced through the VA as well. This argument is persuasive from a policy perspective: if the purpose of the exception is to provide the option of judicial resolution of disputes when the homeowner financed through the VA, why would refinancing, especially here where it was through the VA, end this protection? Nevertheless, if the clause was meant to have the interpretation advocated by the Sulzbachs, there would be no need to have the term "original" at all. Their interpretation would essentially nullify the term "original" in the clause altogether, which is disfavored in contract construction. *In re Isbell Records, Inc.*, 586 F.3d 334, 337 (5th Cir. 2009) ("A contract should be interpreted as to give meaning to all of its terms.") (alterations omitted). Accordingly, this argument fails.

Next, the Sulzbachs argue that, even if their home is not considered to have original financing because they refinanced it, the clause only requires that FHA-financed homes have original financing, not VA-financed homes. According to the Sulzbachs, the term "original" in the clause above only modifies FHA financing, and not VA financing. In support of this contention, the Sulzbachs point to the clause's heading, which does not contain the term "original," and to the rule of contract construction that contracts be construed against the drafter.

The Court does not find this argument persuasive. A plain reading of the clause indicates that "original" applies to both FHA and VA financing. The terms "original," "FHA," and "VA" are all adjectives modifying "financing." Adjectives can only modify nouns. *See* *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) ("Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality."). The disjunctive "or" separates "FHA" and "VA," indicating that disputes over homes with either type of financing qualify for judicial resolution. Conversely, there is no disjunctive following "original," indicating that it applies to any financing. Accordingly, the option of judicial resolution applies to homes with "original FHA financing" ***or*** "original VA financing." The absence of the term "original" from the clause's heading does not change this result because, "although courts may consider the title of a contract provision or section to interpret a contract, the greater weight must be given to the operative contractual clauses of the agreement." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015) (quotations omitted). Further, the Court finds that the clause is unambiguous in its application only to homes with original financing, so there is no reason to construe it against the drafter. *See* *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) (Gonzalez, J., concurring) (recognizing that only

"inconsistent or ambiguous provisions of an insurance policy will be construed against" the drafter).

***3** This holding is also supported by common sense. The Sulzbachs' reading of the warranty provision would produce the result that all homes with VA financing have the option of judicial resolution, but only homes with *original* FHA financing have the option. The Sulzbachs have not advanced any argument as to why the parties would have intended this unusual result, and the Court can think of none.

Last, the Sulzbachs argue that, regardless of the language of the warranty, StrucSure is required by regulations to provide them a judicial resolution for disputes arising from their VA refinanced home. The regulation (which has been repealed but was in place at the time the parties executed the warranty) appears in a list of requirements that the Department of Housing and Urban Development (HUD) must consider to approve insured ten-year protection plans, which are warranty agreements for homes with mortgages insured by HUD, such as those financed through the FHA or VA. *See* 24 C.F.R. § 203.200. The relevant regulation provides:

> A Plan must contain pre-arbitration conciliation provisions at no cost to the homeowner, *and a provision for judicial resolution of disputes*, but arbitration, which must be available to a homeowner during the entire term of the coverage contract, must be an assured recourse for a dissatisfied homeowner.

24 C.F.R. § 203.204(g) (rescinded March 2019) (emphasis added). According to the Sulzbachs, the effect of this regulation is that, regardless of the warranty agreement's language, StrucSure is required by the regulation to provide for judicial resolution of their dispute with the Sulzbachs.

The Sulzbachs over-read this provision. As stated previously, the above regulation is not written as a standalone requirement to the effect that warranty companies must offer judicial resolution to certain homeowners in the warranty agreement. Instead, the regulation is written as a requirement that *the agency* (HUD) require certain provisions when determining whether to approve housing warranty agreements. Here, the warranty agreement at issue was approved by HUD.[2] Therefore, the Sulzbachs' statutory challenge to the mandatory arbitration provision in this case is really an argument that HUD's approval of the warranty agreement was erroneous. This amounts to an improper collateral attack on an agency determination. *See* *Fed. Sav. & Loan Ins. Corp. v. Locke*, 718 F. Supp. 573, 586 (W.D. Tex. 1989) (Bank Board's determination of "worthlessness" of claims was a final agency action subject to review under the Administrative Procedure Act (APA), and not subject to collateral attack though a lawsuit). Moreover, even if true it does not necessarily provide an avenue for relief for the Sulzbachs.

HUD is entitled to deference in its decision to approve the warranty agreement provided by StrucSure, including the arbitration provision with an unambiguous exception only for homes with original FHA or VA financing. HUD apparently viewed StrucSure's warranty agreement as complying with the relevant regulations. If the Sulzbachs believe this was an incorrect conclusion by HUD, the APA provides the vehicle to challenge it. They are not permitted to collaterally attack that determination by challenging the Court's order to arbitrate now. More importantly, regardless of the correctness of HUD's conclusion, the regulation in question does not compel the conclusion that the arbitration provision is illegal or contrary to public policy.

## IV. Conclusion

***4** For the foregoing reasons, the Court hereby denies the Sulzbachs' Amended Motion to Reconsider (Doc. No. 19) and the related motions (Doc. Nos. 31 & 34). The Court's previous order compelling the parties to arbitration remains in effect. (Doc. No. 17).

### All Citations

Not Reported in Fed. Supp., 2021 WL 3516242

## Footnotes

1 That statute provides in part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

2 StrucSure has asked that this Court take judicial notice of the approval and has provided the governmental websites with the relevant information as various exhibits to demonstrate that fact (*See* Doc. No. 32, Exs. A, B, C, D). "[G]ovemmental websites are proper sources for judicial notice." *Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 871 (S.D. Tex. 2020). The Court therefore overrules the Sulzbachs' Rule 403 objection to this request.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2024 WL 1122430
Only the Westlaw citation is currently available.
United States District Court, M.D. Louisiana.

ALEX A., BY AND THROUGH his guardian, Molly SMITH; Brian B.; and Charles C., by and through his guardian, Kenione Rogers, individually and on behalf of all others similarly situated
v.
Governor John Bel EDWARDS, in his official capacity as Governor of Louisiana; William Sommers, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, James M. LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections

CIVIL ACTION NO. 22-573-SDD-RLB
|
Signed March 14, 2024

**Attorneys and Law Firms**

David J. Utter, William R. Claiborne, Pro Hac Vice, The Claiborne Firm, P.C., Savannah, GA, Marisol J. Dominguez-Ruiz, Pro Hac Vice, Savannah, GA, Ashley Dalton, New Orleans, LA, Lauren Winkler, Susan M. Meyers, Southern Poverty Law Center, New Orleans, LA, Christopher James Murell, Meghan K. Matt, Murell Law Firm, New Orleans, LA, Russell D. Barksdale, Barksdale Law, L.L.C., New Orleans, LA, Sara Helene Godchaux, Loyola University New Orleans College of Law, New Orleans, LA, Corene Thaedra Kendrick, Pro Hac Vice, American Civil Liberties Union Foundation, San Francisco, CA, David B. Shanies, Pro Hac Vice, Shanies Law Office, New York, NY, Tammie M. Gregg, Pro Hac Vice, ACLU National Prison Project, New York, NY, Nancy Rosenbloom, Pro Hac Vice, American Civil Liberties Union Foundation, Washington, DC, Ronald S. Haley, Jr., Baton Rouge, LA, for Molly Smith, Kenione Rogers.

Connell Lee Archey, Allena Brooke McCain, Madaline King Rabalais, Butler Snow LLP Butler Snow LLP, Baton Rouge, LA, Anna Little Morris, Lemuel E. Montgomery, III, Pro Hac Vice, Carly H. Chinn, Pro Hac Vice, Kyle V. Miller, Pro Hac Vice, Butler Snow LLP, Ridgeland, MS, for Jon Bel Edwards, William Sommers, James M. LeBlanc.

**ORDER**

RICHARD L. BOURGEOIS, JR., UNITED STATES MAGISTRATE JUDGE

***1** Before the Court is Defendants' Motion for Reconsideration, in Part, of Order [314], Granting Plaintiffs' Motion to Enforce [299] Order Permitting Access to OJJ Youth in Jackson Parish ("Motion for Reconsideration"). (R. Doc. 316). The motion is opposed. (R. Doc. 327).

**I. Background**

On August 19, 2022, the plaintiff Alex A. commenced this putative class action on behalf of certain individuals under the secure care of the Office of Juvenile Justice ("OJJ") to obtain injunctive relief preventing their transfer from the Bridge City Center for Youth ("BCCY") to a location at the Louisiana State Penitentiary at Angola known as the Bridge City Center for Youth at West Feliciana ("BCCY-WF"). (R. Docs. 1, 96).

On September 23, 2022, the district judge denied Alex A.'s Motion for Preliminary Injunction, allowing the transfer of the youths to BCCY-WF based on certain promises regarding the temporary nature of the facilities and the conditions of confinement. (R. Doc. 79).

The operative pleading in this action is the First Amended Class Action Complaint filed by Alex A., Brian B.,[1] and Charles C. (collectively, "Plaintiffs") on behalf of themselves and others similarly situated against Governor John Bel Edwards,[2] Deputy Secretary of the OJJ Williams Sommers,[3] and the Secretary of the Louisiana Department of Public Safety & Corrections ("DOC") James M. LeBlanc (collectively, "Defendants"). (R. Doc. 96). Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment (Count I), declaratory and injunctive relief for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count II), and declaratory and injunctive relief for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count III). (R. Doc. 96 at 35-39).

Among other things, Plaintiffs filed a Motion for Class Certification (R. Doc. 99) and second Motion for Preliminary Injunction (R. Doc. 163).


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

On August 31, 2023, the district judge granted Plaintiffs' Motion for Class Certification, appointing the Plaintiffs as class representatives for the following class:

> [A]ll youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU")[4] at Angola or another adult prison (the "Principal Class"), including a subclass of all current and future youth with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act in the custody of OJJ who have been, might be, or will be transferred to the OJJ site at Angola or another adult prison (the "Disabilities Subclass").

***2** (R. Doc. 243 at 8).[5] The district judge also designated Plaintiffs' counsel as Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure. (R. Doc. 243 at 21).

On September 8, 2023, finding that the OJJ broke virtually every promise it had made, the district judge granted Plaintiffs' Second Motion for Preliminary Injunction, enjoined Defendants from housing youth in OJJ custody at BCCY-WF, and ordered Defendants to move the youth from BCCY-WF no later than September 15, 2023. (R. Doc. 257; *see* R. Doc. 267). Defendants appealed the foregoing rulings to the Fifth Circuit. (R. Doc. 259).

On September 15, 2023, Defendants moved the youth housed at BCCY-WF to the Jackson Parish Jail (the facility name used by Plaintiffs) or the Jackson Parish Juvenile Facility (the facility name used by Defendants) in Jonesboro, Louisiana (the "Jackson Facility"). (R. Doc. 229-1 at 1-3; R. Doc. 303 at 2; R. Doc. 303-1 at 1).[6]

On October 16, 2023, the district judge held a hearing, in part, on Plaintiffs' Class Motion for Access to Counsel (R. Doc. 262). In granting this motion, the district judge stated, in relevant part, the following:

> The Office of Juvenile Justice is ordered to promptly facilitate opportunity for class members to have a face-to-face meeting with class counsel;
>
> Consent to meet with class counsel shall be obtained from the class member prior to meeting with class counsel in the following manner. Prior to a meeting with class counsel, the class member shall be informed by one representative of OJJ, in the presence of class counsel, that there is a class action, that the youth is a member of the Class, that the members of the Class are represented by class counsel, that the class member is entitled to meet privately with class counsel but is not obliged to meet with class counsel.
>
> Counsel shall confer to determine which youth are subject to possible transfer to the TTU. All youth presently in a TTU facility are class members and class counsel shall have access to them.
>
> Any further issues related to this process shall be presented to the Magistrate Judge for resolution.

(R. Doc. 293 at 2).

On October 24-25, 2023, Plaintiffs' counsel met with 22 youth at the Jackson Facility. (*See* R. Doc. 299-1 at 3; R. Doc. 303 at 3). It appears that there is no dispute that these 22 youth were previously housed at BCCY-WF and were transferred to the Jackson Facility.

On November 1, 2023, Plaintiffs' counsel requested to meet with the 22 youth, as well as "any other new class members detained at the facility since the last visit to class members" by Plaintiffs' counsel, on November 3. (*See* R. Doc. 299-4 at 5). Defendants denied the request and proposed certain additional restrictions on attorney visits. (R. Doc. 299-4 at 4).

***3** On November 13, 2023, Plaintiffs filed a Motion to Enforce, which sought an order granting Plaintiffs' counsel access to youth in OJJ custody and housed at the Jackson Facility. (R. Doc. 299).

On November 14, 2023, the undersigned held a status conference with the parties. (R. Doc. 302). The undersigned ordered the parties to file briefs addressing, among other things, the scope of the certified class, whether a scheduling order should be entered while the preliminary injunction ruling is on appeal, and whether and to what extent discovery (and access to counsel) should be allowed with respect to the Jackson Facility.

On November 27, 2023, the district judge referred the Motion to Enforce to the undersigned for resolution. That same day, the parties filed the briefs ordered by the undersigned. (*See* R. Docs. 307, 308).

On December 19, 2023, the Fifth Circuit dismissed the appeal as moot because the 90-day preliminary injunctive period under the Prison Litigation Reform Act ("PLRA") automatically expired on December 7, 2023 (or at the latest December 13, 2023), and vacated the district judge's ruling issuing the preliminary injunction. *See* *Smith v. Edwards*, No. 23-30634, 2023 WL 8747492 (5th Cir. Dec. 19, 2023). The Fifth Circuit did not address the scope of the certified class.

On February 7, 2024, the undersigned granted Plaintiff's Motion to Enforce, stating Plaintiffs' counsel shall have access to all youth in OJJ custody, wherever located, in accordance with the default terms of the Youth Services Policy No. C.1.4, which governs attorney visitation. (R. Doc. 299, "Motion to Enforce Order").

On February 12, 2024, Defendants filed the instant Motion for Reconsideration, which seeks reconsideration of the Motion to Enforce to the extent it allows Class Counsel to access youth who were not previously housed at BCCY-WF. (R. Doc. 316). In short, Defendants argue that the class definition cannot include other youths given that Secretary LeBlanc and Secretary Loftin have submitted sworn affidavits providing that "there are no youth who may be transferred to BCCY-WF and there are no youth who may be transferred to a TTU at an 'adult prison.' " (R. Doc. 316-1 at 12; *see* R. Docs. 316-2, 316-3).

In opposition, Plaintiffs argue that motions for reconsideration are disfavored and rarely granted, Defendants have failed to present any newly discovered evidence that merit reconsideration, and Defendants are improperly seeking to limit the class definition through the reconsideration of an order limited to the issue of access to counsel. (R. Doc. 327).

Defendants also moved to stay enforcement of the Motion to Enforce Order (i.e., to preclude Class Counsel from having access to youth at the Jackson Facility who were not previously housed at BCCY-WF) until the resolution of the instant Motion for Reconsideration. (*See* R. Docs. 320). The district judge denied this relief. (R. Doc. 325).

On February 23, 2024, Defendants filed a Motion to Dismiss, which seeks dismissal pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because of mootness. (R. Doc. 322). The arguments raised by Defendants in support of dismissal based on mootness are similar to the arguments raised in the instant Motion for Reconsideration. This Motion to Dismiss remains pending before the district judge.

## II. Law and Analysis

### A. Legal Standards

***4** "[T]he Federal Rules of Civil Procedure do not recognize a general motion for reconsideration." *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997). Nevertheless, the Fifth Circuit has "consistently recognized that such a motion may challenge a judgment or order under the Federal Rules of Civil Procedure 54(b) [or] 59(e)." *Burkette v. E. Feliciana Par. Sheriff*, No. 18-996, 2022 WL 16758256, at *2 (M.D. La. Nov. 8, 2022) (citations omitted). Where, as here the motion for reconsideration concerns an interlocutory order, the appropriate standard to apply is found in Rule 54(b). *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017); *see* *Burkette*, 2022 WL 16758256, at *2 (applying Rule 54(b) standard to motion for reconsideration of ruling granting a motion to quash); *Cook v. Flight Servs. & Sys., Inc.*, No. CV 16-15759, 2019 WL 2067640, at *1 (E.D. La. May 10, 2019) (Rule 54(b) standard applies to reconsideration of interlocutory discovery order).

In pertinent part, Rule 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Unlike with a Motion to Alter or Amend a Judgment brought under Rule 59(e), a court considering the Rule 54(b) standard "is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin*, 864 F.3d at 336 (citations omitted). While Rule 54(b) affords broad discretion to the court to reconsider and reverse interlocutory orders, this "broad discretion must be exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays." *Burkette*, 2022 WL 16758256, at *2 (quoting *Carroll v. SGS Auto. Servs., Inc.*, No. 16-537, 2021 WL 2550278, at *2 (M.D. La. June 22, 2021)).

"Motions for reconsideration are 'extraordinary remed[ies] and should be used sparingly in the interest of finality and conversation of judicial resources.' " *Dixon v. D.R. Horton, Inc. - Gulf Coast*, No. 22-01005, 2023 WL 2486587, at *2 (M.D. La. Feb. 24, 2023) (quoting *Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL-CIO, Loc. 198*, 495 F. Supp. 3d 392, 396 (M.D. La. 2020)). "To the point, a motion for reconsideration is generally *not* the vehicle for raising arguments that could have been raised before the entry of the challenged order." *Dixon*, 2023 WL 2486587, at *2 (citing *Adams*, 495 F. Supp. 3d at 396; *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004)).

**B. Analysis**

Having considered the arguments of the parties, the Court finds no basis to reconsider (or otherwise modify or vacate) the Motion to Enforce Order.

The district judge (1) granted Plaintiffs' Motion for Class Certification and (2) granted Plaintiffs' Class Motion for Access to Counsel. (*See* R. Docs. 243, 293). Plaintiffs then filed a motion seeking to enforce the district judge's order granting access to counsel given that Defendants sought to add additional restrictions on attorney visits and otherwise refused to allow attorney visits with youth who were not previously housed at BCCY-WF. (R. Doc. 299). It is only in the context of determining whether and to what extent Class Counsel could visit youth at the Jackson Facility that the undersigned addressed the scope of the class as defined by the district judge. Based upon a plain reading of the district judge's ruling granting class certification, the undersigned concluded that "individual youths moved directly to the Jackson Facility fall within the scope of the class as defined by the district judge's ruling." (R. Doc. 314 at 6).

***5** Defendants now seek a ruling limiting the certified class to "those youth in OJJ's custody who were previously housed at BCCY-WF." (R. Doc. 316 at 3). To be clear, the undersigned's Motion to Enforce Order did not define, or otherwise modify, the scope of the class in this action. To the extent Defendants are seeking a revised ruling modifying the class in this action, they must seek such relief from the district judge or by appeal as allowed under Rule 23(f). Indeed, whether the purported new facts and evidence presented by Defendants (including the closure of BCCY-WF) have any bearing on the scope of the class in this action (or whether this action should proceed) has been presented to the district judge through Defendants' Rule 12(b)(1) Motion to Dismiss. (*See* R. Doc. 322).

Having considered the arguments of the parties, the Court finds no basis for modifying the determination in the Motion to Enforce Order. Based on the *district judge's certification of the class and the class definition*, the scope of the class includes all youth at the Jackson Facility because the class definition includes youth who "have been, might be, or will be" transferred to BCCY-WF. [7]

Defendants argue that the scope of the class is necessarily limited to those who have already been transferred to BCCY-WF given purported new evidence and facts. Defendants argue that there is no longer any possibility that any juveniles in OJJ custody will be transferred to BCCY-WF in the future because "(1) OJJ closed BCCY-WF and currently has no plans to resume use of BCCY-WF to house youth because OJJ's newly-renovated facility at SCY-Monroe will soon reopen, obviating the need for secure care housing at BCCY-WF; and (2) the Louisiana Department of Corrections ("DOC") has already begun using, and intends to use, the prior BCCY-WF facility to house only adult offenders." (R. Doc. 316-1 at 3) (emphasis added). Defendants submit declarations of Secretary Loftin and Secretary LeBlanc in support of these plans and intentions. (*See* R. Doc. 322-3, 322-4). Among other things, Secretary LeBlanc states that "[f]or the foreseeable future, DOC intends to use the Angola Reception Center [the building on campus at Louisiana State Penitentiary previously occupied by BCCY-WF] for housing only adult inmates." (R. Doc. 322-4 at 1) (emphasis).

The subjective plans and intentions set forth by Defendants do not merit a finding, for the purpose of determining whether Class Counsel should have access to all youth at the Jackson Facility, that youth in OJJ custody are not potentially subject to transfer to BCCY-WF in the future. Furthermore, as stated above, Defendants have raised these very issues in the context of seeking dismissal of this action for lack of subject matter jurisdiction based on mootness. (*See* R. Doc. 322). Defendants' argument that the scope of the class is narrowed in light of post-certification events is best addressed by the district judge in the context of resolving that pending dispositive motion.

***6** The underlying issue addressed in the Motion to Enforce Order was the scope of Class Counsel's visitation rights with respect to youth in OJJ custody at the Jackson

Facility. For the purposes of resolving the instant Motion for Reconsideration, the undersigned concludes that Defendants have not established that the youth located at the Jackson Facility (regardless of whether they were transferred from BCCY-WF) do not face potential transfer to BCCY-WF in the future. Accordingly, Class Counsel shall have access to all youth in the Jackson Facility, in accordance with the Motion to Enforce Order, absent an order from the district judge narrowing the class in this action to exclude all youth in OJJ custody who were not previously transferred to BCCY-WF.

**III. Conclusion**

For the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion for Reconsideration (R. Doc. 316) is **DENIED**. The parties shall bear their own costs.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1122430

## Footnotes

1 Brian B. is now deceased. (R. Doc. 162). Accordingly, Alex A. and Charles C. are the only remaining named "Plaintiffs" in this action.

2 Governor Jeff Landry has been substituted in place of Governor Edwards by operation of law. *See* Fed. R. Civ. P. 25(d).

3 Deputy Secretary Otha "Curtis" Nelson, Jr. has been substituted in place of Deputy Sommers by operation of law. *See* Fed. R. Civ. P. 25(d).

4 OJJ policy defines a TTU as "[a] maximum custody unit for youth described as violent and very aggressive with a documented history of engaging in behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and youth." (R. Doc. 70-3 at 5).

5 The district judge's ruling does not specifically define this class, which was proposed by Plaintiffs. Given that the district judge granted Plaintiffs' Motion for Class Certification, this proposed class definition is the governing class definition.

6 As discussed below, the parties dispute regarding whether the Jackson Facility is an "adult prison" or must be a "TTU" for the purposes of the class definition.

7 The parties have set forth additional arguments with respect to their competing understandings of whether youth who have never been housed at BCCY-WF independently qualify as class members based on being held at the Jackson Facility. Defendants argue that the Jackson Facility (or any other facility holding youth in OJJ custody other than BCCY-WF) must be both an "adult prison" and a "TTU" for the purposes of the class definition. (*See* R. Doc. 316-1 at 3-4, 11-12). Plaintiffs, on the other hand, argue that the Jackson Facility (or any other facility holding youth in OJJ custody other than BCCY-WF) must only be an "adult prison." (*See* R. Doc. 327 at 8 and n. 6). The Motion to Enforce Order provided the parties with an opportunity to conduct limited discovery with respect to whether the Jackson Facility is an "adult prison" and whether it is operating as a TTU. (*See* R. Doc. 314 at 12). The Court need not resolve this dispute for the purposes of the instant ruling because the scope of the class includes all youth at the Jackson Facility given their potential transfer to BCCY-WF.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

2017 WL 3484507
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

DAC SURGICAL PARTNERS P.A., et al., Plaintiffs,
v.
UNITED HEALTHCARE SERVICES, INC., et al., Defendants.

CIVIL ACTION NO. 4:11-CV-1355
|
Signed 08/14/2017

**Attorneys and Law Firms**

Bryan S. Dumesnil, Bracewell LLP, Houston, TX, Robert J. Axelrod, Axelrod & Dean LLP, New York, NY, for Plaintiffs.

John T. Lepore, Charles Chejfec, Kathleen A. Kelley, Kathy P. Josephson, Kathy L. Kottos, Kathleen M. Flannery, Katten Muchin Rosenman LLP, Chicago, IL, Peter J. Shakow, Unitedhealth Group, Minnetonka, MN, Kevin William Yankowsky, Fulbright Jaworski LLP, Houston, TX, for Defendants.

## ORDER AND OPINION

MELINDA HARMON, UNITED STATES DISTRICT JUDGE

***1** Pending before the Court is Plaintiffs' Motion for Reconsideration of the Court's December 8, 2016 Evidentiary Opinion and Order.[1] (Document No. 543). Defendants United Healthcare and Ingenix, Inc. (collectively "United") have filed a Response (Document No. 550), Plaintiffs have filed a Reply (Document No. 552), and United filed a Sur-reply. (Document No. 556). Upon review and consideration of these filings, relevant legal authority, and for the reasons explained below, the Court finds that Plaintiffs' Motion for Reconsideration will be denied.

### Background

On December 8, 2016 this Court entered an order sustaining United's Objections to Magistrate Judge Stacy's Order Denying United's Motion to Strike Declarations and Advantix Records Attached to Plaintiffs' Response to United's MSJ. (Document No. 540).[2] Plaintiffs now object to that Order on various grounds, arguing in their Motion for Reconsideration that declarations from the Doctor Owners (referred to as the "declarations") and Advantix records (referred to as the "call logs") constitute admissible summary judgment evidence. (Document No. 543).

### Standard of Review

The Federal Rules of Civil Procedure do not recognize a general motion for reconsideration. However, courts do rule on motions for reconsideration under Rules 54(b), 59, and 60. *Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 481 (N.D. Tex. 2016). Requests that the court reconsider an interlocutory order fall under Rule 54(b), which states that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." The parties agree that the Court's December 7, 2016 Order and Opinion (Document No. 540) was an interlocutory order which falls under Rule 54(b). (Document No. 543 at 2; Document No. 550 at 5).

In comparison, Rule 59(e) addresses motions "to alter or amend a judgment." "A motion to alter or amend the judgment under Rule 59(e) must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Rosenblatt v. United Way of Greater Hous.*, 607 F.3d 413, 419 (5th Cir. 2010) (alterations and internal quotation marks omitted) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003)). "To prevail on a Rule 59(e) motion, the movant must show at least one of the following: 1) an intervening change in controlling law; 2) new evidence not previously available; 3) the need to correct a clear or manifest error of law or fact or to prevent manifest injustice." *United States v. Saldivar*, No. 2:03-CR-182-2, 2014 WL 357313, at *1 (S.D. Tex. Jan. 31, 2014). Relief under this rule is considered to be extraordinary and "should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (citations omitted).

***2** Some courts have explained that the standard in evaluating a motion to reconsider filed under Rule 54(b) "appears to be less exacting than that imposed by Rules 59 and 60." *In re ProvideRx of Grapevine, LLC*, 507 B.R.

132, 142 (Bankr. N.D. Tex. 2014) (citing *Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F.Supp.2d 550, 552 (N.D. Tex. 2009)). Yet in those cases courts have provided the caveat that, "even so, considerations similar to those under Rules 59 and 60 inform the Court's analysis. That is, considerations such as whether the movant is attempting to rehash its previously made arguments or is attempting to raise an argument for the first time without justification bear upon a court's review of a motion for reconsideration under Rule 54(b)." *Id.* In another case the court explained that "[a]lthough the source of the court's authority to revise or amend an order or judgment is different for interlocutory orders than for final orders or judgments, many of the same policy considerations apply both to motions for reconsideration under Rule 54(b) and to motions for reconsideration under Rule 59(e). Accordingly, district courts (including this court) frequently apply the same standards to the two." *eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp. 2d 745, 748 (E.D. Tex. 2012) (citing *T-M Vacuum Prod., Inc. v. TAISC, Inc.*, No. CIV.A. H-07-4108, 2008 WL 2785636, at *2 (S.D. Tex. July 16, 2008) ("Rule 59(e)'s legal standards are applied to motions for reconsideration of interlocutory orders.")) (other citations omitted). Based on this case law, the Court believes that a standard very similar to Rule 59(e) is appropriate.

Plaintiffs make much of case law which notes that, under Rule 54(b), "the trial court is free to reconsider and reverse its decision [in an interlocutory order] for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds by* *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). However, while this discretion exists, the Court does not believe that it negates the policy reasons behind discouraging motions for reconsideration which rehash the same arguments or, without justification, raise new arguments for the first time. Using an overly generous standard in reviewing motions under Rule 54(b) would reduce judicial efficiency and give parties no incentive to raise all relevant arguments at first consideration of an issue; the fact that the Court retains the power to revise interlocutory orders does not give parties the right to continuously revisit the same issues. *See* *Tolleson v. Livingston*, No. 2:12-CV-201, 2014 WL 1386319, at *2 (S.D. Tex. Apr. 9, 2014) ("[T]his broad discretion [under Rule 54(b) ] must be exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays.") (citing *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1414–15 (5th Cir. 1993)).

The Court believes that several of Plaintiffs' arguments have been raised previously and are not appropriately raised in the Motion for Reconsideration. For the sake of clarity, though, the Court will address parts of Plaintiffs' arguments. *See* *Resolution Trust Corp. v. Holmes*, 846 F. Supp. 1310, 1316 (S.D. Tex. 1994) ("Despite the fact that neither a Rule 59 nor a Rule 60 motion provides the proper vehicle for rehashing old arguments or advancing theories of the case that could have been presented earlier, the court will address each of [plaintiff's] arguments for the sake of clarity of the record.").

**Discussion**

The Court will begin by quoting the first portion of its Order and Opinion, in which the Court wrote that: "As a preliminary matter, the Court agrees that DAC violated the Court's original order by failing to submit a dispositive motion in light of the summary judgment record as it existed on September 3, 2014. (Document No. 480 at 5). On that basis alone the Court would be justified in striking the exhibits." (Document No. 540 at 3). Plaintiffs did not raise this portion of the Order in their Motion for Reconsideration, and for that reason alone Plaintiffs' Motion fails. [3] Regardless of Plaintiffs' other arguments, the fact remains that Plaintiffs violated a Court Order when they submitted the call logs and declarations, and that alone was sufficient reason for the Court to strike the exhibits. Plaintiffs only address this in their Reply, in which Plaintiffs argue that "[a]lthough the Evidentiary Order does state that the Court would be justified in striking the evidence at issue based on Plaintiffs' failure to submit a dispositive motion in light of the summary judgment records as it existed, the Evidentiary Order does not strike the evidence for that reason. Plaintiffs had no reason in their Motion to seek reconsideration of a ruling that the Court did not make." (Document No. 552 at 7-8). To clarify, the Court struck the evidence because of Plaintiffs' violation of the Court's Order; the additional reasons provided by the Court do not negate the fact that the ruling was based on this violation. Plaintiffs otherwise offer no explanation for their disregard of the Court's orders in their briefing and this is fatal to their Motion for Reconsideration.

***3** The Court will also briefly address the arguments which are raised in Plaintiffs' Motion for Reconsideration. Plaintiffs first state that the Court's finding of inadmissibility runs

counter to Fifth Circuit and Texas case law. (Document No. 543 at 3-7) (citing *Hermann Hosp. v. National Standard Ins. Co.*, 776 S.W.2d 249, 252 (Tex. App.—Houston [1st Dist.] 1989, no writ) and *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 385 (5th Cir. 2011)). The Court thoroughly discusses both cases in its Order and Opinion ruling on Plaintiffs' other Motion for Reconsideration (Document No. 573), and will not entirely rehash that reasoning here.

Next Plaintiffs argue that "[t]he Court's Evidentiary Order made a manifest error by striking all of the Doctor Owner Declarations in their entirety. Doing so resulted in the exclusion of portions to which United did not specifically object." (Document No. 543 at 7). This is incorrect. United clearly asked that all of the Doctor Owner Declarations be stricken in their entirety. (*See* Document No. 532 at 7-11; Document No. 532-1 at 1; Document No. 534 at 5 n.4). Therefore this argument fails.

Plaintiffs then argue that the Court's ruling that the declarations are not based on personal knowledge "warrants reconsideration." (Document No. 543 at 8). First, the finding that the declarations were not based on personal knowledge was initially made in the Court's September 3, 2014 Order and Opinion. (Document No. 480 at 3). In that Order the Court denied Plaintiffs' Motion to Supplement the Summary Judgment Record (Document No. 364), finding that the declarations submitted by Plaintiffs were "not based on personal knowledge" and would not be admitted as evidence. (Document No. 480 at 3).[4] Rather than heeding this directive, Plaintiffs then submitted the same declarations as exhibits to their Response to United's Consolidated Motion for Summary Judgment. (Document No. 510). In response to this, United filed a Motion to Strike (Document No. 523), which the Magistrate Judge initially denied. (Document No. 530). This Court overturned the Magistrate Judge's ruling, explaining *again* that the declarations were not based on personal knowledge, and therefore were not proper evidence. (Document No. 540).

The time for objecting to the Court's determination that the declarations were not based on personal knowledge was after the Court's initial ruling in document number 480. Yet instead of filing a motion for reconsideration of that order, Plaintiffs opted to ignore it, filing the declarations despite the Court's specific instructions not to do so. Given this history, the time for reconsideration of that decision has long passed. Plaintiffs have lost their right to complain about this issue. Moreover, the Court's previous Order sufficiently explains that the declarations were not based on personal knowledge. (*See* Document No. 540 at 4-5).

Plaintiffs also argue that the Court's ruling that the declarations are inconsistent with the testimony of the Doctor Owners "warrants reconsideration." (Document No. 543 at 10). Yet this argument contains the same fatal flaw as above. The Court also explicitly determined that the declarations were inconsistent with the Doctor Owners' prior testimony in document number 480.[5] Plaintiffs did not appropriately challenge that initial decision, but instead chose to include the declarations in evidence in violation of the Court's Order. In doing so Plaintiffs have similarly lost their right to argue that the declarations are not inconsistent with the Doctor Owners' prior testimony. Moreover, the Court has also already sufficiently explained that the declarations were inconsistent with the testimony of the Doctor Owners. (*See* Document No. 540 at 5-6).

***4** Lastly, Plaintiffs argue that "the Court's rejection of the call logs because they did 'not connect the contents of the logs to any of the alleged promises made by United to pay for the facility fees at issue' warrants reconsideration." (Document No. 543 at 11). The Court disagrees. As explained before, Plaintiffs have not "connect[ed] the contents of the logs to any of the alleged promises made by United to pay for the facility fees at issue." (Document No. 540 at 8) (citing Document No. 480 at 3). The call logs in question consist of approximately 2,000 pages, and most of the calls recorded do not appear to be categorized as verification calls. To the extent that some records are coded as "ver[6]" it is entirely unclear which calls relate to which Doctor Owner or patient. As stated in the previous opinion, the Court is not required to sift through these voluminous pages in search of instances where United promised to pay for facility fees. Nor does the chart provided by Plaintiffs clarify this issue. It does not point to any pre-procedure promises or representations made by United and contains "inaccuracies [ ] regarding the amount charged and the dates of service." *Id.* at 8-9. Therefore the Court does not believe that reconsideration is appropriate.

## Conclusion

For the reasons discussed above, the Court hereby

ORDERS that Plaintiffs' Motion for Reconsideration (Document No. 543) is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3484507

## Footnotes

1 This Order and Opinion is Document No. 540.

2 Please refer to the Court's Order and Opinion for detailed background information.

3 As explained by United,

When a party moving for reconsideration fails to address one of the court's justifications for its ruling, even if it argues that other justifications for the ruling are erroneous, the order at issue still stands based upon the unaddressed justification. This is so even if the arguments as to the court's other justifications have merit. *See e.g., Patton v. Bryant*, 2014 WL 457921, at *2 (S.D. Miss. Feb. 4, 2014), *aff'd.* 584 Fed.Appx. 242 (5th Cir. 2014) (when plaintiff moving for reconsideration failed to address the court's finding that his claims should be dismissed as barred by a certain precedent, “even if the Court were to find merit in [plaintiff's] other arguments—which it does not—the Court's order of dismissal would still stand on the basis of” the unaddressed precedent); *see also Global Marine Shipping (No. 10) Ltd. v. Finning Intern. Inc.*, 2002 WL 31246548, at *2 (E.D. La. Oct. 4, 2002) (denying motion for reconsideration of court's dismissal of defendant for movant's failure to challenge all of the bases supporting the dismissal).

(Document No. 550 at 5-6).

4 That Order stated: “[t]he Court further agrees with United that the affidavits of the Doctor Owners are not based on personal knowledge.... During their depositions, the Doctor Owners stated that they had no knowledge of United's conversations with Palladium regarding payments or coverage for facility fees. *See* Doc. 406, Ex. 3 and Ex. 4.” (Document No. 480 at 3).

5 As explained previously,

> The Court further agrees with United that the affidavits of the Doctor Owners ... are inconsistent with the Doctor Owners' prior testimony as 30(b)(6) representatives. During their depositions, the Doctor Owners stated that they had no knowledge of United's conversations with Palladium regarding payments or coverage for facility fees. *See* Doc. 406, Ex. 3 and Ex. 4. In addition, the affidavits contradict the Doctor Owners' prior acknowledgement that verifications of coverage are different than promises of payment. *See* Doc. 406, Ex. 7. Courts may disregard an affidavit which contradicts prior testimony from a Rule 30(b)(6) deposition. *Hyde v. Stanley Tools*, 107 F. Supp.2d 992, 993 (E.D. La. 2000) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)).

*Id.*

6 This presumably means “verification.”

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

2016 WL 3365426
Only the Westlaw citation is currently available.
United States District Court, M.D. Louisiana.

ING BANK N.V., Plaintiff,
v.
M/V PORTLAND, IMO NO. 9497854,
Her Engines, Tackle, Equipment, Furniture,
Appurtenances, Etc. in Rem, et al. Defendants.

Case No. 3:15-cv-00805-JWD-RLB
|
Signed 06/16/2016

**Attorneys and Law Firms**

James D. Bercaw, Robert J. Stefani, Laura Elizabeth Avery, King, Krebs & Jurgens, PLLC, Len R. Brignac, King, Leblanc & Bland, PLLC, New Orleans, LA, for Plaintiff.

Gary A. Hemphill, David Joseph Saltaformaggio, Jeremy T. Grabill, Phelps Dunbar, LLP, New Orleans, LA, Gregory T. Stevens, Phelps Dunbar, Baton Rouge, LA, for Defendants.

**ORDER AND RULING ON MOTIONS TO COMPEL DISCOVERY AND SUFFICIENT DISCLOSURES AND TO VACATE RULE B ATTACHMENT**

JOHN W. deGRAVELLES, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

***1** Before the Court is the Motion to Compel Sufficient Disclosures ("Motion for Disclosure"), (Doc. 24), and the Motion to Compel Discovery ("Motion for Discovery") (collectively, "Plaintiff's Motions" or "Relevant Motions"), (Doc. 26), [1] filed by ING Bank N.V. ("ING," "Bank," or "Plaintiff"), and the Motion to Vacate the Rule B Attachment of the M/V Portland and Reduce Security ("Motion to Vacate"), (Doc. 18), filed by Azuline Shipping and Trading Company ("Azuline"). Appearing "specially," "restrictively," and "solely" as the claimant of one *in rem* defendant herein, Portland M/V, IMO No. 9497854 ("Portland"), as well as her engines, tackle, equipment, furniture, equipment, furniture, appurtenances, and every part, Azuline opposes Plaintiff's Motions with the Memorandum in Opposition to ING's Motion to Compel Sufficient Initial Disclosures ("Opposition to Motion for Disclosure"), (Doc. 25), and the Memorandum in Opposition to ING's Motion to Compel Discovery ("Opposition to Motion for Discovery") (collectively, "Azuline's Oppositions"), (Doc. 31). These five motions echo points made in several other filings, including Plaintiff's Motion for Leave to File Verified First Amended Complaint ("Motion to Amend"), [2] (Doc. 39); Plaintiff's First Amended Verified Complaint ("Amended Complaint"), (Doc. 42); and Azuline's Notice of Opposition to ING's Motion for Leave to File Verified First Amended Complaint, (Doc. 43), ("Opposition to Leave"); and Azuline's Answer and Affirmative Defenses to the Verified First Amended Complaint ("Amended Answer"), (Doc. 44). Unlike this matter's substantive law, the single issue raised in the Relevant Motions and presently contested by ING and Azuline (collectively, "Parties") is whether Plaintiff is entitled to discovery into facts supporting the jurisdictional claim, one initially advanced in its first pleading ("Complaint"), (Doc. 1), and further amplified in the Amended Complaint, (Doc. 42), that Portland "was and is beneficially owned, operated and managed by" A.M. Nomikos Transworld Maritime Agencies, S.A. ("Nomikos"), "and is the alter ego of the registered vessel owner, Azuline," (Doc. 26-1). Plaintiff aks this Court to allow it to conduct such discovery, as it is essential to establishing this tribunal's subject-matter jurisdiction ("jurisdictional discovery") and remains questionable only by virtue of Azuline's resistance to Plaintiff's every attempt at uncovering the relationship, if any, between Azuline, the Portland's recorded owner, and Nomikos, this same vessel's purported manager. Azuline, in turn, requests the Court to do the very opposite by granting its Motion to Vacate.

***2** While both Parties rely on a handful of contrary cases, [3] three longstanding principles guide this Court's resolution of this dispute. First, the scope of discovery under the Federal Rules of Civil Procedure [4] is broad, bounded by a few construed limits. Second, whenever a factual question regarding a court's jurisdiction exists, a party is traditionally entitled to receive an opportunity to secure and present evidence related to this threshold issue, and the decision regarding such discovery's appropriateness lies wholly within the relevant trial court's discretion. Third (and relatedly), if such discovery is permitted, it should be circumspectly monitored and tightly demarcated. In general, then, the party is normally allowed to do no more than necessary to verify allegations of specific facts crucial to a federal court's jurisdictional determination. Undeniably, admiralty, the substantive law which governs this suit, often compels the application of unique principles. Nevertheless, these precepts'

retain their potency whenever jurisdictional questions arise at a case's commencement.

Accordingly, having employed these tenets, this Court concludes that, in the Complaint, the Plaintiff has alleged sufficient facts that, if substantiated, would amply support this Court's *in rem* jurisdiction over the Portland and *in personam* jurisdiction over Nomikos, the defendant being sued *in personam* and Azuline's alleged alter ego, allegations properly and effectively augmented in the Amended Complaint. Due to the evident plausibility of Plaintiff's alter ego claims, the Rules, which prioritize the just and efficient adjudication of every action and entitle any party to discovery into any non-privileged matter that is relevant to its opponent's claims or defenses, strongly militate in favor of Plaintiff's invocation of Rule 26, the statutory basis for both the Motion for Disclosures and the Motion for Discovery. This result, in turn, is supported by the overwhelming weight of the jurisprudence construing the Supplemental Rules for Admiralty or Maritime Claims. [5] Though Defendant has offered up a few cases to buttress its response, these opinions are too few in number and too questionable in reasoning to persuade this Court to disregard this venerable axiom.

For these reasons, as discussed more fully below, this Court GRANTS the Motion for Disclosures and the Motion for Discovery and DENIES WITHOUT PREJUDICE Azuline's Motion to Vacate. [6]

## II. BACKGROUND

### A. RELEVANT FACTS

Prior to this suit, O.W. Bunker & Trading A/S and O.W. Bunker China, Ltd. (collectively, "Bunker") made a number of deliveries to three separate vessels: the Portland; the M/V/ Annika N., IMO No. 9514054 ("Annika"); and M/V Melchior, IMO No. 9100102 ("Melchior") (collectively, "Supplied Vessels"). (Doc. 1 at 2–3; Dc. 42 at 2–3.) In the process, Bunker issued invoices to Furness Withy Chartering Ltd. ("Furness"), "Nomikos' broker for the procurement, supply and delivery of bunkers, lubricants and other marine fuel to the Portland and the other Supplied Vessels." (Doc. 1 at 4.) The invoices appended to the Complaint bear this out, as the first two are addressed to "A.M. Nomikos / Transworld Maritime Agencies SA / C/O Furness Withy Chartering Co." (*See, e.g.*, Doc. 1-2 at 1, 5; Doc. 1-3 at 1, 5; Doc. 1-4 at 5.) According to the Complaint, Nomikos had multiple "alter egos," including AMN Bulk Carriers, Inc. and A.M. Nomikos & Sons (UK) Ltd. (Doc. 1 at 11, 13–14; Doc. 42 at 11; *see also* Doc. 16 at 2.) Most relevantly to the case at hand, the Portland was alleged to be "beneficially owned, operated and managed by Nomikos and Nomikos' wholly owned and controlled subsidiary," Azuline, [7] (Doc. 1 at 2, 4; Doc. 42 at 2, 4; Doc. 42 at 3, 4, 18, 19, 20–21), Portland's "registered owner," [8] (Doc. 1 at 4). According to the Demetriades Affidavit, Azuline is a Librarian corporation with a registered office of 80 Broad Street, Monrovia, Liberia, "wholly owned" by Bass Holding SA ("Bass"), another Liberian company located at the same registered office. (Doc. 18-3 ¶¶ 4 –6).

***3** "[A] banking and financial services corporation or business entity organized and existing under the laws of The Netherlands," ING eventually became the "assignee of certain accounts, assets and maritime liens" once owned Bunker. (Doc. 1 at 2; Docs. 1-1, 1-2, 1-3, 1-4; Doc. 42 at 2.) Allegedly, Plaintiff holds the accounts receivables owed by Nomikos for bunkers supplied and delivered to the Subject Vessels. (Doc. 1 at 2; Dc. 42 at 2.) When Bunker defaulted on its $70 million obligation to ING, (Doc. 1 at 3; Doc. 42 at 3), and after it declared bankruptcy, (Doc. 18-2 at 2 –3), pursuant to Section 1333 of the United States Code's twenty-eighth title, [9] Admiralty Rules C and B, and Rule 9(h), ING exercised its discretion to proceed against the Portland *in rem* and Nomikos *in personam.* (Doc. 1 at 6–7; Doc. 42 at 7.) Pursuant to this Court's orders, ING secured the Portland's arrest and attachment, (Docs. 7, 8), and the release of the vessel was secured pursuant to a letter of undertaking given by United Kingdom Mutual Steam Ship Assistance Association (Europe) Limited (UKE), (Doc. 10-1). Subsequently, when ING sought to obtain initial disclosures and further discovery from Nomikos' alleged alter ego, Azuline, (Doc. 24-1 at 1; Doc. 26-1 at 4), after Azuline filed the Motion to Vacate, Azuline refused to supply any information. (*See, e.g.*, Doc. 26-1 at 6–7.) Azuline did so for one apparent reason: as its responses indicate, (Doc. 26-1 at 4–5), the Complaint's purported deficiency under Rule E(2)(a). *See infra* Part II.C.

### B. PROCEDURAL HISTORY

On November 30, 2015, ING filed four documents: the Complaint, (Doc. 1); the Motion for Issuance of a Warrant of Arrest Pursuant to Admiralty Rule C ("Motion for Arrest"), (Doc. 2); and the Motion Authorizing Issuance of a Writ of Attachment and Garnishment Pursuant to Supplemental Admiralty Rule B ("Motion for Attachment"), (Doc. 3); and the Motion to Allow Vessel to Move Within Port ("Motion to Allow"), (Doc. 4). On that same day, this Court granted

the Motion for Arrest, (Doc. 6), the Motion for Attachment, (Docs. 7, 8), and the Motion to Allow, (Doc. 9). This arrest and attachment was released at ING's request on December 3, 2015. (Doc. 10.) Azuline submitted the Notice of Verified Statement of Rights or Interest on December 16, 2015. (Doc. 13.) A scheduling order was entered on December 21, 2015. (Doc. 14.)

On January 21, 2016, Nomikos answered the Complaint. (Doc. 15.) Azuline tendered the Motion to Vacate on March 14, 2016. (Doc. 18.) Plaintiff filed the Motion for Disclosure on March 29, 2016, (Doc. 24); the Opposition to Motion for Disclosure arrived on April 8, 2016, (Doc. 25). The Motion for Discovery came on April 8, 2016, (Docs. 26, 27-1), and Azuline's counter was first filed on April 15, 2016, (Doc. 31), and formally docketed on April 19, 2016, (Doc. 37). In chambers, oral argument was held on April 22, 2016. (Docs. 38, 40.) At this argument's conclusion, the Court afforded Plaintiff an opportunity to request permission to amend the Complaint pursuant to Rule 15. (Docs. 38, 40.) Plaintiff did so on April 27, 2016, (Doc. 39), and the Amended Complaint was entered on April 29, 2016, (Doc. 42). Azuline filed the Opposition to Leave on May 2, 2016. (Doc. 43.) Seventeen days later, Nomikos submitted the Amended Answer. (Doc. 44.)

### C. PARTIES' ARGUMENTS

#### 1. Motion for Disclosure

Plaintiff seeks an order to compel Azuline "to provide sufficient initial disclosures in accordance with ... [Rule] 26(a)(1) as concerns either the production of a copy or the provision of a description of documents and tangible things Azuline has in its possession, custody, or control to support" the Motion to Vacate. (Doc. 24 at 1.) Specifically, ING now demands a copy or adequate description "including but not limited to" the following documents: (1) the agreement between Azuline and Nomikos; (2) Azuline's articles of incorporation; (3) the articles of incorporation of Bass, Azuline's alleged Liberian owner; (3) Azuline's corporate resolutions; (4) Bass' corporate resolutions; (5) Azuline's by-laws; (6) Bass' by-laws; (7) Azuline's tax returns for the last three fiscal years; (8) Bass' tax returns for the same period; and (9) any other documents or tangible things that Azuline will rely on to support its defense that Nomikos is not its alter ego. (*See* Doc. 25-1.) In making this request, Plaintiff characterizes the initial disclosures provided by Azuline on March 23, 2016, as improper under Rule 26(a)(1)(A)(ii) due to Azulein's "failure to either produce a copy of or an adequate description of all documents and tangible things that it may use to support its defenses." (Doc. 24-1 at 2.)

***4** The sole document "Azuline referenced in its Initial Disclosures" was the Demetriades Affidavit. (*Id.*) Yet, even though this lone document "referenced the corporate documents and shareholder information of Azuline and Bass," these documents were never provided; only Demetriades' words were offered to substantiate Azuline's defense. (*Id.* at 2–3.) More support was lacking, as "Demetriade's declaration also referenced an agreement between Azuline and Nomikos concerning the M/V PORTLAND" that has never been provided. (*Id.* at 3.) In light of both this absence of supporting documentation and one declaration's plethora of unverifiable claims, Azuline failed to comply with Rule 26(a)(1)(A)(ii) by having failed to provide any specificity regarding the documents upon which it now relies to support its defense to Plaintiff's alter ego claim. (*Id.*) Contending that Rule 37(a)(4) allows this Court to punish Azuline for "evasive or incomplete disclosure," Plaintiff ends with a request for "an Order, pursuant to Fed. R. Civ. P. 37(a)(3) to compel Azuline to supplement its initial disclosures either to produce a copy of or to provide an adequate description of all documents referenced in Mr. Demetriades' declaration and otherwise falling within the provisions of Fed. R. Civ. P. 26(a)(1)(A)(ii)." (*Id.* at 4.)

In response, Azuline attacks Plaintiff's claims as "premised on the conclusory allegation that Nomikos should be considered the beneficial owner of all three vessels because it is purportedly the alter ego of the actual vessel owners." (Doc. 25 at 1.) In its view, these assertions do not meet Admiralty Rule E(2)(a)'s "requirement that such claims be pled with 'particularity' and ING cannot demonstrate 'probable cause' for its attachment of the PORTLAND." (*Id.* at 2.) Due to this pleading defect, Plaintiff "is not entitled to conduct post-attachment discovery in response to Azuline's Motion to Vacate" so as to "bolster retroactively its alter ego claims and avoid dismissal." (*Id.* at 2 (citing *Oldendorff Carriers GmbH & Co., KG v. Grand China Shipping (Hong Kong) Co.*, No. C-12-074, 2012 U.S. Dist. LEXIS 188347, 2012 WL 3260233, at *8 (S.D. Tex. July 2, 2012)).) In other words, Azuline's opposition to the Motion to Compel is, first and foremost, predicated on the Complaint's apparent inadequacy.

Nonetheless, Azuline maintains that the "initial disclosures are not deficient" and that "parties are not entitled to compel the production of documents in connection with initial disclosures." (*Id.* at 3.) Regardless, it fully complied with

Rule 26(a)(1)(A)(ii), as Rule only requires "that Azuline disclose documents that Azuline may use to support its claims or defenses," not that It provide Plaintiff with "useful" documents. (*Id.* at 4 (emphasis in original) (citing to *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-4527, 2006 U.S. Dist. LEXIS 97208, at *21, 2006 WL 5230033, at *6 (E.D.N.Y. Sept. 29, 2006)).) Even if Azuline had to disclose the requested documents, "Rule 26 only requires Azuline to provide 'a description by category and location' of such documents." (*Id.* at 5.) Azuline contends that " 'a listing of materials by category ... satisfies Rule 26(a)(1)(A)(ii)' "; such a listing it provided. (*Id.*; *see also* Doc. 24-3) The objective of Rule 26(a)(1)(A)(ii) disclosures "is to enable the other parties to make informed decisions about which documents they should request be produced pursuant to Rule 34, and to enable them to frame document requests that will avoid squabbles about wording." (*Id.* at 6 (internal quotation marks omitted) (quoting MILLER ET AL., FED. PRAC. & PROC. CIV. § 2052 (3d ed. 1999)).) For these reasons, Azuline argues that Plaintiff's "motion to compel should be denied." (*Id.* at 6.)

**2. Motion to Compel**

Traceable to the same alleged intransigence behind the Motion for Disclosure, the Motion to Compel "requests this Court enter an order compelling Azuline to respond to ING Bank's written discovery within 7 days." (Doc. 26 at 1.) According to ING, Azuline chose not to comply with Rule 26 when it willfully "did not provide any substantive answer to any of the foregoing written discovery"; "[r]ather Azuline produced a total of 144 pages of objections," in which the same three cases are cited, (Doc. 26-1 at 2, 4 –5.) Azuline's objections, which were primarily that discovery was "premature in light of Azuline's pending Motion to Vacate the Rule B Attachment of the ... PORTLAND and Reduce Security," are contrary to the applicable law, and should be overruled and stricken by the Court." (*Id.* at 2, 5.) In support, Plaintiff first stresses discovery's great breadth and general liberality, so much so that "Parties resisting discovery bear the burden of justifying their objections and bases for not responding to requests." (*Id.* at 5–6 (citing to *Chiasson v. Zapata Gulf Marine Corp.*, 988 F. 2d 513, 517 (5th Cir. 1993), and *McLeod, Alexander, Powel, & Apffel, P.c. V. Quarles*, 894 F. 2d 1482, 1485 (5th Cir 1990)).)

***5** Thereafter, pointing out that the Complaint asserts the Portland "was and is beneficially owned, operated and managed by Nomikos, and is the alter ego of the registered vessel owner Azuline," Plaintiff now seeks no more than crucial information to verify the claims advanced in Demetriades' "self-serving declaration." (*Id.* at 6.) Plaintiff argues that "a substantial amount of the information rests within the sole custody of Azuline, Nomikos, and the other Nomikos alter ego entities, to which ING Bank has directed its foregoing written discovery." (*Id.*; *see also, e.g.*, Doc 1 at 2.) As "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion," Plaintiff merits "an opportunity to obtain adequate discovery," a chance afforded by a number of other courts. (*Id.* at 6–7.) Indeed, while it can cite to numerous opinions, Azuline relies on deeply flawed cases. [10] (*Id.* at 7–9.) Thus, Plaintiff implores this Court to follow a familiar principle —"When a factual question governs the Court's jurisdiction, the Plaintiff must have ample opportunity to secure and present evidence relevant to the jurisdictional question"— and therefore "strike the objection of prematurity, and require Azuline to fully and completely respond to each Request for Admission, Interrogatory, and Request for Production." (*Id.* at 9.) In the end, because its every request bears upon "the alter ego status of Azuline, Nomikos, and the other Nomikos alter egos near the time the M/V PORTLAND was arrested and attached," no other result accords with the Rules and with precedent.

On March 14, 2016, Azuline challenged the sufficiency of ING's alter ego allegations by means of the Motion to Vacate. (Doc. 31 at 2.) Quoting this rule, Azuline asserts: "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing which the plaintiff shall be required to show why the arrest or attachment should not be vacated." (*Id.*) For the attachment not to be vacated, the pleading standard encoded in Admiralty Rule E(2)(a) must be met. (*Id.* at 4 (citing, among others, *United States v. $49,000 Currency*, 330 F.3d 371, 376 n.8 (5th Cir. 2003)).) Per this criterion, "[a] plaintiff must, therefore, do more than simply provide greater detail than it otherwise would be required to do under Rule 8 of the Federal Rules of Civil Procedure." (*Id.* (also citing *Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm.*, 511 F. Supp. 2d 399, 404 (S.D.N.Y. 2007)).) As encapsulated in the Complaint, however, Plaintiff's allegation that Azuline is Nomikos' alter ego will not do, as it is "unsupported by any substantive factual allegations and falls far short of Supplemental Rule E(2)(a)'s requirement that such claims be pled with 'particularity.' " (*Id.* at 2.) Therefore, "it cannot be said that the PORTLAND is the property of Nomikos and the Rule B attachment premised upon that fiction must be

vacated.” (*Id.* at 2, 4 (relying on, among others, *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013)).)

Per Azuline, “Rule E properly places the focus of the post-attachment hearing on the allegations of the complaint.” (*Id.* at 6.) But, as written and docketed, the Complaint simply does not meet its particularity requirement as construed by several courts, including *Vitol*, “[the] leading case on this issue at the circuit level.” (*Id.* at 4–6.) With its first pleading so flawed, having attempted to distinguish Plaintiff's own case law, “ING is not entitled to embark on a fishing expedition in the vain hope that it will discover some evidence to support its alter ego theory.” (*Id.* at 6.) Regardless of discovery's underlying goals, the result that it seeks—denial of ING's discovery motions and the Portland's release—most closely cohere with the “core purpose of Rule E”: while “[v]essel owners have long claimed that the ex parte nature of Rule B attachments violates the procedural due process clause of the Fifth Amendment to the United States Constitution,” “[t]hose challenges have been unsuccessful only because of the procedural protections contained in Rule E.” (*Id.* at 10 (citing *Schiffahartsgesellschaft Leonhardt & Co. V. A. Bottacchi S.A. De Navegacion*, 773 F.2d 1528, 1539 (11th Cir. 1985)).) Simply put, for the same reason it opposed Plaintiff's request for initial disclosures, Azuline now opposes the Motion for Discovery: as a matter of law, Plaintiff is not “entitled to conduct discovery on its alter ego theories in advance of the Court's ruling on Azuline's Motion to Vacate.” (*Id.* at 3.)

## III. DISCUSSION

### A. APPLICABLE LAW

#### 1. Admiralty Statute

***6** In accordance with § 1333(1), any district court has “original jurisdiction, exclusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction” and “[a]ny prize brought into the United States and all proceedings for the condemnation of property taken as prize.” 28 U.S.C. § 1333; *Lozman v. City of Riviera Beach*, 133 S. Ct. 735, 739, 184 L.Ed. 2d 604 (2013); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 748, 181 L.Ed. 2d 881 (2012). With constitutional roots, this statute both grants a district court the authority to grant attachments and arrests in actions *in rem* and provides a sufficient basis for a court taking jurisdiction over alter ego claims relating to the effected vessel. *Flame S.A. v. Freight Bulk Pte Ltd.*, 807 F.3d 572, 582 (4th Cir. 2015) (citing *Swift & Co. Packers v. Companai Columbiana Del Caribe, S.A.*, 339 U.S. 684, 689 n.4, 70 S. Ct. 861, 865 n.4, 94 L.Ed. 1206 (1950)); *see also, e.g.*, *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997); *Atlanta Shipping Corp. v. Chem. Bank*, 631 F. Supp. 335, 341 (S.D.N.Y. 1986). Indeed, the Fifth Circuit has left no doubt about the existence of this power and the jurisdictional nature of this inquiry: as it once wrote, federal courts sitting in admiralty “can pierce the corporate veil of a corporation in order to reach the ‘alter egos’ of the corporate defendant directly involved,” a “heavily fact-specific” analysis. *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157, 1160 (5th Cir. 1981); *accord, e.g.*, *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 21 (1st Cir. 1998); *cf.* *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010) (“[A] court which has jurisdiction over a corporation has jurisdiction over its alter egos.”); *OS Shipping Co. v. Global Mar. Trust(s) Private Ltd.*, No. 11-CV-377-BR, 2011 U.S. Dist. LEXIS 49054, at *14, 2011 WL 1750449, at *6 (D. Or. May 6, 2011) (“Admiralty courts may pierce the corporate veil in order to reach the ‘alter egos’ of a corporate defendant.” (quoting *Chan*, 123 F.3d at 1294)). Of course, “[f]ederal courts sitting in admiralty must apply federal common law when examining corporate identity.” *Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd.*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991); *accord, e.g.*, *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 508–09 (S.D.N.Y. 2012).

As such, when one party articulates an alter ego claim and another attacks it as purportedly insufficient, the extent of a court's admiralty jurisdiction has been placed at issue, and federal common law must be consulted. *Cf., e.g.*, *Sabine Towing & Transp. Co. v. Merit Ventures, Inc.*, 575 F. Supp. 1442, 1446 (E.D. Tex. 1983) (citing *Swift*, 339 U.S. at 689). In addition, the establishment of a non-party's status as an alter ego and the precise import of an alleged agency relationship in attachment matters frequently necessitates resolution of an intensely factual jurisdictional inquiry over which this Court may exercise its constitutional and statutory authority in admiralty cases. *See, e.g.*, *KPI Bridge Oil Singapore PTE Ltd. v. Berlian Laju Tanker Tbk PT*, No.

C 12-00710 WHA, 2012 U.S. Dist. LEXIS 37751, at *10–11 (N.D. Cal. Mar. 20, 2012); *ABN AMRO, Inc. v. Capital Int'l, Ltd.*, 595 F. Supp. 2d 805, 822 (N.D. Ill. 2008). Since a court's jurisdiction over an alter ego is coextensive with its jurisdictional reach over the sham (or dummy) corporation, facts relevant to an alter ego analysis are ineluctably jurisdictional in nature and often clouded at a case's inception. *Cf., e.g.*, *Dolco Invs. Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007); *Wajilam Exports Singapore Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275 (S.D.N.Y. 2006).

**2. Admiralty Rules**

In this substantive area, the Rules and the Admiralty Rules intermingle, occasionally even clashing. *See* SUP. MAR. R. A(2); *United States v. $134,972.32 Seized from FNB Bank, Acct. No. 5351*, 94 F. Supp. 3d 1224, 1229 (N.D. Ala. 2015). Whenever such a conflict emerges, the Admiralty Rules rightly control. SUP. MAR. R. A(1)–(2), G(1); *see also, e.g.*, *Approximately $77,000.00 in U.S. Currency*, 2013 U.S. Dist. LEXIS 179186, at *9 n.2, 2013 WL 6842889, at *3 n.2. Thus, though Azuline cites to Rule 8 and impliedly relies upon the Court's *Twombly* and *Iqbal* decisions, (*See* Doc. 31 at 6 n.14, 9–10), Admiralty Rule E contains the only relevant pleading standard for such actions. [11] *See Vitol*, 708 F.3d at 547. *But see United States v. Vehicle 2007 Mack 600 Dump Truck*, 680 F. Supp. 2d 816, 827 (E.D. Mich. 2010) (citing *United States v. $ 41,580.00*, 253 Fed.Appx. 880, 881–82 (11th Cir. 2007)).

***7** This rule requires that any "complaint ... state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." SUP. MAR. R. E(2)(a). Per the Admiralty Rules' plain text, this unique standard, rather than any other erected by the Rules, applies when a court must pass on the sufficiency of the action concerns, as it does so here, maritime attachment and garnishment. *See, e.g.*, *United States v. 4323 Bellwood Circle, Atlanta, Georgia 30349*, 680 F. Supp. 2d 1370, 1372 (N.D. Ga. 2010) (finding that "the traditional pleading rules are modified by" the Admiralty Rules and applying Admiralty Rule G(2) to determine the sufficiency of the forfeiture complaint); *United States v. $22,173.00 in United States Currency*, 716 F. Supp. 2d 245, 249 (S.D. N.Y. 2010) (finding that Admiralty Rule G(2), rather than Fed. R. of Civ. P. 8, governs the sufficiency of a civil forfeiture complaint); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008) (finding that Supplemental Rule G creates a heightened pleading requirement for civil forfeiture complaints as compared to the Rule 8 standard applicable in other cases). When forfeiture is sought, as a case cited by Azuline itself clarifies, (Doc. 31 at 4–5), it has also been held to require that "a complaint ... allege sufficient facts to support a reasonable belief that ... property is subject to forfeiture," *Vitol*, 708 F.3d at 542; *accord, e.g.*, *U.S. v. Mondragon*, 313 F.3d 862, 865 (4th Cir. 2002); *see also, e.g.*, *United States v. $829,422.42 in United States Currency Seized from Account No. XXXXX2771 at Citibank, N.A.*, No. 3:08CV00914 (DJS), 2009 U.S. Dist. LEXIS 51133, at *14–15, 2009 WL 1743753 (D. Conn. June 18, 2009). Thus, if a defendant can "frame a responsive pleading" without the need for a more definite statement and so long as the pertinent pleading's allegations do not dwell solely in "the realm of the purely speculative," Admiralty Rule E's unambiguous bar has been met and surpassed. *E.g.*, *Vitol, S.A.*, 708 F.3d at 545; *Puerto Rico Ports Auth. v. BARGE KATY-B*, 427 F.3d 93, 105 (1st Cir. 2007); *Monragon*, 313 F.3d at 865. While Rule 8 and Admiralty Rule E may overlap, the latter compels no greater specificity, so says the opinion—the Fourth Circuit's *Vitol*—that Azuline describes as the "leading case this issue at the circuit level," (Doc. 31 at 4). The factual allegations, taken as true, need only support the relevant claim and allow a defendant to launch an investigation and frame a response. *See All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d at 16.

**3. Rules' Fifth Title**

Rule 26 sets forth discovery's basic limits, FED. R. CIV. P. 26, while Rule 1 sets forth the overarching tenets—efficiency and justice—intended to dictate a court's interpretation of any single rule, FED. R. CIV. P. 1. Generally, Rule 26 allows for broad fact discovery into a party's claims and defenses, with courts admonished not to so narrowly apply them "so as to deprive a party of the discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." *Jones v. Forrest City Grocery, Inc.*, No. 4:06CV00944-WRW, 2007 U.S. Dist. LEXIS 19482, at *2 & n.3, 2007 WL 841676, at *1 & n.3 (E.D. Ark. Mar. 16, 2007) (quoting *Trevion v. Celanese Corp.*, 701 F.2d 397, 405 (5th Cir. 1983)). By

precedent, its ambit is circumscribed only by those limitations that "come into existence when the inquiry touches upon the irrelevant" or when a request "encroaches upon the recognized domains of privilege" or offends the balancing test set in Rule 26(b). *Hickman v. Taylor*, 329 U.S. 495, 508, 67 S. Ct. 385, 392, 91 L.Ed. 451 (1947). Pursuant to Rules 1 and 26, discovery should rarely be restricted if ostensibly relevant evidence lies in another's files on the basis of alleged irrelevance or asserted, but unproved, inconvenience. As in all discovery matters, a district court's discretion in demarcating these borders is "broad." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 856 (5th Cir. 2000); *accord, e.g.*, *Belhas v. Moshe Ya'Alon*, 515 F.3d 1279, 1290 (D.C. Cir. 2008). Inevitably, it is case-specific.

## B. APPLICATION

***8** In light of the foregoing principles, Plaintiff's Motions must be granted for two reasons. First, admiralty law's bare precedent supports Plaintiff's Motions, a position equally consistent with the pro-discovery mandate encoded in Rules 1 and 26. Second, the cases cited by Azuline in its response to Plaintiff's Request for Production, (Doc. 26-1), and whose conclusions it now implores this Court to adopt, (*See, e.g.*, Docs. 26, 31), do not fit this case's particular set of facts. Once these differences are uncovered, not one of these non-binding cases can be deemed wholly dispositive or convincing. For these two causes, with this Court's jurisdiction at issue and with discovery having been impeded by Azuline's ambiguous responses, this Court will honor the Rules' animating objectives: "Rule 26 must be read in light of its dual purposes of narrowing the issues and eliminating surprise." *McHugh v. Olympia Entm't, Inc.*, 37 Fed.Appx. 730, 735 (6th Cir. 2002); *see also, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Parnon Energy, Inc.*, 593 Fed.Appx. 32, 36 (2d Cir. 2014) ("Relevance to the subject matter under Rule 26 is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." (internal quotation marks omitted) (quoting *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 2389, 57 L.Ed. 2d 253 (1978))); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) ("The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad."); *Teichgraeber v. Memorial Union Corp. of Emporia State Univ.*, 932 F. Supp. 1263, 1265 (D. Kan. 1996) ("Discovery relevance is minimal relevance, which means it is possible and reasonably calculated that the request will lead to the discovery of admissible evidence." (citation omitted) (internal quotation marks omitted)). [12]

### 1. Sufficiency of the Complaint and the Propriety of Jurisdictional Discovery

In specifying the general limits for jurisdictional discovery in and outside of admiralty law's purview, the vast majority of federal courts have reached the exact same conclusion: "When ... there is ... a factual question regarding a district court's jurisdiction, the district court must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Hansen v. PT Bank Negara Indon.*, 601 F.3d 1059, 1063–64 (10th Cir. 2010) (citing *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000), as to a foreign sovereign's entitlement to immunity); *see also, e.g.*, *Toys R Us., Inc. v. Step Two*, 318 F.3d 446, 456 (3d Cir. 2003) (affirming the principle that "courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous" and collecting cases so concluding); *Raccoon Recovery, LLC v. Navoi Mining & Metallurgical Kombinat*, 244 F. Supp. 2d 1130, 1141 (D. Colo. 2002) (noting that a district "court has discretion to permit limited discovery with respect to jurisdictional issues"); *Gould, Inc. v. Pechiney Ugine Kuhlman*, 853 F.2d 445, 451 (6th Cir. 1988) (same); *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (same). The Fifth Circuit has itself described this juridical obligation in the same terms. *Box v. Dallas Mexican Consulate Gen.*, 487 Fed.Appx. 880, 884 (5th Cir. 2012); *see also, e.g.*, *McAllister v. FDIC*, 87 F.3d 762, 766 (5th Cir. 1996) ("When a district court makes factual determinations decisive of a motion to dismiss for lack of jurisdiction, it must give plaintiffs an opportunity for discovery and a hearing that is appropriate to the nature of the motion to dismiss"); *cf. Intelsat Global Sales & Mktg. Ltd. v. Cmty. of Yugoslav Posts Tels. & Tels.*, 534 F. Supp. 2d 32, 34 (D.D.C. 2008) ("[A] court should allow for limited jurisdictional discovery if a plaintiff shows a non-conclusory basis for asserting jurisdiction and a likelihood that additional supplemental facts will make jurisdiction proper."). Naturally, convinced by this overwhelming body of case law, court after court has authorized such precisely focused discovery in admiralty cases. *See, e.g.*, *China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*, 882 F. Supp.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2d 579, 588 (S.D.N.Y. 2012); *Res. Marine Pte, Ltd. v. Solym Carriers (London) Ltd.*, No. 2:12-cv-2554-JAM-GGH, 2012 U.S. Dist. LEXIS 179820, at *8, 2012 WL 6628966, at *3 (E.D. Cal. Dec. 19, 2012) (extending the general rule, as stated in *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003), to maritime attachment cases); *Oldendorff Carriers GmbH & Co. KG v. Grand China Shipping (Hong Kong) Co. Ltd.*, No. C-12-74, 2012 U.S. Dist. LEXIS 145949, at *4–5 (S.D. Tex. Oct. 10, 2012); *Kite Shipping LLC v. San Juan Navigation Corp.*, No. 11cv02694 BTM (WVG), 2012 U.S. Dist. LEXIS 96199, at *19–21, 2012 WL 4049936, at *6–7 (S.D. Cal. Sept. 13, 2012); *KPI Bridge Oil Singapore PTE Ltd.*, 2012 U.S. Dist. LEXIS 37751, at *10–11. Indeed, when one party has denied this principle's application in an Admiralty Rule E(4)(f) proceeding, courts have not hesitated to reject this position. *See, e.g., KPI Bridge Oil Singapore PTE Ltd.*, 2012 U.S. Dist. LEXIS 37751, at *12 –13 (finding that an alter ego claim has been alleged with sufficient detail to trigger a right to jurisdictional discovery when the complaint stated that one entity had been "dominated and controlled" by another); *cf. Equatorial Marine Fuel Mgmt. Servs. PTE v. MISC Berhad*, 591 F.3d 1208, 1209–10 (9th Cir. 2010) (declining to consider a plaintiff's new contention that an agency relationship had existed).

***9** Two other patterns can be discerned in case after case. First, many courts have passed upon the merits of Admiralty Rule E motions to vacate only after they first provided the party asserting jurisdiction with just such an opportunity. *See, e.g., Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat*, No. 09-3292 (JBS-AMD), 2010 U.S. Dist. LEXIS 5936, at *10–11, 2010 WL 33806, at *3–4 (D.N.J. Jan. 26, 2010)*Sea Vill. Marina, LLC v. A 1980 Carlcraft Houseboat*, No. 09-3292 (JBS-AMD), 2010 U.S. Dist. LEXIS 5936, at *10–11, 2010 WL 33806, at *3–4 (D.N.J. Jan. 26, 2010); *OS Shipping Co. v. Global Mar. Trust(s) Private Ltd.*, No. 11–CV–377–BR, 2011 U.S. Dist. LEXIS 49054, at *2–3, 2011 WL 1750449, at *1–2 (D. Or. May 6, 2011); *Hawknet Ltd. v. Overseas Shipping Agencies*, No. 07 Civ. 5912(NRB), 2009 U.S. Dist. LEXIS 44023, at *5, 2009 WL 1309854, at *2 (S.D.N.Y. May 6, 2009). Second, while jurisdictional discovery may always be denied, the existence of a reasonable possibility of finding sufficient proof can often tip the scale in its favor. *See Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982). Arguably, it may even be required in such circumstances. *Id.* (affirming the denial of discovery on questions of personal jurisdiction where the discovery sought could not have added any significant facts).

Here, the Complaint, both as filed and as supplemented by the Amended Complaint, passes Rule E's standard. Admittedly not the most detailed of pleadings, the Complaint did proffer factual allegations that, if believed, as this Court is required to do for purposes of Admiralty Rule E, would tend to establish Azuline's status as an alter ego of Nomikos. In particular, the Plaintiff has alleged that Azuline is under the "direct control and management of Nomikos," that the various entities are "controlled and operated by the same managers and executives," and that Nomikos is the true (and only) "beneficial owner." (*See, e.g.*, Doc. 1; Doc. 26-1.) Attachments to the Complaint, meanwhile, suggest that Nomikos operated under multiple corporate guises. (*See, e.g.*, Doc. 1-2, 1-3, 1-4.) Under applicable federal common law, such indicia of shared control and such domination are two of the many factors considered in establishing an artificial entity's status as another's mere alter ego. *See, e.g., Vitol, S.A.*, 708 F.3d at 544; *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853, 859 (9th Cir. 1986). Unsurprisingly, therefore, such allegations have been held adequate enough to trigger a constricted period of jurisdictional discovery. *See, e.g., KPI Bridge Oil Singapore PTE Ltd.*, 2012 U.S. Dist. LEXIS 37751, at *12 –13.

True, these factual allegations may be "conclusory," as Azuline asserts in the Opposition. (Doc. 31 at 3.) However, while this characterization may be fatal for purposes of Rule 56, it is not under Admiralty Rule E, for this Court must accord the presumption of truth to these allegations. [13] *See, e.g., 829,422.42 in United States Currency Seized from Account No. XXXXX2771 at Citibank, N.A.*, No. 3:08CV00914 (DJS), 2009 U.S. Dist. LEXIS 51133, at *14–15, 2009 WL 1743753; *United States v. $79,321*, 522 F. Supp. 2d 64, 68 (D.D.C. 2007). Standing alone, the Complaint's allegations suggested the existence of Azuline as a dummy and a sham, telltale indicia of an alter ego claim; Azuline promptly recognized as much in the Motion to Vacate, (*See* Doc. 18-1 at 5), without impairing its ability to answer, (Doc. 15). *See, e.g., United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, (D.D.C. 2013) ("At the pleading stage, [per Rule E] it suffices for the government to simply allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation."). As such, the Complaint, as now supplemented by the Amended Complaint, are more than

sufficient to establish ING's entitlement to limited discovery as to Azuline's plausible status as a sham corporation. In fact, as this case's docket well shows, the Complaint surely allowed Defendant to "frame a responsive pleading" on both its own and Nomikos' behalf as well as file a credible motion to vacate, thereby satisfying Admiralty Rule E's particularly standard. SUP. MAR. R. E(2)(a); *Vitol*, 708 F.3d at 545. In finding the Complaint sufficient for the present and ordering further discovery into a single jurisdictional issue, this Court does no more than adhere to a well-settled principle—"[T]he district court must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction," *Hansen*, 601 F.3d at 1063–64—endorsed by the Fifth Circuit in a most persuasive opinion, *Box*, 487 Fed.Appx. at 884.

***10** Significantly, this decision both to recognize the temporary viability of a satisfactory pleading and to authorize discovery into a key issue, rather than to dismiss a complaint for a mere formalistic or technical defect, is buttressed by two other facts. First, so as to counter Plaintiff's allegations, Azuline has so far presented nothing but the unsworn declaration of a man over whom this Court has no apparent jurisdiction, a hodgepodge of eighteen paragraphs that references sundry other documents and expects court and party to assume the veracity of those unsupported assertions. [14] (Doc. 18-3.) When sharply managed discovery may allow this Court to conclusively confirm—or decisively negate—its jurisdiction, and when a complaint has made a colorable jurisdictional claim, justice and logic caution against denying jurisdiction on the basis of such unbacked evidence.

Second, jurisdictional discovery is no party's right. *Freeman v. United States*, 556 F.3d 326, 342 (5th Cir. 2009) ("A party is not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion"). However, it is normally disfavored in similar circumstances only "where discovery would be unnecessarily burdensome or futile." *Wright v. N.J./ Dep't of Educ.*, 115 F. Supp. 3d 490, 497 (D.N.J. 2015). Yet, Azuline, a party's undisputed owner, has so far steadfastly refused to provide Plaintiff with more than a list of vague categories and 144-pages worth of objections. Had some documentation and more than a scintilla of evidence been exchanged demonstrating the fancifulness of ING's alter ego claim, this Court may have denied the validity of Plaintiff's discovery requests. In such a situation, a finding of futility or onerousness would be anchored in more than a defending entity's assertion. But, having nothing to examine and forced to depend purely on Azuline's mostly undisturbed silence, this Court cannot determine whether such discovery would be "unnecessarily burdensome" or "futile to [P]laintiff's cause." *See, e.g.*, *Everything Yogurt Brands, LLC v. M.A.R. Air Foods, Inc.*, No. 09-4847, 2009 U.S. Dist. LEXIS 94601, at *4–5, 2009 WL 3260629, at *2 (D.N.J. Oct. 9, 2009); *Brownstein v. N.Y.U. Med. Ctr.*, No. 94-907, 1994 U.S. Dist. LEXIS 16760, at *20, 1994 WL 669620, at *6 (D.N.J. Nov. 22, 1994). In such cases, the better policy is to allow discovery, whether Admiralty Rule E or Rule 8 applies. *See, e.g.*, *McAllister*, 87 F.3d at 766; *China Nat'l Chartering Corp*, 882 F. Supp. 2d at 588. So the Rules themselves suggest. *See, e.g.*, *Teichgraeber*, 932 F. Supp. at 1265.

**2. Azuline's Insufficient Case Law**

Conversely, not one of the cases cited by Azuline in Opposition to Motion for Discovery, (Doc. 31 at 5), and the Opposition to Motion for Disclosure, (Doc. 26; *see also* Doc. 26-1 at 4–5), persuade this Court to reject this precedent's directions. To Azuline, each case recognizes "that a plaintiff is not entitled to bolster its case for an attachment by conducting post-attachment discovery." (Doc. 31 at 5.) Once each opinion is carefully read and its procedural posture is diligently examined, however, its inapplicability to this proceeding is apparent.

Again and again, Azuline cites to one opinion, ignoring its pointed history: *Oldendorff Carriers GmbH & Co. KG v. Grand China Shipping (Hong Kong) Co. Ltd.*, C.A. No. C-12-074, 2012 U.S. Dist. LEXIS 188347, 2012 WL 3260233 (S.D. Tex. July 2, 2012). As ING rightly notes, (Doc. 26-1 at 7–9), this decision was specifically overturned by the district court, at which time the latter tribunal authorized precisely the kind of jurisdictional discovery that the Plaintiff now seeks. 2012 U.S. Dist. LEXIS 145949, at *4–5 (S.D. Tex. Oct. 10, 2012). Pivotally here, this decision, not the Magistrate Judge's analysis, has ample support in the relevant jurisprudence. *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007). As the Fifth Circuit once advised, not even "the tension between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery" should dissuade a court from compelling discovery if it can

"be ordered circumspectly and only to verify allegations of specific facts crucial to ... [that jurisdictional] determination." *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992). In deciding this jurisdictional question—whether Azuline is Nomikos' alter ego and thus subject to this Court's jurisdiction under § 1333—this Court agrees.

***11** Azuline's second case, *Unitas Fin. Ltd. v. Di Gregorio Havegacao Ltda.*, No. 99-1233 JCLLIFLAND, 1999 WL 33116415 (D.N.J. Nov. 8, 1999), is legally and factually distinct from the present matter. First, this decision was ultimately based on "Third Circuit law" stating that the garnishees' status as insurers alone cannot form a basis to attach their accounts unless and until plaintiffs are able to demonstrate that some debt is owed to defendant. *Id.* at *2. As such, while controlling law forbade attachment in the absence of any other evidence in *Unitas*, Azuline has not claimed that such an absolute rule governs here. Second, the plaintiff there had failed to "suggest or demonstrate" that it had sought relevant discovery "from the garnishees during the five months of attachment that preceded" their conclusory affidavit; hence, it made "no showing to this Court of any efforts to obtain information regarding the insurance policies from defendants or garnishees nor do they attest that garnishees have blocked any efforts at discovery." *Id.* at *4. In contrast, ING has long sought such discovery, only to be impeded by Azuline's documented resistance.

The next decision cited by Azuline, *Mason Agency Ltd. v. Eastwind Hellas SA*, No. 09 Civ. 6474 (DLC), 2009 U.S. Dist. LEXIS 91305, 2009 WL 3109821 (S.D.N.Y. Sept. 29, 2009), is also pointedly dissimilar. In this New York case, the plaintiff had relied purely on three contractual and quasi-contractual arguments; by its own choice, the plaintiff had thusly cabined its own allegations and disavowed any other claim. Presented with such a focused complaint, the district court predicated its decision on the "undisputed" fact that the relevant contract contained no reference whatsoever to the defendant. *Id.* at *8. Here, ING had imperfectly articulated an alter ego claim in the Complaint, an allegation that is doctrinally independent of any particular contract and state body of law and that has now been supplemented by its second pleading. (*See, e.g.*, Doc. 1 at 2; Doc. 42 at 18.)

Azuline's final case, *Deiulemar Shipping SPA v. Probulk Carriers Ltd.*, 348 Fed.Appx. 608 (2d Cir. 2009), is simply inapposite, its import oversold. In this unpublished decision upholding the district court's denial of a request for jurisdictional discovery, the Second Circuit did not, as Azuline now asserts, recognize that "a plaintiff is not entitled to bolster its case for an attachment by conducting post-attachment discovery," (Doc. 31 at 6). Instead, the Second Circuit there did no more than affirm a lower court's decision, under the generous abuse of discretion standard, choosing not to authorize such discovery. *Deiulemar*, 348 Fed.Appx. at 609. As such, no definite prohibition on such discovery was mentioned, much less endorsed; the decision not to authorize such an undertaking was alone affirmed. Additionally, as this three-paragraph opinion intimates, some discovery had, in fact, taken place prior to the relevant motion's tendering. *Id.* The district court thus possessed a record which allowed it to reach a number of factual conclusions to which the circuit court applied the clearly-erroneous standard and chose not to order "*further* discovery," not *all* discovery. *Id.* (emphasis added). Because it is the latter that Azuline has attempted to foreclose with its discovery responses, *Deiulemar* is readily distinguishable.

## IV. CONCLUSION

Analyzed holistically, the Complaint and Amended Complaint's alter ego claims as to Azuline satisfy Admiralty Rule E(2)(a), thereby obviating the basis of Azuline's Motion to Vacate. Nonetheless, as Azuline has credibly raised questions about this Court's jurisdiction, and before this Court can decide these crucial threshold questions, precedent requires that ING be given an opportunity to conduct the very discovery that Azuline itself has hindered. Accordingly, this Court **GRANTS** ING's Motion to Compel Sufficient Disclosures, (Doc. 24), and the Motion to Compel Discovery, (Doc. 26), and **DENIES WITHOUT PREJUDICE** Azuline's Motion to Vacate the Rule B Attachment of the M/V Portland and Reduce Security, (Doc. 18). So as to ensure this discovery is properly limited, on or before **11:59 a.m.** on **July 5, 2016**, the Parties are to submit a joint schedule for limited discovery as to ING Bank's alter ego claim, as encapsulated in the Amended Complaint, and Azuline is ordered to provide the Plaintiff with the initial disclosures specified in ING's Motion to Compel Sufficient Initial Disclosures on or before **July 5, 2016**, at **11:59 a.m.**

Signed in Baton Rouge, Louisiana, on June 16, 2016.

### All Citations

Not Reported in Fed. Supp., 2016 WL 3365426

## Footnotes

1 On April 8, 2016, the originally filed Motion for Discovery was replaced by another. (Doc. 28.) Citations to Document Number 26 are to the swapped variant.

2 Federal Rule of Civil Procedure 15 "sets forth the applicable procedural mechanism for amending a complaint." United States v. Approximately $77,000.00 in U.S. Currency, No. 1:11-cv-01251 GSA, 2013 U.S. Dist. LEXIS 179186, at *9, 2013 WL 6842889, at *3 (E.D. Cal. Dec. 20, 2013). According to its first paragraph, "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or ... if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15(a)(1); *Dueling v. Devon Energy Corp.*, 623 Fed.Appx. 127, 128 (5th Cir. 2015). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," and a court "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). For two different reasons, as stated by this Court at the conference held on April 22, 2016, (Doc. 41), and as asserted in the Motion to Amend, (Doc. 39), this Court granted the Motion to Amend. First, as Azuline itself has never answered, the twenty-one day timespan set in Rule 15(a)(1) has not yet commenced. Second, even if this watch had run by virtue of the filing of either Nomikos' answer, (Doc. 15), or Azuline's Motion to Vacate, (Doc. 18), Rule 15(a)(2) "evinces a bias in favor of granting leave to amend." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Thus, "unless there is a substantial reason, such as undue delay, bad faith, dilatory motive, or undue prejudice to the opposing party, the discretion of the district court is not broad enough to permit denial." *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Co.*, 195 F.3d 765, 770 (5th Cir. 1999) (citations omitted) (internal quotation marks omitted). The Court found no such motives or undue burden in light of, among other matters, Plaintiff's general promptness and Azuline's refusal to permit even minimal discovery and evident ability to mount a credible defense.

3 Admirably, Defendant's counsel acknowledged the paucity of case law during this Court's April conference.

4 In this order and ruling ("Ruling"), any and all references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

5 In this Ruling, any and all references to "Admiralty Rule" or "Admiralty Rules" are to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture, technically amendments to the Rules themselves.

6 Naturally, Azuline may freely refile this motion upon the conclusion of the Parties' limited discovery. Plaintiff's failure to substantiate its allegations after such discovery may indeed prove fatal to the Portland's continued attachment.

7 The Answer was jointly filed by Nomikos and Azuline. (Doc. 15; Doc. 16 at 2.)

8 In an "unsworn" affidavit attached to the Motion to Vacate ("Demetriades Affidavit"), (Doc. 18-3; Doc. 24-5), Mr. Christophoros Demetriades ("Demetriades"), "the sole director of Azuline," attempts to parry these allegations with detail. (Doc. 18-1 at 11; Doc. 18-3 ¶ 8.) For example, Demetriades avers that Azuline had no more than a contractual relationship and shares no corporate office with Nomikos and that Nomikos has no involvement in Azuline's "incorporation" or "day-to-day corporate operations." (Doc. 18-3 ¶¶ 9–13.) He concludes with a legal assertion: "Azuline and Nomikos are completely separate corporate entities with independent corporate existences." (*Id.* ¶ 16.)

9 In this Ruling, any and all references to "Section 1333" or "§ 1333" are to this particular section of the Title 28 of the United States Code.

10 These cases are dissected later in this Ruling. *See infra* Part III.B.2.

11 Crucially, the standard for dismissal remains the same, as the Admiralty Rules contain no specialized criterion.

12 While the Rules were amended effective December 1, 2015, the relevance standard for discovery has not changed. Instead, the proportionality factors once set in Rule 26(b)(2)(C) have now been moved into Rule 26(b)(1) so as to reemphasize the fact that evidence's discoverability is subject to the proportionality test first adopted in 1983. Relevance itself, a discrete and separate yet oft-merged requirement, remains a relatively low threshold.

13 Tellingly, Azuline's own position—that "none of the registered owners are alter egos of Nomikos," (Doc. 18-1 at 4), echoed throughout Azuline's Oppositions—is itself conclusory.

14 In a revealing, if not directly applicable, example, when only such supported affidavits exist and personal jurisdiction must be confirmed, a "plaintiff usually bears only a prima facie burden," *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015); *accord* *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005).

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

KeyCite Yellow Flag
Distinguished by Vanguard Soap, LLC v. Certain Underwriters At Lloyd's, London, W.D.Tenn., November 1, 2022

2020 WL 1532323
Only the Westlaw citation is currently available.
United States District Court, M.D. Tennessee, Nashville Division.

John J. SHUFELDT, M.D., Plaintiff,
v.
BAKER, DONELSON, BEARMAN, CALDWELL AND BERKOWITZ, P.C., Defendant.

Case No. 3:17-cv-01078
|
Field 03/31/2020

**Attorneys and Law Firms**

August Carl Winter, Brentwood, TN, for Plaintiff.

D. Gil Schuette, Mark W. Lenihan, Michael R. O'Neill, Robert A. Peal, W. Scott Sims, Sims Funk, PLC, Nashville, TN, for Defendant.

## MEMORANDUM ORDER

ALISTAIR E. NEWBERN, United States Magistrate Judge

***1** Plaintiff Dr. John J. Shufeldt is the founder of NextCare, Inc., and the former CEO of NextCare Holdings, Inc. (collectively, NextCare). (Doc. No. 72.) In February 2013, Shufeldt retained Defendant Baker, Donelson, Bearman, Caldwell and Berkowitz, P.C., (Baker Donelson) to investigate whether NextCare had unlawfully diluted and devalued Shufeldt's shares in the companies and thereby breached their fiduciary duty to him. (*Id.*) Shufeldt sued NextCare in Arizona state court in October 2015 and ultimately settled his claims. (*Id.*) In this action, Shufeldt alleges that Baker Donelson committed legal malpractice by allowing Shufeldt's claims against NextCare to become time-barred during the course of its representation, resulting in Shufeldt being forced to accept a significantly devalued settlement of the Arizona action. (*Id.*)

Now before the Court are four motions to compel discovery, two filed by Shufeldt (Doc. Nos. 78, 99) and two filed by Baker Donelson (Doc. Nos. 77, 98). For the reasons offered below, Baker Donelson's first motion to compel (Doc. No. 77) will be found moot; Shufeldt's first motion to compel (Doc. No. 78) will be granted in part and found moot in part; Baker Donelson's second motion to compel (Doc. No. 98) will be granted in part and denied in part; and Shufeldt's second motion to compel (Doc. No. 99) will be granted in part and denied in part.

## I. Background

### A. Factual History [1]

On February 11, 2013, Shufeldt retained Baker Donelson to obtain corporate documents from NextCare and investigate potential breach-of-fiduciary-duty claims against it. (Doc. No. 72.) Through Baker Donelson, Shufeldt sent a demand letter to NextCare requesting production of corporate records under applicable Delaware law. (*Id.*) After NextCare refused, Baker Donelson prepared a second demand letter. (*Id.*) Seven months later, on October 18, 2013, Baker Donelson informed Shufeldt that it had not sent the second demand letter. (*Id.*) Baker Donelson did not begin to research the statute of limitations applicable to Shufeldt's claims until September 26, 2014, when Shufeldt explicitly asked the lawyers to do so. (*Id.*) Shufeldt alleges that his claims against NextCare expired during the course of Baker Donelson's representation due to Baker Donelson's negligence. (*Id.*)

Shufeldt filed suit against NextCare in Arizona state court on October 7, 2015. (Doc. Nos. 77, 80.) As expected, NextCare argued that Shufeldt's claims were time-barred. (Doc. No. 72.) Shufeldt settled his claims with NextCare before the Arizona court resolved the question of whether his claims were timely. (*Id.*) In this action, Shufeldt seeks compensatory damages from Baker Donelson, including what he paid for work negligently performed and the reasonable attorney's fees he incurred in this action and the Arizona action. (*Id.*)

### B. Procedural History

There are two sets of cross-motions to compel before the Court. The Magistrate Judge authorized the filing of these motions after holding telephone conferences with counsel for the parties. The motions to compel are summarized below. [2]

#### 1. Baker Donelson's First Motion to Compel

***2** Baker Donelson's first motion to compel addresses Shufeldt's alleged failure to adequately invoke attorney-client and settlement privileges in objecting to Baker Donelson's discovery requests. (Doc. No. 77.) Shufeldt agreed to supplement his discovery responses and provide a log of any documents withheld because of an asserted privilege after a telephone conference with the Magistrate Judge. (*Id.*) Baker Donelson argues that the one-page privilege log that Shufeldt provided is inadequate and that Shufeldt has therefore waived any privileges he could assert. (*Id.*) Shufeldt responds that he had unsuccessfully attempted to confer with Baker Donelson regarding the form of the privilege log, which, Shufeldt insists, is adequate. (Doc. No. 80.) Further, Shufeldt states that he is continuing to collect responsive documents and has no objection to an order requiring the parties to supplement their discovery responses. (*Id.*) In an updated response, Shufeldt states that he is willing to provide an item-by-item privilege log of all materials predating the filing of the Arizona action he claims are privileged. (Doc. No. 99.)

Baker Donelson also seeks an order compelling Shufeldt to adequately respond to several interrogatories and requests for production of documents (RFPs). (Doc. No. 77.) Interrogatories 21 through 23 concern the NextCare transactions that were the foundation of Shufeldt's breach-of-fiduciary-duty claims in the Arizona action. (*Id.*) Interrogatory 25 requests information about Shufeldt's communications with other attorneys prior to filing the Arizona action. (*Id.*) RFP 23 addresses Shufeldt's communications with non-Baker Donelson attorneys regarding the statute of limitations applicable to his claims against NextCare. (*Id.*) RFPs 24 and 32 seek other documents referencing that statute of limitations and RFP 30 concerns Shufeldt's settlement of his claims. (*Id.*)

### 2. Shufeldt's First Motion to Compel

Shufeldt's first motion to compel concerns a memorandum that Baker Donelson attorney Patton Hahn prepared regarding the statute of limitations applicable to Shufeldt's claims against NextCare. (Doc. Nos. 78, 79.) According to Shufeldt, he received two versions of this memo in 2014. (Doc. No. 79.) Hahn first emailed the memo to Shufeldt on the evening of October 1, 2014, in a searchable Microsoft Word format. (*Id.*) The footer of the memorandum showed a date of May 7, 2014, and the document's metadata shows that it was last printed on that date. (*Id.*) Hahn emailed Shufeldt a revised version of the memo on October 2, 2014, in a different format that was not searchable. (*Id.*) The date shown in the footer of the second version of the memo is October 2, 2014. (*Id.*) Shufeldt claims that Hahn inadvertently left the May 7, 2014 date in the footer of the first memo he sent to Shufeldt and changed the date to October 2, 2014, in the second version to hide that he had delayed completing the memo for almost five months. (*Id.* at PageID# 858.)

Shufeldt asserts that Baker Donelson's alteration of the memorandum continued during discovery in this action. (Doc. No. 79.) Shufeldt alleges that one version of the memo produced in discovery contained no footer; the footer of the second document showed a date of October 2, 2014. (*Id.*) Accordingly, Shufeldt seeks an order requiring Baker Donelson to produce all of its documents in native format so that he can "determine the extent of [Baker Donelson's] alterations and spoliation ...." (*Id.* at PageID# 859.)

In response, Baker Donelson offered to investigate the alleged alteration of the memo. (Doc. No. 81.) Baker Donelson then filed a supplemental opposition to Shufeldt's first motion to compel, stating that it had investigated the issue and Shufeldt's allegation of spoliation was without merit. (Doc. No. 86.) Baker Donelson attached the affidavit of its counsel explaining that the inconsistencies among versions of the memorandum are attributable to errors that occurred during document production and printing. (Doc. No. 86-1.) Baker Donelson further states that it has reproduced its original document production to provide all documents in native format with accompanying metadata. (Doc. No. 98.) Shufeldt responds that he has not received the versions of the memo in question in native format and cannot extract the relevant metadata and again asks for production of the memos in their native Word format. (Doc. Nos. 99, 102, 104.)

### 3. Baker Donelson's Second Motion to Compel

***3** In its second motion to compel, Baker Donelson alleges that Shufeldt's production in response to its RFP 29, which asks for all documents related to the Arizona action, is incomplete. (Doc. No. 98.) Baker Donelson reaches this conclusion because NextCare produced significantly more documents in response to the same inquiry made by subpoena. (*Id.*) Baker Donelson further states that Shufeldt has admitted his counsel in the Arizona action destroyed certain documents under the terms of a protective order issued in that action. (*Id.*)

Baker Donelson seeks an order requiring Shufeldt to produce or confirm that he has produced all documents responsive to RFP 29 and to provide an affidavit stating the steps that he has taken to preserve documents relevant to this case. (*Id.*)

In responding in opposition to Baker Donelson's second motion, Shufeldt argues that his production concerning the Arizona action has already been voluminous and that he has withheld some responsive documents on the grounds of privilege. (Doc. No. 102.) Shufeldt also argues that Baker Donelson has failed to make a preliminary showing that he destroyed or failed to preserve relevant evidence and has waived its objection to his production. (*Id.*) Baker Donelson filed a reply, arguing that it did not waive its objection to Shufeldt's response to RFP 29 and that Shufeldt breached his duty to preserve relevant evidence, even if it was his attorney who destroyed the documents. (Doc. No. 103.)

#### 4. Shufeldt's Second Motion to Compel

Shufeldt's second motion to compel primarily concerns Baker Donelson's failure to appear for a Rule 30(b)(6) deposition and related refusal to produce certain documents on that date in response to Shufeldt's RFP 1. (Doc. Nos. 99, 100.) Shufeldt seeks an order requiring a Baker Donelson representative to appear for a Rule 30(b)(6) deposition and testify about the timekeeping, billing, and record-retention policies and procedures that were in place during Baker Donelson's representation. (Doc. No. 100.) Shufeldt also asks that Baker Donelson be ordered to respond to RFP 1 by producing the record-retention policies that govern timekeeping and billing. (*Id.*) Shufeldt argues that Baker Donelson's failure to comply with its own procedures while representing him would be relevant to determining whether it committed malpractice and could necessitate further discovery into potential spoliation. (*Id.*) Shufeldt's motion also requests that Baker Donelson be ordered to produce documents responsive to Shufeldt's RFPs 8 and 9, which seek discovery identifying who produced the copies of the October 1 and October 2, 2014 memoranda. (*Id.*) Baker Donelson responds that all of Shufeldt's requested discovery relates only to spoliation and, because he has not shown a prima facie case of spoliation, is not warranted. (Doc. No. 101.) Shufeldt replies that the discovery is relevant to spoliation and to the merits of the case. (Doc. No. 104.)

### II. Legal Standard

"[T]he scope of discovery is within the sound discretion of the trial court[.]" *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (alteration in original) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). Generally, Federal Rule of Civil Procedure 26 allows discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Relevant evidence in this context is that which " 'has any tendency to make a fact more or less probable than it would be without the evidence' if 'the fact is of consequence in determining the action.' " *Grae v. Corr. Corp. of Am.*, 326 F.R.D. 482, 485 (M.D. Tenn. 2018) (quoting Fed. R. Evid. 401). A motion to compel discovery may be filed in a number of circumstances, including when a party fails to "answer an interrogatory submitted under Rule 33[,]" or "produce documents ... as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iii)–(iv). "[A]n evasive or incomplete disclosure, answer, or response" is considered a "failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). "The court will only grant [a motion to compel], however, if the movant actually has a right to the discovery requested." *Grae*, 326 F.R.D. at 485.

### III. Analysis

***4** For the reasons below, Baker Donelson's first motion to compel (Doc. No. 77) will be found moot; Shufeldt's first motion to compel (Doc. No. 78) will be granted in part and found moot in part; Baker Donelson's second motion to compel (Doc. No. 98) will be granted in part and denied in part; and Shufeldt's second motion to compel (Doc. No. 99) will be granted in part and denied in part.

#### A. Baker Donelson's First Motion to Compel

Shufeldt maintains that the one-page privilege log he has provided to Baker Donelson is sufficient, but, in recent filings, he has agreed to revise the log with additional detail and to supplement his discovery responses. The Court finds that Shufeldt must provide a more detailed privilege log and that Shufeldt did not, despite Baker Donelson's contrary argument, waive any relevant privilege by failing to provide such a log in the first instance.

#### 1. Shufeldt's Privilege Log and Related Discovery Responses

After a discovery conference with the Magistrate Judge regarding documents Shufeldt withheld in his original production, Shufeldt produced a one-page privilege log, the scope of which is limited "to documents generated prior to the filing date of the [Arizona action]." (Doc. No. 77-4, PageID# 830.) The log lists categories of withheld documents subject to the attorney-client privilege, including "written communications with the attorneys who represented him in the [Arizona action], the Employment Action, the Qui Tam Action and in regard to the Department of Justice's investigation of NextCare and Shufeldt."[3] (*Id.* at PageID# 831.) Shufeldt concedes that he waived the attorney-client privilege with respect to the meetings he had with attorneys from the Artemis Law Firm, Dickinson Wright, and Greenberg Traurig in October 2014. (Doc. No. 77-4.) The privilege log states that Shufeldt does not believe that he had any other communications with his attorneys before October 7, 2015, regarding statute of limitations issues, but claims that, should any additional documents exist, they are subject to the attorney-client privilege. (*Id.*) The log also asserts that "[p]rivilege ... is claimed for the work product materials generated by Shufeldt's attorneys." (*Id.* at PageID# 831.) Finally, the privilege log asserts that the documents exchanged by the parties in the course of settlement negotiations "are shielded from discovery pursuant to state and federal rules of evidence 408 and applicable state law regarding mediation materials." (*Id.*)

Baker Donelson finds the privilege log inadequate for several reasons. Baker Donelson argues that Shufeldt wrongly limited the scope of the privilege log to materials generated before the filing of the Arizona action. (Doc. No. 77.) Further, Baker Donelson argues that Shufeldt's categorical approach to the privilege log is too vague to enable Baker Donelson "to know what documents are being withheld on a claim of privilege or to challenge the assertion of privilege as to any of the documents being withheld. (*Id.* at PageID# 742.) Baker Donelson argues Shufeldt's failure to provide an adequate privilege log amounts to waiver of any relevant privilege. (Doc. No. 77.) Baker Donelson also argues that Shufeldt has waived any applicable privilege by putting the withheld documents at issue in this action. (*Id.*)

***5** Shufeldt responds that the categorical approach is consistent with this Court's Administrative Order 174-1, which governs electronic discovery. However, Shufeldt also states that he "is prepared to supplement his privilege log by providing an item by item log of the privileged materials that were generated prior to October 7, 2015, when the [Arizona action] was filed by counsel for Shufeldt ...."[4] (Doc. No. 100, PageID# 1224.)

A party who withholds otherwise discoverable materials as privileged bears the burden of establishing the applicability of the privilege. *See* Fed. R. Civ. P. 26(b)(5)(A); *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006); *Ross v. City of Memphis*, 423 F.3d 596, 606 (6th Cir. 2005). Typically, parties ensure compliance with Rule 26(b)(5)(A) through a document-by-document privilege log that states the "date and time of the document, the type of communication, the author, the addressee(s), identification of the recipients, the privilege asserted, and an explanation of the privilege claimed." *First Horizon Nat'l Corp. v. Houston Cas. Co.*, No. 2:15-CV-2235, 2016 WL 5867268, at *5 (W.D. Tenn. Oct. 5, 2016) (collecting cases). Where a document-by-document privilege log would be unduly burdensome, courts have permitted a categorical log. *See id.*; *see also* Fed. R. Civ. P. 26(b)(5) advisory committee's note to 1993 amendment ("Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories."). Even where a categorical approach is used, however, the log must still provide the information needed to evaluate claims of privilege. *See* *S.E.C. v. Thrasher*, No. 92 CIV. 6987, 1996 WL 125661, at *2 (S.D.N.Y. Mar. 20, 1996) (explaining that a categorical log must include the relevant time period, the individuals involved, and representations that the elements of privilege or work product are satisfied).

This Court's Administrative Order 174-1, which governs discovery of electronically stored information, provides that, "[i]f a log is produced, the Court expects the parties to discuss foregoing using traditional document-by-document logs in favor of alternative logging methods, such as identifying information by category or including only information from particular metadata fields ...." M.D. Tenn. Admin. Order 174-1 (privilege). Ultimately, regardless of the form the log takes, the information submitted by the withholding party must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii).

***6** Shufeldt's one-page privilege log is inadequate. The log makes broad categorical claims of privilege as to almost all written communications with Shufeldt's attorneys in the Arizona action and as to unspecified "work product materials" and "mediation materials[.]" (Doc. No. 77-4, PageID# 831.) These claims of privilege are not specific enough to enable Baker Donelson or the Court to assess their merits. *See* Fed. R. Civ. P. 26(b)(5)(A)(ii). Further, as Baker Donelson points out, there is no apparent reason to limit the scope of the log to materials generated before the filing of the Arizona action. Materials produced during the pendency of that action that would shed light on the strength of the statute-of-limitations advice that Baker Donelson provided Shufeldt or the issue of damages are just as relevant to Shufeldt's claims in this action as similar materials produced before October 7, 2015. [5]

The question thus becomes whether Shufeldt may provide a revised privilege log, as he has agreed to do, or whether he should be deemed to have waived any relevant privileges, as Baker Donelson argues. "Waiver is an 'extreme sanction' typically 'reserved for cases of unjustifiable delay, inexcusable conduct, and bad faith in responding to discovery requests.' " *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2017 WL 3668848, at *2 (S.D. Ohio Aug. 24, 2017) (quoting 6 James Wm. Moore, *Moore's Federal Practice* § 26.90[2] (3d ed.)); *see also* 8 Charles A. Wright et al., *Federal Practice and Procedure* § 2016.1 (3d ed. updated Aug. 2019) ("A key point here is that finding a waiver in such situations is a sanction, not an automatic consequence of every failure to comply with Rule 34(b)'s time limit for responding to a discovery request with sufficient detail."). Ultimately, "individual cases must ...be assessed on their individual circumstances." 8 Charles A. Wright et al., *Federal Practice and Procedure* § 2016.1 (3d ed. updated Aug. 2019).

The circumstances here do not support finding waiver. Although Shufeldt delayed providing a privilege log for more than a year after invoking various privileges in his initial response to Baker Donelson's discovery requests, he did so based on a good-faith argument that he should not have to provide a privilege log until the Court ruled on his other objections to Baker Donelson's discovery requests. *See* *United States v. Philip Morris Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003) (holding that trial courts should rule on objections to breadth of request at issue before deciding whether objecting party must provide a privilege log for documents covered by the request); *see also* 8 Charles A. Wright et al., *Federal Practice and Procedure* § 2016.1 (3d ed. updated Aug. 2019) (explaining that "courts may properly question whether failure to list materials [in a privilege log] is justified in good-faith reliance on other objections such as burden"). After the Magistrate Judge rejected that position during the discovery dispute conference, Shufeldt provided a privilege log and attempted, unsuccessfully, to confer with Baker Donelson regarding the form that the log should take. (Doc. Nos. 80, 82.) Shufeldt's ongoing efforts to locate responsive documents in a case that has already entailed voluminous discovery and his willingness to provide an item-by-item privilege log cannot be characterized as bad faith. [6] Finally, the Court finds that Baker Donelson's argument that Shufeldt has waived any applicable privilege by putting privileged documents at issue in this action will be better addressed after Shufeldt has provided a revised privilege log.

***7** Accordingly, Shufeldt will be allowed to file a revised item-by-item privilege log for all withheld materials. The log shall state with particularity Shufeldt's basis for withholding relevant documents. To avoid further disputes about the adequacy of the log, the parties shall meet and confer regarding its form within seven days of the date of this order. The Court finds that Baker Donelson's motion to compel supplemental responses to Interrogatory 25 and RFPs 23, 24, 30, and 32 is moot in light of Shufeldt's willingness to supplement those discovery responses and provide a revised privilege log. All of Baker Donelson's objections to Shufeldt's responses to those discovery requests turn on the adequacy of Shufeldt's privilege log, which now will be amended.

### 2. Interrogatories 21–23

These interrogatories concern the NextCare transactions that led Shufeldt to assert breach-of-fiduciary-duty claims in the Arizona action:

> Interrogatory 21: State in detail the basis for your allegation in paragraph 40 of the complaint in the [Arizona] Action that "[t]he 2012 Challenged Transaction was also the result of an unfair process and unfair price," and identify all documents relating to or supporting your response to this interrogatory.
>
> * * *
>
> Interrogatory 22: State in detail the basis for your allegation in paragraph 30 of the complaint in the [Arizona] Action that "[t]he valuation of the Company was further

manipulated, allowing EEF[7] to cement its control over the Company," and identify all documents relating to or supporting your response to this interrogatory.

* * *

Interrogatory 23: State in detail the basis for your allegation in paragraph 41 of the complaint in the [Arizona] Action that "[i]f the Challenged Transactions were done correctly and in good faith, Plaintiff and the other founders of the Company would continue to own in excess of 25% of NextCare's stock, as opposed to the 1.3% claimed," and identify all documents relating to or supporting your response to this interrogatory.

(Doc. No. 77, PageID# 730–32; *see also* Doc. No. 77-4.) Baker Donelson argues that the information sought in these interrogatories is relevant because it goes to Shufeldt's claim that he be awarded damages in this action because he settled his claims against NextCare in the Arizona action for less than they were worth due to Baker Donelson's negligence. (Doc. No. 77.) In his initial responses to these interrogatories, Shufeldt objected that they sought disclosure of privileged materials that are subject to confidentiality orders and agreements. (*Id.*) During a discovery dispute conference, the Magistrate Judge agreed that the interrogatories sought relevant information and instructed Shufeldt to supplement his responses with all non-privileged responsive facts. (*Id.*)

Baker Donelson argues that Shufeldt's supplemental responses to these interrogatories are inadequate. In responding to Interrogatories 21 and 22, Shufeldt referred to an expert report prepared by Matthew Morris, whom Shufeldt retained in the Arizona action, opining that the 2012 NextCare transaction was the result of an unfair process and that the valuation of NextCare was manipulated. (*Id.*) Shufeldt further stated, in responding to Interrogatory 21, that "pertinent source documents in [his] care, custody[,] and control ... have been shared with [Baker Donelson]." (Doc. No. 77-4, PageID# 825.) Baker Donelson argues that Shufeldt never provided the Bates numbers associated with Morris's report or other pertinent source documents and that, because Mr. Morris is not an expert in this action, he cannot be compelled to testify. (Doc. No. 77.) In responding to Interrogatory 23, Shufeldt stated that the basis for his claim in the Arizona action that his ownership interest in NextCare had been diluted to 1.3% was a February 19, 2013 letter to NextCare written by Baker Donelson attorney Patton Hahn. (Doc. No. 77-4.) Baker Donelson does not explain its argument that this response is inadequate.

***8** The arguments raised regarding these interrogatories appear now to be moot. With respect to Interrogatories 21 and 22, Shufeldt explains that Morris's report "was specifically identified as an exhibit to the Rule 26 report of Shufeldt's expert witness Robert Hackett." (Doc. No. 80, PageID# 912.) Shufeldt also states that he emailed Baker Donelson's counsel the Bates numbers for three valuation studies of NextCare, all of which support Shufeldt's claim that the 2012 NextCare transaction was the result of an unfair process. (Doc. No. 80.) Regarding Interrogatory 23, Shufeldt reiterates that Baker Donelson is the source of his claim that his ownership interest in NextCare was diluted to 1.3%. (*Id.*) Baker Donelson does not respond to any of these arguments in its reply. The Court thus finds that any issues concerning these interrogatories have been resolved.

Baker Donelson's first motion to compel will be found moot.

### B. Shufeldt's First Motion to Compel

Many of the claims raised in this motion are also now moot. Shufeldt seeks an order requiring Baker Donelson to provide its documents in native format, which, Shufeldt concedes, Baker Donelson has largely done. The only remaining issue is whether Baker Donelson should be ordered to produce its copies of the memoranda produced on October 1, 2014, and October 2, 2014, in their native formats. Baker Donelson argues that the relevant metadata can be extracted from TIFF versions of the memoranda that have been produced. (Doc. No. 101.) Shufeldt disagrees, claiming that the necessary metadata, which includes the date and time a document was last saved and printed and the name of the person who last saved it, cannot be extracted from the TIFF files. (Doc. No. 104.)

The Court finds that Baker Donelson must produce the native versions of these documents. Although the parties did not meet and confer about Baker Donelson's alleged alteration of the memoranda at issue before Shufeldt filed his motion to compel, they did meet and confer about the motion's central request—that Baker Donelson produce all documents in native format. Shufeldt's motion is therefore properly before the Court, despite Baker Donelson's contrary argument. Baker Donelson has not offered any substantive reason why Shufeldt should not have the metadata he seeks, arguing only that the relevant documents were altered prior to production as result of inadvertent error rather than bad faith. Accordingly, Shufeldt's motion to compel will be granted in part and Baker Donelson will be ordered to produce all copies

of the memoranda shared with Shufeldt on October 1, 2014, and October 2, 2014, in their native formats.

### C. Baker Donelson's Second Motion to Compel

This motion concerns Shufeldt's response to Baker Donelson's RFP 29, which seeks all documents related to the Arizona action and Shufeldt's alleged destruction of relevant evidence during that action. (Doc. No. 98.) Baker Donelson seeks an order compelling Shufeldt to (1) clarify whether he has completely responded to RFP 29 and, if he has not, requiring him to produce any additional responsive documents within fifteen days and (2) provide an affidavit detailing the steps he took to preserve responsive documents in this case. (*Id.*) Baker Donelson's motion will be granted in part as it pertains to RFP 29, but denied as to Baker Donelson's request that Shufeldt provide a sworn affidavit regarding his preservation efforts.

#### 1. RFP 29

Baker Donelson's RFP 29 seeks "[a]ll documents relating to, referencing or obtained during the course of the [Arizona action], including but not limited to pleadings, orders, correspondence, discovery, documents obtained from parties or third parties in discovery, documents obtained informally, *etc.*" (Doc. No. 98-1, PageID# 1193 (emphasis in original).) Shufeldt objected to the request, arguing that it seeks privileged materials and is overly broad and unduly burdensome. (*Id.*) Despite those objections, Shufeldt stated that he would produce his "Separation Agreement and the discoverable documents relevant to the parties' claims and defenses and proportional to the needs of the case that are responsive to this request." (*Id.*)

***9** Baker Donelson is concerned that Shufeldt has withheld responsive documents not encompassed by that response. (Doc. No. 98.) Baker Donelson subpoenaed from NextCare all documents relating to the Arizona action in February 2019. (*Id.*) NextCare responded by producing 72,000 pages of documents. (*Id.*) Of those, 61,974 pages were documents produced to Shufeldt during the Arizona action that Baker Donelson argues Shufeldt should also have produced in response to RFP 29. (*Id.*) To Baker Donelson, "it is self-evident that Shufeldt's document production is deficient" because Shufeldt has produced only 49,466 pages of documents in this case. (*Id.* at PageID# 1149.) Baker Donelson also claims that Shufeldt has admitted that he did not retain any documents relating to the Arizona action. (Doc. No. 98) Baker Donelson requests that Shufeldt be ordered to supplement his response to RFP 29 with "a clear and unambiguous representation as to whether Shufeldt has produced any and all documents related to the [Arizona action] that are within his possession, custody, or control." (*Id.* at PageID# 1154.) If he has not, Baker Donelson requests an order requiring him to produce those documents within fifteen days. (Doc. No. 98.)

Shufeldt denies that he failed to retain documents from the Arizona action, claiming that he "has obtained more than 35,000 pages of documents from his former attorneys in Arizona, and ... has supplied counsel with more than 18,000 pages of his own documents." (Doc. No. 102, PageID# 1243.) Further, Shufeldt states that he has not produced all documents responsive to RFP 29 because some "are privileged attorney-client or work product documents or settlement-related materials that are exempt from discovery." (*Id.* at PageID# 1244.) Shufeldt also argues that Baker Donelson waived any argument based on his response to RFP 29 by failing to raise it in the first discovery dispute conference and that, regardless, RFP 29 is overly broad. (Doc. No. 102.)

Given that Shufeldt has withheld documents responsive to RFP 29 based on various privileges, he should supplement his response to RFP 29 after completing his revised privilege log. Shufeldt's other objections to RFP 29 are without merit. Baker Donelson could not have raised its objection until it received NextCare's subpoena response in the fall of 2019, well after it filed its first motion to compel. Further, Shufeldt's objection that RFP 29 is overbroad is not developed enough to be persuasive. In the absence of any argument from Shufeldt explaining why documents from the underlying action are not relevant to his claims, his objection that RFP 29 is overly broad fails.

Accordingly, Shufeldt will be ordered to supplement his response to RFP 29 to clarify whether he has produced all responsive documents and whether he is withholding any on the grounds of privilege. Any documents withheld on grounds of privilege shall be noted in the revised privilege log.

#### 2. Affidavit Regarding Preservation Efforts

Baker Donelson asks the Court to order Shufeldt "to provide a sworn declaration stating in clear and unambiguous terms


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

every step he took to preserve and collect documents from the underlying litigation that were within his possession, custody, or control." (Doc. No. 98, PageID# 1155.) The basis of this request is Shufeldt's alleged admission that certain documents were destroyed during the Arizona action under the terms of a protective order entered in that case. (Doc. No. 98.) Baker Donelson argues that, by the time the documents were destroyed, Shufeldt had already stated his intention to sue Baker Donelson and therefore had a duty to preserve relevant evidence. (*Id.*) His failure to do so, according to Baker Donelson, may warrant the imposition of sanctions. (*Id.*)

Shufeldt responds that Baker Donelson's request for spoliation discovery should be denied because Baker Donelson has not made a preliminary showing that he or his present counsel destroyed or failed to preserve evidence. (Doc. No. 102.) Rather, all Baker Donelson has shown is that Shufeldt's "former counsel, not [Shufeldt], destroyed relevant information pursuant to an agreed protective order entered in the case in which the former attorney provided representation." (*Id.* at PageID# 1248.) Baker Donelson replies that the duty to preserve relevant information applied to Shufeldt equally. (Doc. No. 103.)

***10** Each party to civil litigation is required to preserve evidence that the party knows or should know may be relevant to current or future litigation. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). In certain circumstances, the parties may investigate the adequacy of one another's preservation efforts through discovery. *See Konica Minolta Bus. Sols., U.S.A. Inc. v. Lowery Corp.*, No. 15-cv-11254, 2016 WL 4537847, at *5–6 (E.D. Mich. Aug. 31, 2016) (explaining that discovery into a party's preservation efforts and other topics was needed before entering spoliation sanctions). Such investigation is especially relevant where the adequacy of a party's preservation efforts is in question. *See EPAC Techs., Inc. v. Thomas Nelson, Inc.*, No. 3:12-cv-00463, 2015 WL 13729725, at *6 (M.D. Tenn. Dec. 1, 2015) (finding that discovery into defendant's litigation hold notices would be allowed upon a preliminary showing of spoliation). However, because unbounded discovery into a party's preservation efforts can become a "fishing expedition[,]" spoliation discovery is appropriately limited to investigation of the allegedly destroyed evidence. *Mannina v. District of Columbia*, ––– F. Supp. 3d ––––, 2020 WL 555056, at *9 (D.D.C. Feb. 4, 2020).

Here, Shufeldt's concession that his former counsel destroyed relevant evidence during the Arizona action raises a question as to the adequacy of Shufeldt's preservation efforts. Shufeldt's claim that there has been no preliminary showing of spoliation because he did not personally destroy the documents is unpersuasive. Although "'the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client [his] obligations to retain pertinent documents that may be relevant to the litigation[,]' " *John B. v. Goetz*, 879 F. Supp. 2d 787 (M.D. Tenn. 2010) (quoting *Telecom Int'l Am. Ltd. v. AT & T Corp.*, 189 F.R.D. 76, 81 (S.D.N.Y. 1999)), Shufeldt has not alleged that his former counsel failed to advise him of his preservation obligations and that he was otherwise unaware of them. Further, a lawyer's destruction of relevant evidence can support the imposition of spoliation sanctions against the lawyer's client. *See, e.g.*, *Univ. of Pittsburgh v. Townsend*, No. 3:04-cv-291, 2007 WL 1002317, at *3–5 (E.D. Tenn. Mar. 30, 2007) (finding that spoliation sanctions could be imposed against plaintiff due to his counsel's destruction of discoverable evidence but ultimately declining to impose them because counsel did not act with the necessary intent). Accordingly, Baker Donelson may conduct discovery into Shufeldt's former counsel's destruction of relevant evidence. However, Baker Donelson's request that Shufeldt provide a sworn declaration regarding all preservation efforts related to the Arizona action is too broad and will be denied. *See Mannina*, 2020 WL 555056, at *9 ("Without some showing that other relevant evidence was destroyed— such as references to a missing document, or witness testimony regarding a missing document— further discovery into the scope of any alleged spoliation would be a mere fishing expedition.").

For the foregoing reasons, Baker Donelson's second motion to compel will be granted in part and denied in part. Shufeldt will be ordered to supplement his response to RFP 29 after completing his revised privilege log. Baker Donelson's request that Shufeldt provide a sworn declaration stating the steps he took to preserve documents from the Arizona action will be denied. Instead, Baker Donelson may conduct limited discovery into Shufeldt's former counsel's alleged destruction of relevant documents under the terms of an agreed protective order entered in the Arizona action.

### D. Shufeldt's Second Motion to Compel

Shufeldt seeks an order compelling Baker Donelson to (1) appear at a deposition noticed under Federal Rule of Civil

Procedure 30(b)(6) and supplement its response to Shufeldt's related RFP 1, which seeks Baker Donelson's record-retention policies and procedures and (2) supplement its response to RFPs 8 and 9, which seek documents showing the identities of the people who helped Baker Donelson produce the October 1 and October 2, 2014 memoranda. (Doc. Nos. 99, 100.) Shufeldt's motion will be granted with respect to the deposition but denied with respect to the RFPs.

### 1. Baker Donelson's Rule 30(b)(6) Deposition

***11** Rule 30(b)(6) authorizes a party to notice the deposition of a corporate representative. Fed. R. Civ. P. 30(b)(6). The notice "must describe with reasonable particularity the matters for examination." *Id.* That requirement "enable[s] the responding organization to identify the person who is best situated to answer questions about the matter ...." 8A Charles A. Wright et al., *Federal Practice and Procedure* § 2103 (3d ed. updated Aug. 2019). Failure to appear at a Rule 30(b)(6) deposition "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2). A responding party who fails to appear at a Rule 30(b)(6) deposition without filing a motion for a protective order may be subject to sanctions. Fed. R. Civ. P. 37(d)(1)(A)(i). "It 'is not proper practice [ ] to refuse to comply with the [Rule 30(b)(6)] notice, put the burden on the party noticing the deposition to file a motion to compel, and then seek to justify non-compliance in opposition to the motion to compel.' " *U.S., ex rel. Fry v. Health All. of Greater Cincinnati*, No. 1:03-cv-167, 2009 WL 5227661, at *2 (S.D. Ohio Nov. 20, 2009) (alterations in original) (quoting *New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.*, 242 F.R.D. 164, 166 (D. Mass. 2007)).

But that is precisely what Baker Donelson did here. After Shufeldt noticed Baker Donelson's 30(b)(6) deposition for September 16, 2019, Baker Donelson responded with a list of objections and stated that, "[b]ecause none of the topics of inquiry are appropriate, Baker Donelson will not be producing a witness on September 16, 2019." (Doc. No. 95-1, PageID# 1127.) Baker Donelson did not file a motion for a protective order, which forced Shufeldt to file a motion to compel Baker Donelson to appear for deposition and respond to questions about the billing and timekeeping policies that governed the conduct of his former Baker Donelson attorneys as well as applicable record-retention procedures. Baker Donelson's argument that all of the discovery that Shufeldt seeks is unjustified spoliation discovery should have been raised in a motion for a protective order under Rule 26(c). This procedural deficiency is alone enough to grant Shufeldt's motion to compel. *See U.S., ex rel. Fry*, 2009 WL 5227661, at*2; *see also New Eng. Carpenters Health Benefits Fund*, 242 F.R.D at 166.

Further, it is not apparent that all of the testimony that Shufeldt seeks is properly characterized as spoliation discovery. Shufeldt argues that the timekeeping and billing policies that governed his former attorneys' conduct are relevant to determining whether Baker Donelson negligently allowed the statute of limitations on his claims against NextCare to expire. (Doc. No. 100.) Shufeldt points out that Baker Donelson's first invoice referencing statute of limitations research is dated September 26, 2014, which is inconsistent with a recently disclosed email showing that Baker Donelson attorney Hahn had done such research in March 2014 and shared it with another attorney. (*Id.*) Shufeldt also emphasizes that Baker Donelson produced prebills for its November 22, 2013 invoice but none for its April 4, 2014 invoice, which does not mention statute of limitations research. (Doc. No. 104.) Shufeldt argues that all of this "makes the requested discovery regarding the identities, practices and recollections of the attorneys who reviewed Hahn and Winger's prebills relevant to Shufeldt's claims that his lawyers missed the statute of limitations." (*Id.* at PageID# 1262.) The Court agrees that, to the extent that Shufeldt's malpractice claim hinges on when his Baker Donelson attorneys were conducting statute of limitations research, Baker Donelson's timekeeping and billing policies and practices are relevant insofar as they reveal when such research took place.

***12** Accordingly, Shufeldt's motion to compel Baker Donelson to appear for a Rule 30(b)(6) deposition will be granted. Baker Donelson will be ordered to appear at the next properly noticed deposition, barring the filing of a motion for a protective order.

### 2. RFP 1

This RFP seeks Baker Donelson's "record retention policies and procedures, including those which pertain to external and internal email communications, in effect from and after January 1, 2013, both generally and with respect to [Baker Donelson's] Birmingham, Alabama office." (Doc. No. 95-2,

PageID# 1133–34.) Baker Donelson objected to that request on the ground that it seeks information that is irrelevant, unlikely to lead to admissible evidence, and disproportionate to the needs of the case. (Doc. No. 95-2.) Shufeldt now seeks an order compelling Baker Donelson to supplement its response to a modified version of RFP 1, which seeks only Baker Donelson's "record and retention policy and procedures as to attorney time records, bills and prebills." (Doc. No. 100, PageID# 1222.) Baker Donelson again labels Shufeldt's request spoliation discovery and argues that there is no factual basis to support it. (Doc. No. 101.)

The Court agrees that Shufeldt has not offered an adequate reason to support discovery into Baker Donelson's record-retention policies and procedures. Shufeldt has not alleged that Baker Donelson destroyed any relevant records, only that certain records—including prebills for the April 4, 2014 invoice—do not exist. Baker Donelson responds that it "did not have a policy for retaining these draft bills, but has searched for and produced all prebills in its possession related to its representation of Shufeldt." (Doc. No. 101, PageID# 1238.) The Sixth Circuit has explained that "[a] failure to collect evidence that may or may not have been available for collection is very different from the intentional destruction of evidence that constitutes spoliation." *United States v. Greco*, 734 F.3d 441, 447 (6th Cir. 2013). In the absence of an allegation that Baker Donelson had a duty to preserve prebills from 2014 and that Baker Donelson breached that duty, there has been no preliminary showing of spoliation that would warrant discovery into Baker Donelson's record-retention practices. Shufeldt effectively concedes that he has not made such a showing when he states, "[i]f the [discovery he is seeking] indicates that spoliation has taken place, then [Baker Donelson] also should be required to provide substantive responses to [RFPs 2–5]." (Doc. No. 100, PageID# 1222.) Accordingly, Shufeldt's motion to compel a supplemental response to RFP 1 will be denied.

### 3. RFPs 8 and 9

These RFPs seek the identities of the people who participated in the production of the altered versions of the memoranda from October 1, 2014, and October 2, 2014, respectively. (Doc. No. 100.) Baker Donelson opposes these requests on the grounds that they seek irrelevant information and are unduly burdensome. As discussed above, Baker Donelson will be ordered to produce these memoranda in their native formats, which, according to Shufeldt, will enable him "to determine the extent of [Baker Donelson's] alterations and spoliation, apply for the appropriate remedies, and otherwise have a full and fair opportunity to obtain discovery in this case." (Doc. No. 79, PageID# 859.) The Court finds that RFPs 8 and 9 are premature and will not compel responses to them at this time. Shufeldt may renew these requests if appropriate after analyzing the metadata from the native versions of the memoranda.

***13** For the foregoing reasons, Shufeldt's second motion to compel will be granted with respect to the Rule 30(b)(6) deposition of Baker Donelson but denied with respect to his RFPs.

## IV. Conclusion

For the foregoing reasons, Baker Donelson's first motion to compel (Doc. No. 77) is FOUND MOOT; Shufeldt's first motion to compel (Doc. No. 78) is GRANTED IN PART AND FOUND MOOT IN PART; Baker Donelson's second motion to compel (Doc. No. 98) is GRANTED IN PART AND DENIED IN PART; and Shufeldt's second motion to compel (Doc. No. 99) is GRANTED IN PART AND DENIED IN PART. The parties shall supplement their discovery responses consistent with this Order by April 28, 2020.

It is so ORDERED.

## All Citations

Not Reported in Fed. Supp., 2020 WL 1532323

## Footnotes

1 These facts are drawn primarily from Shufeldt's amended complaint. (Doc. No. 72.)


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2 Issues not discussed herein are moot. The parties agree that any issues associated with Baker Donelson's Interrogatories 5, 9, and 14–16 have been resolved. (Doc. Nos. 99, 103.) Shufeldt states that Baker Donelson's concerns regarding its Interrogatory 19 have also been resolved (Doc. No. 99), which the Court assumes to be true in the absence of any contradictory assertion from Baker Donelson (Doc. No. 103). The same holds true for Baker Donelson's unrebutted claim that any issues with its response to Shufeldt's Interrogatory 5 are now moot. (Doc. Nos. 98, 102.) Finally, it is not clear whether Shufeldt has formalized responses to Baker Donelson's Interrogatories 17, 18, and 20 by providing relevant Bates numbers; if he has not, he shall do so when supplementing his other discovery responses consistent with this Order.

3 According to Baker Donelson's revised first set of interrogatories, the Employment Action "refers to the litigation that [Shufeldt] filed against NextCare ... that is referenced in paragraph 45 of [his] complaint in the [Arizona action,]" (Doc. No. 70-4, PageID# 546), and the Qui Tam Action "refers to the litigation filed by Antonio Saidiana in the United States District Court for the Western District of North Carolina, No. 3:11-cv-0141[,]" (*id.* at PageID# 547). Baker Donelson alleges that the Department of Justice investigated "whether NextCare had engaged in fraudulent billing under Shufeldt's direction and leadership" and that the investigation ultimately resulted in a settlement. (Doc. No. 98, PageID# 1145.)

4 Shufeldt also complains that, "while Baker Donelson has asserted attorney client and work product privileges, Baker Donelson has never produced a privilege log of any kind." (Doc. No. 102, PageID# 1250.) The Court finds that any dispute about the adequacy of Baker Donelson's privilege log has not been properly raised and is not relevant to resolution of Baker Donelson's first motion to compel. *See* *Alutiiq Int'l Sols., LLC v. Lyon*, No. 2:11-cv-01104, 2012 WL 4155081, at *2 (D. Nev. Sept. 19, 2012) (finding that it is generally "not a defense to a motion to compel discovery to argue that an opposing party has been equally (or more) non-compliant in its discovery obligations").

5 Shufeldt implicitly concedes this point by including settlement materials in his privilege log, which could not have been generated prior to the filing of the Arizona action.

6 None of the cases that Baker Donelson cites in support of its waiver argument involves similar efforts by the producing party's counsel. *See* *Brown v. Tellermate Holdings Ltd.*, No. 2:11-cv-1122, 2013 WL 1363738, at *4 (S.D. Ohio Apr. 3, 2013)(finding that defendant had waived settlement privilege where it first asserted the privilege in earnest "in response to a motion to compel (or under the threat of an impending motion)"); *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271, 2006 WL 3771010, at *8 (S.D.N.Y. Dec. 15, 2006) (concluding that nonparty had waived any applicable privilege by asserting, without citing any authority, "that it 'had no obligation to provide [the requesting party] with a privilege log' "); *Carfagno v. Jackson Nat'l Life Ins. Co.*, No. 5:99CV118, 2001 WL 34059032, at *2 (W.D. Mich. Feb. 13, 2001) (finding that defendant had waived any relevant privilege where its brief made "vague statements concerning the possibl[y] privileged nature of [various] documents..." but defendant had not submitted "a privilege log in support of its objections"). These cases are therefore distinguishable and do not control the outcome here.

7 EEF stands for "Enhanced Equity Fund, L.P." (Doc. No. 70-4, PageID# 547.)

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 9

2012 WL 1067889
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Patrick TRACY, on behalf of himself and all other employees similarly situated, et al., Plaintiffs,
v.
NVR, INC., Defendant.

No. 04–CV–6541L.
|
March 26, 2012.

**Attorneys and Law Firms**

J. Nelson Thomas, Jayme Lynn Feldman, Laura A. Myers, Sarah Meghan Born, Michael J. Lingle, Thomas & Solomon LLP, Rochester, NY, for Plaintiffs.

Lorie E. Almon, Seyfarth Shaw LLP, New York, NY, Barry J. Miller, James M. Hlawek, Richard L. Alfred, Seyfarth Shaw LLP, Boston, MA, William G. Bauer, Woods Oviatt Gilman LLP, Rochester, NY, for Defendant.

*DECISION & ORDER and*
*REPORT & RECOMMENDATION*

MARIAN W. PAYSON, United States Magistrate Judge.

***PRELIMINARY STATEMENT***

***1** Commenced nearly eight years ago, this protracted and often contentious collective action has spawned dozens of discovery disputes. The latest, and hopefully final, disputes arise from allegations by both parties that the other has spoliated evidence. (Docket579, 624). Because resolution of the motions turns in part upon the relevance of the alleged spoliated material, I briefly summarize the factual and legal issues pertinent to plaintiffs' claims.

Plaintiff Patrick Tracy ("Tracy") commenced this action in 2004 against NVR, Inc., a public corporation engaged in the home construction business, alleging that he and other similarly-situated employees of NVR were unlawfully denied overtime pay under the Fair Labor Standards Act ("FLSA") and the New York Labor Law. (Docket1, 394). From 2000 until 2005, Tracy was employed by NVR as a Sales and Marketing Representative ("SMR"). (Docket # 394 at 1). In that position, Tracy met with potential customers interested in purchasing homes in custom-built residential subdivisions, showed them model homes and attempted to negotiate and finalize home purchases in the developments. (*Id.*). Tracy alleges that he and other SMRs generally worked from inside a model home in one of NVR's developments. (*Id.*). His complaint alleges that he and other SMRs regularly worked more than forty hours per week, but were improperly classified by NVR as exempt employees under the FLSA and thus denied statutorily-required overtime compensation. (Docket80, 394 at 1–2). Discovery proceeded initially only on Tracy's claims. (Docket # 291).

On July 14, 2007, United States District Judge David G. Larimer conditionally certified the collective action claims under the Fair Labor Standards Act. [1] (Docket # 136). Thereafter, NVR identified approximately 1,615 individuals as putative class members eligible to join the litigation. (Docket # 590 at ¶ 6). By September 12, 2007, the end of the opt-in period, 155 current and former SMRs had opted to join the lawsuit as party plaintiffs. (*Id.* at ¶ 7). As a result of the subsequent withdrawal or dismissal of claims by 22 of the plaintiffs, 133 plaintiffs are currently participating in this litigation. (Docket # 621 at 17).

In February 2009, Judge Larimer denied Tracy's motion for summary judgment on his individual claims. (Docket # 394). In opposing Tracy's motion, NVR maintained that SMRs had been properly compensated pursuant to FLSA regulations exempting from overtime requirements any employee "customarily and regularly engaged away from his employer's place of business" in sales activities. (*Id.* at 3). *See* 29 C.F.R. 541.500. Specifically, NVR relied on Department of Labor opinion letters concluding that "sales persons operating from model homes are exempt as outside sales employees, where their duties require their frequent absence from the model home or comparable sales office." (Docket # 394 at 4). Tracy, on the other hand, claimed that he did not "customarily and regularly" perform work away from the model home and that he "never strayed from NVR's designated sales sites when making sales." (*Id.*).

***2** Judge Larimer concluded that summary judgment was inappropriate considering the parties' "nearly diametrically opposed descriptions of ... Tracy's sales activities in and away from the model homes to which he was assigned." (*Id.* at 8–9). Those disputed facts, Judge Larimer determined, are "central to the determination whether Tracy was 'customarily

and regularly engaged' outside of NVR's place of business, and present a material question of fact as to whether the 'outside sales' exception applies to him, and to those similarly situated." (*Id.* at 9).

Following Judge Larimer's decision, the parties conducted discovery relating to eight plaintiffs selected by defendant. (*See* Docket # 400). Following numerous disputes between the parties, the discovery period concluded in June 2010, except for certain follow-up discovery approved by the Court. (Docket # 490 at 85).

In plaintiffs' pending motion, they seek an order compelling NVR to produce its litigation hold notices, accompanied by a list of employees who received the notices. To justify their request for production of documents generally protected by the attorney-client privilege, plaintiffs maintain that they have made a preliminary showing of spoliation. (Docket # 579). In NVR's motion, it seeks an order imposing sanctions as a result of the loss or destruction by plaintiff Megan Fox Donahue of her calendars spanning the period August 2000 through December 2003 and an expense report she prepared for the month August 2000. (Docket # 624).

## *DISCUSSION*

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999). *See also* *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 685 F.Supp.2d 456, 465 (S.D.N.Y.2010). "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.' " *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 685 F.Supp.2d at 465; *see also* *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 106–07 (2d Cir.2002) (citing *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 135–36 (2d Cir.1998)); *Reilly v. NatWest Mkts. Grp., Inc.,* 181 F.3d 253, 267 (2d Cir.1999) ("[w]hether exercising its inherent power or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses"), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 940, 145 L.Ed.2d 818 (2000).

A party moving for spoliation sanctions must demonstrate that: (1) the party charged with destroying the evidence had an obligation to preserve it; (2) the records were destroyed with a "culpable state of mind"; and (3) the destroyed evidence was relevant to the party's claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 107–08 (2d Cir.2001)). *See also* *Pension Comm.,* 685 F.Supp.2d at 467; *Arista Records LLC v. Usenet.com, Inc.,* 608 F.Supp.2d 409, 430 (S.D.N.Y.2009); *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 220 (S.D.N.Y.2003).

### I. *Plaintiffs' Motion to Compel Production of Litigation Hold Notices*

***3** I turn first to plaintiffs' motion to compel production of NVR's litigation hold notices, which NVR has asserted are protected from discovery under the attorney-client privilege. Plaintiffs do not dispute that the communications are privileged, but contend that they have made a preliminary showing of spoliation of evidence sufficient to justify their production.

#### A. *Facts*

##### 1. *Document Retention Practices of Certain NVR Managers*

In support of their motion, plaintiffs rely on deposition testimony from six NVR managers—Paul Mock, Doug Partington, Mark D'Urso, Michael Barrett, David Wilcox and Michelle Sobieski. Plaintiffs contend that their testimony establishes that (1) NVR failed to instruct them to preserve all relevant documents or (2) despite those instructions, preservation did not occur. As a result, plaintiffs contend, information and documents were destroyed, including electronically-stored information, that shed light on the central question of how SMRs customarily spent their time. The particular documents that plaintiffs contend the managers failed to preserve are "traffic reports," quarterly marketing reports, customer surveys and "secret shopper" reports. (Docket 580 at 4, 9; 621 at 7–8). Neither party has explained, nor do the deposition excerpts submitted describe, the particular information contained on any of these reports other than the traffic reports, which are described below. [2]

**a.** ***Paul Mock:*** Since 1998, Paul Mock has worked as a Division Manager for NVR's Washington West division. (Docket # 588 at ¶ 1). In that position, he supervised Sales Managers who, in turn, supervised SMRs, but he did not directly supervise any SMRs. (*Id.*). Mock testified that in 2007 he received an instruction to preserve documents, although he did not recall searching for any documents after he received that notice. (Docket # 581, Ex. A at 29, 32, 33–35). On January 29, 2010, pursuant to Fed.R.Civ.P. 26(a)(1)(A)(i), NVR designated Mock, along with nearly 200 others, as an individual likely to have information that NVR may use in support of its defenses. (Docket # 581, Ex. G).

Among the documents and reports that Mock regularly reviewed were "traffic reports." Mock testified that each division compiled a weekly report that summarized information about "traffic" in each development (referred to by NVR as a "community") within the division, such as the number of customers who visited the community, the number of appointments set, the number of contracts written and the number of sales made. (Docket # 581, Ex. A at 223–24). Mock testified that only one SMR generally worked in each community, and an administrative employee for the division would prepare the traffic report from information provided by each community and distribute the report throughout the division, as well as to the Regional Manager in charge of the division and the President in charge of the region. (*Id.* at 224–25, 227). Mock testified that he typically retained his copies of the traffic reports for one year in order to make annual comparisons of traffic data. (*Id.* at 226). According to Mock, his division did not create or maintain any records reflecting the schedules or daily activities of SMRs who worked in the division. (*Id.* at 219).

***4** In addition, Mock testified that SMRs were required to submit quarterly marketing plans to their Sales Managers. Mock did not regularly receive copies of such reports, and when he did, he did not save them. (*Id.* at 221–22). Similarly, when he did receive copies of completed customer surveys, which were sent by NVR's headquarters to customers who had bought houses in NVR communities, he did not save them. (*Id.* at 338–40). Finally, he also shredded copies of any "secret shop" reports he received. (*Id.* at 289–90).

Six of the opt-in plaintiffs worked in the Washington West division, although none were still employed by NVR at the time they joined this litigation. (Docket # 588 at ¶¶ 3–4). Four of the six terminated their employment within the year preceding the filing of their opt-in notices. (*Id.* at ¶ 4).

**b.** ***Doug Partington:*** Doug Partington was promoted from Sales Manager to Regional Sales and Marketing Manager in January 2003. (Docket # 589 at ¶ 5). Before he was promoted, Partington directly supervised two of the opt-in plaintiffs, but did not directly supervise any SMRs thereafter. (*Id.* at ¶ 4). Partington testified that he was not familiar with a litigation hold notice. (Docket # 581, Ex. B at 41–42). He further testified that he regularly deleted email and disposed of customer surveys, and discarded traffic reports at the end of every year. (*Id.* at 45, 49; Docket # 590, Ex. E at 149–50).

**c.** ***Mark D'Urso:*** Before he left NVR in 2007, Mark D'Urso was employed as a Regional Manager for the southwest Ohio region. (Docket # 590, Ex. G at 13). As a Regional Manager, Division Managers reported to him. (Docket # 581, Ex. C at 83). D'Urso testified that he was not familiar with a litigation hold notice and was unaware whether any documents were collected in connection with this litigation. (*Id.* at 84, 88–89). He testified that he deleted emails. (*Id.* at 93–94).

**d.** ***Michael Barrett:*** Before he resigned from NVR in approximately September 2006, he was employed as a Sales Manager and had supervised SMRs, including three opt-in plaintiffs who left employment with NVR approximately one year before they joined the litigation. (Docket581, Ex. D at 30; 589 at ¶¶ 6–7). Barrett testified that he was unfamiliar with a litigation hold notice and threw away "customer surveys" after receiving them. (Docket # 581, Ex. D at 32, 136). According to Barrett, when he resigned, he returned his work computer to NVR without deleting any information. (*Id.* at 128–29). In 2009, Barrett returned to work at NVR as an SMR. (*Id.* at 128).

**e.** ***David Wilcox:*** David Wilcox was a Sales Manager for NVR and supervised three opt-in plaintiffs, each of whom had ceased employment before they joined the litigation. (Docket # 589 at ¶ 8). Wilcox testified that he was not familiar with a litigation hold notice. (Docket # 581, Ex. E at 30–31). He testified that he received and kept traffic reports. (*Id.* at 72).

***5** **f.** ***Michelle Sobieski:*** Since April 1, 2006, Michelle Sobieski worked as Vice President of Sales and Marketing for NVR's Delaware Valley region. (Docket # 589 at ¶ 9). Sobieski did not directly supervise any of the opt-in plaintiffs. (Docket # 590 at 71–73). Sobieski testified that she was not instructed to preserve documents or email related to this

case. (Docket # 581, Ex. F at 59–60). Sobieski testified that when she was employed as Regional Sales Manager during the period 2000 through 2006, she regularly received traffic reports and "mystery shopper" reports, which she saved for approximately one year. (*Id.* at 138–40, 145).

**2. *Destruction of Documents Relating to MTV Office***

Plaintiff Jessica McKnight worked as an SMR in NVR's "MTV"[3] office between 2001 and 2005, and as a Sales Manager between 2005 and 2008. (Docket 595 at 8; 596 at ¶ 45). McKnight joined this lawsuit on August 8, 2007. (Docket # 201). Five months later, NVR closed the MTV office. In response to an interrogatory seeking information about NVR's destruction of certain types of documents, NVR stated that "some documents related to Ms. McKnight's employment may have been discarded or displaced upon the closure of the MTV division office in or about January 2008." (Docket # 530 at ¶ 44, Ex. J at 5). The record contains no information, however, identifying what documents had been maintained in the MTV office when the litigation commenced, McKnight joined the lawsuit or the office was closed.

**B. *Discussion***

**1. *Applicable Legal Principles***

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake v. UBS Warburg LLC,* 220 F.R.D. at 216 (emphasis in original). A party is obligated to preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir.), *cert. denied,* 534 U.S. 891, 122 S.Ct. 206, 151 L.Ed.2d 146 (2001); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp., Inc.,* 212 F.R.D. 94, 105 (E.D.N.Y.2002). Once the duty to preserve has attached, a party should institute a litigation hold and "suspend its routine document and retention/destruction policy." *Toussie v. Cnty. of Suffolk,* 2007 WL 4565160, *7 (E.D.N.Y.2007) (quoting *Zubulake,* 220 F.R.D. at 218).

A party must preserve "what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake,* 220 F.R.D. at 217 (quoting *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991)). The scope of the duty does not include, however, "every shred of paper, every e-mail or electronic document" because such a rule would be crippling to large corporations, which are often involved in litigation. *Zubulake,* 220 F.R.D. at 217 (citing *Concord Boat Corp. v. Brunswick Corp.,* 1997 WL 33352759, *4 (E.D.Ark.1997)). Thus, the duty "extend[s] to any documents or tangible things (as defined by Rule 34(a)) made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses' "—in other words, documents created or maintained by the "key players" in the case. *Id.* at 217–18 (quoting Fed.R.Civ.P. 26(a)(1)(A)). According to *Zubulake,* the key players in the litigation include individuals identified in a party's initial disclosure as persons likely to have relevant information that the party may use to support its claims or defenses. *Zubulake,* 229 F.R.D. at 433–34.

***6** In this case, plaintiffs do not seek a finding that defendant has spoliated evidence or the imposition of sanctions. Rather, they request an order requiring defendant to produce its litigation hold notices, presumably as part of its assessment whether a full-blown spoliation motion is justified. In seeking disclosure of NVR's litigation hold notice and a list of its recipients, plaintiffs rely primarily on *Major Tours, Inc. v. Colorel,* 2009 WL 2413631 (D.N.J.2009). In *Major Tours,* the court held that litigation hold letters are generally protected from discovery as privileged or attorney-work product unless a preliminary showing of spoliation is made. 2009 WL 2413631 at *2. The court further held that a party need not prevail on a separate spoliation motion in order to compel production of litigation hold letters. *Id.* at *2. Rather, a party need only make a preliminary showing of spoliation, which may be established by deposition testimony demonstrating the destruction of documents or the absence of a preservation order. *Id.*

The Second Circuit has not addressed whether a lesser standard of proof applies when a party seeks discovery of litigation hold communications rather than spoliation sanctions. The court's conclusion in *Major Tours* that it does is reasonable, and NVR does not explicitly contend otherwise. *See id.* at * 5 ("most applicable authority from around the country provides that litigation hold letters should be produced if there has been a preliminary showing of

spoliation”). I need not resolve that question, however, because I find that even under the more relaxed “preliminary showing of spoliation” standard, plaintiffs' motion should be denied.

**2. *The Scope of the Duty to Preserve in this Case***

The usual point of departure in analyzing any spoliation issue is to determine the date on which any duty to preserve arose. Here, no dispute exists that NVR had a duty to preserve documents when the lawsuit was filed in 2004. At that time, NVR was obligated to preserve documents related to Tracy's claims that he was unlawfully denied overtime compensation when he worked as an SMR. Those documents necessarily included records pertaining to the hours he worked, the activities he performed and where he performed them. The records also included those reflecting NVR's compensation policies for SMRs, including its decision to classify SMRs as exempt employees.

Rather, this dispute pertains to discovery relating to certain of the opt-in plaintiffs who were supervised by some of the managers or worked in a division for which the managers had responsibility. Plaintiffs maintain that NVR had a duty to preserve relevant documents pertaining to all SMRs, not just Tracy, in 2004 when Tracy filed the putative class action complaint. In plaintiffs' view, the act of filing the lawsuit as a putative collective and class action was sufficient to trigger an obligation on NVR's part to preserve all relevant documents relating to all former and current SMRs employed by NVR across the country. NVR contends that such a construction of its preservation duties sweeps far too broadly and ignores both the possibility that the court may not have certified a collective action and the fact that Tracy did not even move for certification until 2007. NVR argues that the actual opt-in rate in this case of less than 10% (155 of a possible 1,615) illustrates the excessive, and ultimately unnecessary, burden that it would have shouldered had it been required to preserve all potentially relevant documents relating to all putative class members for the nearly three years before conditional certification was requested and granted.

***7** This Court's search, however, has yielded sparse authority addressing the scope of the duty to preserve in a putative collective class action filed under the FLSA.[4] *See, e.g., Pippins v. KPMG, LLP,* 2012 WL 370321 (S.D.N.Y.2012); *Otsuka v. Polo Ralph Lauren Corp.,* 2010 WL 366653, *4 (N.D.Cal.2010); *O'Brien v. Ed Donnelly Enterprises,* 2006 WL 2583327, *5 (S.D.Ohio 2006) (without analyzing when duty to preserve arose, court declined to award sanctions for the defendants' failure to produce one time record created after the lawsuit was filed but before the plaintiff opted in). *Pippins v. KPMG, LLP,* is instructive, however. In that case, the plaintiff filed a putative collective and class action under the FLSA alleging that the defendant, a national auditing firm, had improperly classified a group of thousands of employees as exempt and had unlawfully denied them overtime wages. *Pippins v. KPMG, LLP,* 2012 WL 370321 (S.D.N.Y.2012). The plaintiffs properly moved for conditional certification, and the court stayed discovery pending its decision. *Id.* at *3.

During the stay, the parties and the magistrate judge attempted to resolve a dispute over preservation of all of the computer hard drives belonging to the thousands of putative class members. *Id.* at *4. The efforts were unsuccessful, and the defendant moved for a protective order. The magistrate judge determined that the defendant was obligated to preserve all of the hard drives, finding that they likely contained relevant information regarding the employees' job responsibilities and the hours they worked. *Id.* at *6. The magistrate judge also found that the duty to preserve arose at the time the putative class action was filed because “at that point it became foreseeable that each and every Audit Associate could be a potential plaintiff.” *Id.* at *7.

After the class was conditionally certified, the district court affirmed the magistrate judge's decision in *Pippins. Id.* The district court held that the defendant was obligated to preserve each of the hard drives until either (1) the parties agreed to a sampling methodology or (2) the defendant abandoned its argument that “even if Audit Associates generally are found to be non-exempt employees ... individual Audit Associates perform work that renders them exempt from the FLSA.” *Id.* at *10. In reaching its determination, the district court found that, for the purpose of determining the duty to preserve, all parties are “key players” and the defendant should “ ‘reasonably anticipate’ that every Audit Associate who will be receiving opt-in notice is a potential plaintiff in this action.” *Id.* at *12. The court acknowledged that at the conclusion of the opt-in period, the defendant was free to destroy hard drives of any noticed employee who had not opted-in.[5] *Id.* at *10. Thus, as the district court noted, because the plaintiffs had moved for conditional certification promptly after filing suit, the practical effect of the magistrate judge's decision was “no[thing] more than preserv[ation] [of]

the status quo" pending decision on the certification motion. *Id.* at *9.

***8** In this case, the question before the Court is not whether NVR had any duty to preserve documents in 2004; clearly, it did. Nor is the question whether that duty encompassed documents and information relating to the named plaintiff and his claims, including the defendant's determination that the entire class of employees of which he is a member is exempt under the FLSA. Clearly, it did. Rather, the narrower question is whether NVR's duty in 2004 extended to documents and information relating to potential opt-in plaintiffs. NVR contends that it did not, emphasizing that the named-plaintiff did not move for conditional certification for over two years after filing suit. I agree with NVR that Tracy's decision to wait over two years before moving materially distinguishes this case from *Pippins.*

Another significant distinction between this case and *Pippins* is the nature of the potential evidence at issue. *Pippins* involved direct evidence maintained by the putative opt-in plaintiffs regarding their work hours and duties. By contrast, the potential evidence involved in this case—traffic reports, quarterly marketing reports, secret shopper reports and customer surveys—provides only indirect information, at best, about the kinds of activities engaged in by SMRs. None of the records apparently provide evidence of the hours worked by any SMR in any particular activity or the particular location where such activity occurred (specifically, whether the activity was inside or outside the model home). Review of the Complaint reveals that those two issues are central to the exemption dispute.

Despite years of discovery, plaintiffs have not explained the contents of the reports, other than the traffic reports; nor are sample reports part of the record on this motion. The absence of this information prevents this Court from assessing whether relevant evidence reasonably could have been plumbed from the records. [6] With respect to traffic reports, one of the managers testified that the reports provided information about customer activity in each community within a division, including the total number of customers visits, appointments, signed contracts and sales. Because most communities employed only one SMR, plaintiffs contend that information about a particular SMR's weekly activities may be extrapolated from the traffic reports. [7] Again, the central dispute raised by the Complaint is not what type of activities SMRs generally engaged in, but *where* they occurred and the *duration* that each involved. Plaintiffs have not shown how reliable evidence about either subject may be derived from the traffic reports. [8] Certainly, more direct evidence exists and has been produced concerning the opt-in plaintiffs' general duties. [9]

To be clear, NVR was not entitled to deviate from its customary document retention policies and "run to the shredder" to destroy documents related to potential opt-in plaintiffs as soon as the action was filed. (*See* Docket # 595 at 5). This case presents no evidence that NVR engaged in any such conduct. *Cf.* *Capellupo v. FMC Corp.,* 126 F.R.D. 545, 551 (D.Minn.1989) (imposing sanctions where defendant's "senior officials," upon receiving notice that employee intended to file a class action lawsuit alleging gender discrimination, instituted widespread program of destruction of affirmative action plans, discrimination claims and investigation and personnel files; "[d]efendant's purge was *intentionally* tailored to make forever unavailable records and documents which defendant knew or should have known would be pertinent to this gender discrimination lawsuit") (emphasis added).

***9** As in any case raising issues of spoliation, the court's determination of the scope of the duty to preserve is a highly fact-bound inquiry that involves considerations of proportionality and reasonableness. *See, e.g.,* *Pippins,* 2012 WL 370321 at *11 ("proportionality is necessarily a factor in determining a party's preservation obligations"); *Orbit One Commc'ns, Inc. v. Numerex Corp.,* 271 F.R.D. 429, 436 n. 10 (S.D.N.Y.2010) (discussing concept of reasonableness and proportionality as "good guiding principles ... [when] evaluating the sufficiency of a party's efforts at preservation after the fact"); *Pension Comm.,* 685 F.Supp.2d at 466 (determining the scope of a party's duty to preserve "depends heavily on the facts and circumstances of each case and cannot be reduced to a generalized checklist of what is acceptable or unacceptable"). These considerations lead me to conclude that even if NVR had a duty to preserve documents relating to potential opt-in plaintiffs at the time the suit was filed (a question I need not and do not reach), plaintiffs have not established—preliminarily or otherwise—that documents that should have been preserved by NVR were lost or destroyed. *See* *Otsuka v. Polo Ralph Lauren Corp.,* 2010 WL 366653 at *4 (defendant's obligation to preserve store video footage did not arise until two years after putative class action was filed where defendant was unaware of relevance of footage to plaintiffs' claims for

overtime compensation until plaintiffs specifically requested it). Accordingly, I deny plaintiffs' motion for an order compelling production of NVR's litigation hold notices or a list of recipients of such notice.

**II.** ***Defendant's Motion for Spoliation Sanctions against Plaintiff***

I turn next to defendant's motion for sanctions against plaintiff Megan Fox Donahue ("Donahue") for spoliation of evidence. Specifically, NVR requests that this Court find that her destruction of certain original documents warrants the imposition of an adverse inference that Donahue was customarily and regularly engaged in outside sales activities and an order precluding her from testifying about her activities as an SMR during the period August 2000 through December 2003. (Docket # 624–1 at 1). Donahue counters that her conduct does not justify the imposition of any sanctions, let alone such severe sanctions as those sought by NVR. (Docket # 627 at 21–25).

**A.** ***Facts***

**1.** ***Overview***

The facts giving rise to this particular motion have been the subject of several previous disputes and motions. Relevant to this sanctions motion are the following facts. During discovery, in response to NVR's document requests, plaintiffs produced (1) copies of calendars (referred to as "day runners") for the period August 2000 through December 2003 that Donahue maintained while employed by NVR and (2) a copy of a monthly expense report for August 2000 that she prepared.

Donahue's day runners were originally produced to defendant's counsel in redacted form, but were later produced in unredacted form. Both sets—the redacted and the unredacted—contain two versions of her monthly calendars for the periods August 2000 through June 2001 and August 2002 through January 2003 that differ from each other in substantial and peculiar ways, as described below. The expense report produced bears a "redacted" notation that her counsel added to reflect that the "original" report received from Donahue had some white-out in the middle of the report.

***10** After copies of the day runners and expense report had been produced, the originals were returned to Donahue, and she either destroyed or lost them. She testified that she shredded the expense report (Docket # 628, Ex. B at 567–68, 574) and did not retain and likely shredded the day runners (Docket # 624, Ex. A at 462–63, 465).

**2.** ***The Calendars***

**a.** ***Donahue's Testimony and Description of Day Runners:*** Donahue testified that she could not explain the origin of the two versions of her calendars. She stated that she did not remember keeping two calendars, nor could she think of any reason that she would have done so. (*Id.* at 467, 554). Donahue also testified that she kept another calendar in her office that reflected her daily work appointments, which was more accurate than the day runners. (Docket # 628, Ex. A at 121). According to Donahue, she left that other calendar at NVR when she stopped working there in 2003. (*Id.* at 127–28). No evidence has been adduced about what happened to it.

The entries on the day runners pertain to what Donahue did, or was planning to do, for each day of the month. For example, they record meetings, training sessions, appointments with customers, personal and work-related lunches and dinners, medical and other personal appointments, parties and days "off." The entries also include abbreviations on many days such as, "WP," "CH," "SE" and "BC," which apparently denote the names of particular NVR communities. (Docket # 624, Ex. A at 527, 534).

**b.** ***Comparison of the Two Versions:*** This Court has reviewed and compared the two versions of the day runners in their entirety.[10] To say that they are replete with differences would risk understatement.[11] The fact that certain entries are identical on both, in terms of content and handwriting, leads to the inescapable conclusion that at some point one original existed, which was copied and then changed to create a second version. Whether all seventeen months for which there are two versions were copied at one time or at different times, such as at the end of each month, cannot be discerned from examining the copies produced.

Despite some identical entries on both versions, one reflects substantially more entries than the other. Indeed, every one of the seventeen months for which there are two versions contains multiple additional entries—over thirty for some months—all of which depict Donahue's daily activities, including in many instances, the nature, purpose, duration and location of the work activities, in addition to leisure activities. For example, one version of the August 2000 calendar contains the notation on August 21, 2000, "drive to Bethesda @ 7 pm," and the notation "Training Bethesda"

spanning the period August 15–17. The other version contains none of this information, and Donahue could not explain why. (Docket # 624, Ex. A at 545). Similarly, one version of the April 2001 calendar contains handwritten entries on April 9, 2001 stating, "9:30 mtg," "prestart 1pm—lot 123," and "WP 1–7". [12] None of this information is present on the other version. Donahue testified that "prestart 1pm—lot 123" meant that a pre-construction meeting regarding lot 123 was scheduled for 1:00 p.m. that day and that the meeting most likely took place at the WP NVR community, not at lot 123. (*Id.* at 527). Many of the additional entries take a similar form —"WP 12–7," "CH 2–7"—and apparently reflect the hours she worked, or was scheduled to work, at a particular NVR community. All told, the two versions reflect hundreds of differences.

***11** Side-by-side comparison of the two versions strongly suggests that after the original was copied, entries were *added* to the copy. The other possible explanation is that the original version had some entries that were "whited-out" on the copy. Although I believe that explanation is implausible, [13] loss of the original makes it impossible to determine conclusively whether the changes resulted from additions or deletions.

Assuming entries were added rather than deleted, the loss of the originals has also deprived NVR of potentially probative evidence as to when the additions were made. For example, additions written in the same ink on a particular monthly calendar may suggest that they were made at the same time, while additions written in different ink may suggest that they were made at different times. If all of the additions on all the monthly calendars are in the same ink, such evidence may suggest that they were all made at the same time and after January 2003, the last month for which two versions exist. The timing of the additions is, of course, germane to their reliability—the more contemporaneous they are with the event they purport to record, the more reliable they are likely to be.

One possible explanation for the additions is that they were intended as annotations for Donahue's counsel. Counsel initially resisted disclosure of Donahue's day runners on the grounds that they were protected under the attorney-client privilege, explaining that she had made notes to her counsel on the calendar that were so intertwined with the original entries that they could not be redacted. After addressing the issue with this Court, the day runners were produced, first in redacted form and eventually in unredacted form. Comparison of the redacted and unredacted sets reveals that, with one exception, all of the information that was redacted were handwritten notes contained in the margins of the calendars. [14] Had the day runners been preserved, they could have been inspected to determine whether the additional entries in the body of the calendar were made in the same ink as the margin notes to counsel. If they were, such evidence may suggest that Donahue made them around or after the time she decided to join the litigation—an inference that would be relevant not only to the issue of reliability, but also to whether her annotations constituted spoliation.

Finally, I note that there are several instances in which different entries appear in exactly the same place on the two versions. For example, one version of the December 2000 calendar contains the notation "2 pm-Mtg for Life Sale—WP" on December 15; the other version contains the entry "6:30 Meig-en" in exactly the same place. Donahue testified that she could not explain the discrepancy. (*Id.* at 555–56). One version of her calendar for April 19, 2001 reflects the notation "7:30–2 pm"; the other reflects the notation "7–12" in exactly the same place. The only conceivable explanation for these discrepancies is that Donahue replaced the original entry on one of the copies with a new entry. Inspection of the originals would show whether white-out or tape appears under one of the conflicting entries, thus facilitating the differentiation between the original entry and the later addition.

### 3. *The Expense Report*

***12** With respect to the August 2000 expense report, Donahue testified that she had applied white-out to a portion of the report before she produced it to her counsel, although she could not remember when she did so and, specifically, whether it was before or after she joined the lawsuit. (Docket # 628, Ex. A at 567–68, 574). Based on the evident "white-out," Donahue's counsel's office stamped the expense report "redacted" and returned the original to Donahue, who then shredded it. (*M.*).

### 4. *Notice to Donahue of Her Preservation Obligations*

Donahue has made conflicting statements about whether she was instructed to preserve documents. At her deposition, she testified that she did not recall receiving such an instruction. (Docket # 624, Ex. A at 485–86). In her interrogatory responses, however, she affirmed that she had received a "Welcome Letter" from counsel in January 2007, although she could not recall its substance, and had had two telephone conversations with representatives from her attorneys' firm in 2009 advising her to preserve all documents. (Docket #

624, Ex. F). Neither Donahue nor her counsel has produced a copy of the "Welcome Letter" sent to Donahue, despite this Court's urging. (Docket # 621 at 41–55). In a letter dated August 26, 2011, plaintiffs' counsel represented that "after a thorough search of all paper and electronic files, plaintiffs have concluded that indirect evidence of the firm's practices exists, but that counsel does not possess any direct evidence of the substance of the preservation language that was included" in the letter sent to Donahue. (Docket # 628, Ex. F).

**B. *Discussion***

Donahue's duty to preserve arose no later than February 8, 2007 when she filed her opt-in notice. (Docket # 39). The duty encompassed retention of her day runners and expense reports because both provide salient information about the nature, location and duration of Donahue's daily work activities. No dispute exists that Donahue destroyed or lost the "original" day runners and expense report after they were copied by her attorney and returned to her. She was also obligated to retain them because they were responsive to NVR's discovery requests and the copies of them did not capture all of the information available on the originals—such as ink color and white-outs. On these facts, I find that Donahue spoliated evidence that should have been preserved. [15]

**1. *Culpability***

In considering sanctions, I must assess the level of culpability with which Donahue destroyed the original documents. "[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator." *Reilly v. NatWest Mkts. Grp., Inc.,* 181 F.3d at 268. Rather, a finding of gross negligence or knowing or negligent destruction of evidence will satisfy the "culpable state of mind" requirement. *Id.; Residential Funding Corp.,* 306 F.3d at 108 ("[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence"); *Zubulake,* 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence").

***13** The record in this case does not support a conclusion that the documents were destroyed willfully or in bad faith. Specifically, no evidence has been adduced that Donahue intentionally destroyed the originals in order to conceal them from NVR. *Compare Arista Records LLC v. Usenet.com, Inc.,* 608 F.Supp.2d at 438–39 (finding bad faith where defendants "took affirmative steps" to make data unavailable and provided misleading information to the court) *with De Espana v. Am. Bureau of Shipping,* 2007 WL 1686327, *3–4 (S.D.N.Y.2007) (no bad faith even though defendant failed to issue a timely litigation hold and inaccurately represented to the court that production was complete, but also produced a "massive record of evidence"). *But see Zubulake,* 229 F.R.D. at 436 (documents were willfully destroyed where employees deleted emails after counsel's instructions to retain documents). In fact, when the documents were returned to her, Donahue presumably knew that copies of them had been made by her attorneys and turned over to NUR's counsel.

I find, however, that Donahue's destruction amounted to gross negligence. The record plainly establishes that she destroyed or lost important records containing information not only relevant, but central, to the issue of how and where she spent her time each day while employed as an SMR. Although copies of the records have been produced, any cursory review of them would reveal substantial and curious discrepancies between the two versions. Donahue—more than anyone else—should have been aware of the discrepancies in her calendars. Both she and her counsel should have anticipated that NUR's counsel would want to inspect the originals in an effort to explore the discrepant entries. Where, as here, a party fails to preserve for inspection and further use original documents that (1) provide evidence central to the party's claims, (2) respond to the opposing party's discovery requests, and (3) contain vast numbers of conflicting handwritten entries, such conduct constitutes more than mere negligence.

**2. *Appropriate Remedy***

Finally, I must determine the sanction that is most appropriate under the circumstances. *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d at 436 ("[t]he determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis") (internal citation omitted). As the Second Circuit has observed:

> [T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the doctrine. The sanction should be designed to: (1) deter

> parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*West v. Goodyear Tire & Rubber Co.,* 167 F.3d at 779 (citing *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998), *overruled on other grounds by* *Roteller v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000)) (internal quotation and citation omitted).

***14** Here, NVR seeks "an adverse inference that Ms. Donahue was customarily and regularly engaged in outside sales activities." (Docket # 624–1). The adverse inference that NVR has requested—a jury instruction that certain facts are deemed admitted and must be accepted as true—represents an adverse inference "[i]n its most harsh form." *Pension Comm.,* 685 F.Supp.2d at 470. Such an instruction would likely result in the dismissal of Donahue's claims because the question whether SMRs, like Donahue, were lawfully exempt from overtime pay requirements under the FLSA turns on whether they were engaged in outside sales activity. *See In re:* *NTL, Inc. Sec. Litig.,* 244 F.R.D. at 192 ("[a]n adverse inference instruction is a severe sanction that often has the effect of ending litigation because it is too difficult a hurdle for the spoliator to overcome") (internal quotations omitted). *See also* *Jones v. Niagara Frontier Trans. Auth. (NFTA),* 836 F.2d 731, 734 (2d Cir.1987), *cert. denied,* 488 U.S. 825, 109 S.Ct. 74, 102 L.Ed.2d 50 (1988) (dismissal or an entry of judgment against a party is "an extreme sanction, to be imposed only in extreme circumstances"). A sanction of dismissal should not be imposed absent a finding of willfulness or bad faith, *Valentine v. Museum of Modern Art,* 29 F.3d 47, 49 (2d Cir.1994), or where lesser sanctions would be effective, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.,* 490 F.3d 130, 140 (2d Cir.2007). Because Donahue's conduct did not involve bad faith, an adverse instruction would be too harsh a sanction.

NVR also urges the Court to issue an order prohibiting Donahue from testifying about her sales activities during the time period covered by the day runners—August 2000 through December 2003. (Docket # 624–1 at 11–12). Although a preclusion order is also a severe sanction, *see, e.g.,* *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (*per curiam* )) ("[a]lthough an order ... precluding a party from presenting evidence ... is strong medicine, such orders are necessary on appropriate occasions to enforce compliance with the discovery rules and maintain a credible deterrent to potential violators"); *Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 71 (2d Cir.1988); *Outley v. City of New York,* 837 F.2d 587, 590 (2d Cir.1988); *Brick v. CSX Transp., Inc.,* 2007 WL 2580483, *3 (W.D.N.Y.2007), it is the most appropriate sanction for Donahue's conduct. To permit Donahue to testify about her activities as an SMR between 2000 and 2003, particularly where that testimony refers to or is refreshed by entries from her daily calendars for that period, without affording NVR's counsel the ability to cross-examine her with the original calendars would permit Donahue to profit unfairly from her destruction of important evidence. No lesser sanction would avoid such an unfair and prejudicial result. *See* *Brown v. Coleman,* 2009 WL 2877602, *3 (S.D.N.Y.2009) (witness was precluded from testifying about facts that could have been gleaned from destroyed documents). Accordingly, I recommend that Donahue not be permitted to offer evidence regarding her daily work activities during the period August 2000 through December 2003.

## *CONCLUSION*

***15** For the reasons discussed below, plaintiffs' motion to compel production of NVR's litigation hold notice and a list of its recipients **(Docket # 579)** is **DENIED.** I recommend that the district court grant in part and deny in part defendant's motion for spoliation sanctions against plaintiff Megan Fox Donahue. (Docket # 624). Specifically, I recommend that Donahue be precluded from offering evidence regarding her daily work activities during the period August 2000 through December 2003.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g.* *Paterson–Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." ***Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.***

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1067889

## Footnotes

1 In 2006, the parties settled the claims of a class of employees classified as Sales and Marketing Associates. (Docket # 345 at ¶¶ 10–11).

2 Wilcox testified that quarterly marketing reports were prepared by SMRs to record, "What are [they] going to do for [their] community ... outside of the corporate efforts." (Docket # 596, Ex. E at 70). He did not explain the format or content of the information in the report.

3 The record on this motion does not disclose the full name of the "MTV" office.

4 Courts in non-FLSA cases have also found that a duty to preserve arises at the time the putative class action is filed, but have not addressed whether the duty to preserve extended to documents relating to putative class members only. *See, e.g., Casale v. Kelly,* 710 F.Supp.2d 347 (S.D.N.Y.2010) (city's obligation to preserve summonses arose when class action was filed challenging enforcement of the loitering statute that had been ruled unconstitutional prior to the issuance of the summonses); *Bensel v. Allied Pilots Assoc.,* 263 F.R.D. 150, 152 (D.N.J.2009) (although general duty to preserve arose when the class action was filed, specific duty to preserve particular witness's documents did not arise until pleadings were amended to include allegations related to that witness); *In re NTL, Inc. Sec. Litig.,* 244 F.R.D. 179, 193 (S.D.N.Y.2007) (duty to preserve documents relevant to the litigation arose at time the securities fraud class action was filed; defendant company was obligated to preserve documents related to company's financial condition where plaintiffs alleged that company had falsely reported that the company's financial condition was healthy); *Keir v.*

Unumprovident Corp., 2003 WL 21997747, *1 (S.D.N.Y.2003) (observing without discussion that defendant's obligation to preserve backup tapes containing email arose on the date that the ERISA class action was filed).

5 The court noted one exception: the defendant was still obligated to preserve hard drives for New York employees who did not opt in because they might become part of "the putative (and as yet uncertified) New York Labor Law class." (*Id.* at *12).

6 For a similar reason, the destruction of documents relating to one of the opt-in plaintiffs in connection with the closure of NVR's MTV office does not provide a basis for making a preliminary finding that NVR spoliated evidence. Although NVR admitted in an interrogatory response that some documents "may have been" destroyed relating to her employment, plaintiffs have not shown what documents were created or maintained in that office that related to her employment, let alone that they would have been relevant to the issues in this case. In other words, this Court simply cannot make any finding in the absence of information about what records existed.

7 For example, counsel explained at oral argument that the amount of time an SMR spent signing contracts inside the model home could potentially be determined from the information recorded in the traffic report because sales contracts are "oftentimes" signed inside a model home. (Docket # 621 at 6).

8 Of course, Tracy was free to move for an order directing NVR to preserve this or any other evidence at the time he filed suit. *See, e.g., Lawson v. Life of the S. Ins. Co.,* 738 F.Supp.2d 1376, 1378 (M.D.Ga.2010) (plaintiff moved for order preserving documents pertaining to putative class members during pendency of interlocutory appeal); *Walker v. Cash Flow Consultants, Inc.,* 200 F.R.D. 613, 617 (N.D.Ill.2001) (granting plaintiff's motion for an order requiring defendant to preserve documents related to putative class members).

9 To the extent that plaintiffs argue that NVR was obligated to preserve these documents as relevant to the questions of commonality and typically under Rule 23, plaintiffs have provided no authority, and this Court has found none, supporting that argument.

10 The Court has copies of the entire calendars because they were submitted for *in camera* review before they were produced to NVR.

11 Plaintiffs appear to suggest that the differences are limited to the examples cited by NVR in its motion papers and fall outside the applicable statute of limitations. Both suggestions are wrong. (Docket # 627 at 5–6). All seventeen months for which there are two versions have multiple differences; six months (August 2002 through January 2003) fall within the limitations period.

12 "WP" refers to an NVR community. (Docket # 624–1 at 2). Donahue testified that a notation such as "CH 10–6" indicated that she was scheduled to or did work at that location from 10:00 a.m. until 6:00 p.m. (Docket # 624, Ex. A at 534).

13 That the printed calendar lines are still visible under entries that appear on one version and not on the other suggests that the entry was added to the copy, rather than deleted from the original.

14 The one exception is the notation "3Q Quota" that appears under the column "To Be Done" in her November 2002 calendar.

15 Although NVR contends that "the discrepancies [in the day runners] appear to reflect a deliberate attempt to alter the day runners by removing or altering references to outside sales activities" (Docket # 624–1 at 3), NVR's motion papers do not press the argument that the alterations constitute spoliation (*see id.* at 6). In any

event, the record does not enable me to make any findings about when the day runners were copied and annotated or when the white-out was applied to the expense report.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 10

2015 WL 12803713
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, McAllen Division.

Mariela DE HOYOS, et al, Plaintiffs,
v.
PRIME, INC., et al, Defendant.

CIVIL ACTION NO. 7:14–CV–890
|
Signed 03/18/2015

**Attorneys and Law Firms**

Jimmie Allen Franklin, Law Offices of Ezequiel Reyna, Jr. P.C., Michael Rene Salinas, Law Office of Ezequiel Reyna, Weslaco, TX, Mohammed Sameer Ahmed, Ahmed Alexander & Molina, Edinburg, TX, for Plaintiffs.

Sarah Pierce Cowen, Summer Olmos, Viola G. Garza, Cowen Garza LLP, McAllen, TX, for Defendant.

## ORDER

Micaela Alvarez, UNITED STATES DISTRICT JUDGE

***1** Pending before the Court is the "Opposed Motion to Compel Plaintiff Kristen Allison Flores' Medical Records and Bills," [1] filed by Defendant Prime Inc. ("Prime"). In the motion Prime represents that it "conferred with Plaintiffs' counsel in a good-faith effort to resolve the dispute without court action, as required by Federal Rule of Civil Procedure 37(a)(1)," but the parties were unable to resolve the dispute. [2] Similarly, in the Certificate of Conference, Prime informs the Court that Plaintiffs' counsel opposes the motion. [3] However, Plaintiffs did not file a response; thus, pursuant to Rule 7.4 of the Local Rules of the United States District Court for the Southern District of Texas, the Court will construe their failure to respond as a representation of no opposition. After considering the motion and relevant authorities, the Court **GRANTS** the requested relief.

### I. Background

On June 30, 2014, Mariela De Hoyos and Kristen Allison Flores (collectively, "Plaintiffs") filed suit in state court against Prime and Gilbert Michael Dillon ("Dillon") in connection with injuries sustained during an automobile accident. [4] Specifically, Plaintiffs allege that Dillon acted negligently while driving Prime's tractor trailer, which collided with De Hoyos's vehicle, thereby causing Plaintiffs' injuries. [5] Plaintiffs are suing Prime for Dillon's alleged negligence through the doctrine of respondeat superior, as well as for negligent hiring, supervision, training, and retention. [6]

On October 13, 2014, Prime served discovery requests on Plaintiffs. [7] On January 9, 2015, Flores served her objections and responses to Prime's requests for production and interrogatories. [8] She objected to every request for production, promising to supplement her responses to Requests for Production Nos. 6 and 7 with current medical records or bills. [9] However, she ultimately did not produce these documents to Prime. [10] In the instant motion, Prime prays that the Court compel Flores to respond to Request for Production No. 6 regarding production of medical records and bills in Flores's care. [11]

### II. Applicable Law

Rule 37 of the Federal Rules of Civil Procedure allows a discovering party, on notice to other parties and all affected persons, to "move for an order compelling disclosure or discovery." [12] A movant's motion "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." [13] As already noted by the Court, Prime has properly included such certification.

Specific to this case, a motion may be made if a party fails to appropriately respond regarding a request for production under Rule 34. [14] Rule 34 allows a party to request production of a document, electronically stored information, or other tangible items within the permissible scope of discovery under Rule 26(b). [15] Requests must describe each item requested with reasonable particularity, specify how the item will be inspected, and may specify the form in which electronically stored information is to be produced. [16]

***2** Unless stipulated or ordered by the Court otherwise, "[t]he party to whom the request is directed must respond in writing within 30 days after being served." [17] As a general rule, when a party fails to timely object to production

requests, objections thereto are waived; however, the Court may allow an untimely objection to stand upon a finding of good cause.[18] Further, for each request for production, the responding party "must either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons."[19] If the responding party provides only an evasive or incomplete response, it must be treated as a failure to respond.[20]

Thus, to properly evaluate the motion, the Court must look to the permissible scope of discovery under Federal Rule of Civil Procedure 26(b), as well as the propriety of Flores's response. The phrasing of Rule 26(b) is deliberately broad,[21] providing that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."[22] However, the Rule specifically provides that the Court must limit the extent of discovery if the discovery sought is unreasonably cumulative or duplicative or can be obtained from a more convenient or less burdensome source; if the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or if the burden or expense of the proposed discovery outweighs its likely benefit.[23] Indeed, "[d]istrict courts have wide discretion in determining the scope and effect of discovery."[24]

## III. Discussion

Through Request for Production No. 6, Prime requested that Plaintiffs produce "any and all medical records and bills in [their] care, custody and/or control that [they] allege resulted for [sic] the incident made the basis of this lawsuit."[25] Because Flores has brought suit for damages against Prime as a result of injuries sustained during an automobile collision, she has clearly put her physical condition at issue in this lawsuit. Indeed, it is well-established law that medical records and bills *resulting from this incident* are centrally relevant and not privileged under Texas law.[26] Accordingly, Prime's Request for Production No. 6 is within the permissible scope of discovery in the instant case.

***3** Flores objected to this request (as she similarly did in thirteen of the remaining fourteen requests for production) on the basis that the request is "overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence," and "fail[s] to adequately identify the type of documents requested."[27] This objection fails on several grounds.

First, Flores's objection is inadequate because it is untimely. In its motion, Prime informs the Court that it served its requests on Plaintiffs on October 13, 2014; however, Flores responded almost three months later, on January 9, 2015, well after the thirty-day response deadline under the Federal Rules. Because there is no indication that the parties stipulated to a longer response time under Rule 29, the Court did not order a different deadline, and there is a lack of good cause or circumstances excusing the untimeliness of the objection, the Court finds Flores waived her objection to Prime's request.

Second, even if the Court let Flores's untimely objection stand, her response is still deficient under the Federal Rules. As to the first basis for her objection, the Court finds such an objection does not constitute any adequate "reason" under Rule 34. For her objection to be proper, Flores would actually have to explain how the request is irrelevant, exceeds an appropriate scope, or will not lead to the discovery of admissible evidence, particularly in light of the well-established law making these records discoverable.[28] In contrast, this blanket objection (incorporated verbatim in fourteen of the fifteen requests for production) informs the Court that Flores did not even attempt to provide good faith answers to the requests for production, and such cursory dismissal of Prime's requests does not provide the Court with a basis for evaluating the objection.[29] Similarly, the Court cannot discern the basis of Flores's second ground for objecting (also incorporated verbatim in a majority of her responses), since the request appears to properly identify the type of documents requested. Indeed, Flores's copy-and-paste objections represent an abuse of discretion afforded to the parties by the Rules.

Lastly, Flores represented that she would "supplement" her response with current medical records.[30] However, she has continued to be non-responsive by failing to provide such records as promised.[31] Accordingly, the Court finds Flores failed to adequately respond to Prime's request.

## IV. Holding

For the reasons provided above, the Court **GRANTS** the motion to compel and **ORDERS** Flores to provide documents responsive to this request for production with all due speed.

Further, the Court finds this to be an appropriate situation to warrant the payment of Prime's reasonable expenses incurred in filing the motion, and will therefore consider any requests and documentation Prime submits to that effect.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12803713

## Footnotes

1 Dkt. No. 10 ("Motion").

2 *Id.* at ¶ 4.

3 *Id.* at p. 5.

4 *See* Dkt. No. 1, Exh. A.

5 *Id.*

6 *Id.*

7 Motion at ¶ 3.

8 Motion, Exh. A.

9 *Id.*

10 Motion at ¶ 3.

11 *Id.* at ¶ 7.

12 Fed. R. Civ. P. 37(a)(1).

13 *Id.*

14 Fed. R. Civ. P. 37(a)(3)(B)(iv).

15 Fed. R. Civ. P. 34(a).

16 Fed. R. Civ. P. 34(b)(1).

17 Fed. R. Civ. P. 34(b)(2)(A).

18 *See* *In re U.S.*, 864 F.2d 1153, 1156 (5th Cir. 1989); *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, No. CIV.A. H–07–2426, 2008 WL 2036816, at *6 (S.D. Tex. May 9, 2008) (citing *Doe v. D.C.*, No. CIV.A.03–1789(GK/JMF, 2005 WL 1787683, at *5 (D.D.C. July 5, 2005)).

19 Fed. R. Civ. P. 34(b)(2)(B) (emphasis added).

20 Fed. R. Civ. P. 37(a)(4).

21 *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) ("Generally, the scope of discovery is broad ....").

22 Fed. R. Civ. P. 26(b)(1).

23 Fed. R. Civ. P. 26(b)(2)(C).

24 *Bradley v. Boysville, Inc.*, 240 F.3d 1073 (5th Cir. 2000).

25 Motion, Exh. A at p. 4.

26 *See* *United States v. Moore*, 970 F.2d 48, 50 (5th Cir. 1992) (noting there is no federal doctor-patient privilege and recognizing that pursuant to Fed. R. of Evid. 501, privilege is governed by state law in cases where state law supplies the rule of decision); Tex. R. Evid. 509(e)(4) (crafting exception to the physician-patient privilege in cases where a party relies on the patient's physical, mental, or emotional condition as a part of the party's claim or defense and the communication or record is relevant to that condition); *see also* *Groves v. Gabriel*, 874 S.W.2d 660, 661 (Tex. 1994) (per curiam) (holding that trial court's order compelling production of medical records not relevant to the underlying suit was overly broad); *Chaput v. Griffin*, No. 3:14–MC–131–G–BN, 2014 WL 7150247, at *3 (N.D. Tex. Dec. 16, 2014) (sustaining objection as to subpoena requesting all records other than those regarding the injuries caused by the subject incident, since those records are protected by the physician-patient privilege).

27 Motion, Exh. A at pp. 3–6.

28 *See* *Enron Corp. Sav. Plan v. Hewitt Associates, L.L.C.*, 258 F.R.D. 149, 159 (S.D. Tex. 2009) (noting that broad, non-specific objections are insufficient and almost impossible to assess on their merits); *Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*, 242 F.R.D. 1, 10 (D.D.C. 2007) (overruling conclusory objection on ground that requests were "over broad.").

29 *Id.*

30 Motion, Exh. A at p. 4.

31 *See* Motion at ¶ 3.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 11

2008 WL 2036816
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

RE/MAX INTERNATIONAL, INC., Plaintiff,
v.
TRENDSETTER REALTY, LLC, et al., Defendants.

Civil Action No. H–07–2426.
|
May 9, 2008.

**Attorneys and Law Firms**

Anthony Frank Matheny, Greenberg Traurig LLP, Houston, TX, John R Posthumus, Gayle L. Strong, Greenberg Traurig, LLP, Denver, CO, for Plaintiff.

Mayur M Patel, Hester & Patel, P.C., Houston, TX, Erik M Pelton, Attorney at Law, Arlington, VA, for Defendants.

**MEMORANDUM AND ORDER**

LEE H. ROSENTHAL, District Judge.

***1** RE/MAX International, Inc. filed this trademark infringement suit against Trend Setter Realty, LLC, one of its competitors in the real estate brokerage industry. RE/MAX also sued Pavnouty Abraham, Trend Setter's registered agent, director, and president, and Deborah Miller, Trend Setter's broker. The defendants move to withdraw or amend admissions resulting from the failure to file a timely response to requests for admission. (Docket Entry No. 23). The defendants also move for leave to file objections to RE/MAX's interrogatories and requests for production. (Docket Entry No. 24). RE/MAX opposes the motions and asks that its filings in opposition be treated as motions to compel. (Docket Entry No. 25 at 6; Docket Entry No. 26 at 6).

Based on the pleadings, the motions, responses, and replies, the parties' submissions, and the applicable law, this court: (1) grants the defendants' motion to withdraw or amend deemed admissions as to request 28 and otherwise denies the motion; and (2) grants the defendants' motion to permit objections to the plaintiff's first set of interrogatories and first requests for production of documents as to objections based on attorney-client privilege or work-product protection and otherwise denies the motion. The reasons are set out below.

**I. Background**

RE/MAX sent the defendants interrogatories and requests for admission and production on November 1, 2007. The defendants did not file objections or a response until March 11, 2008. Nor did the defendants seek an extension.

On March 12, 2008, the defendants moved for leave to submit responses to RE/MAX's First Requests for Admission and to submit objections to RE/MAX's First Set of Interrogatories and First Set of Requests for Production of Documents. (Docket Entry Nos. 23, 24). The defendants asserted that they failed to file a timely response "due to Defendants' search for new counsel with more experience in trademark matters." (Docket Entry No. 23 at 2; Docket Entry No. 24 at 2). The defendants stated that they recently retained Erik M. Pelton of Erik M. Pelton & Associates, PLLC "due to his experience with handling trademark matters." (Docket Entry No. 23 at 2; Docket Entry No. 24 at 2). In its responses, RE/MAX asserted that the defendants had failed to establish good cause for the failure to file timely responses to the interrogatories and production requests; that there was no showing that withdrawing the deemed admissions would "promote the presentation of the merits"; and that the other reasons the defendants identified as grounds for permitting withdrawal of the deemed admissions and late objections—that RE/MAX would not be prejudiced, that it failed to file a motion to compel, and that it failed to contact the defendants about their failure timely to serve responses to the discovery requests—did not support granting the defendants' motions. (Docket Entry Nos. 25, 26). The defendants filed replies. (Docket Entry Nos. 27, 28).

***2** Under the Scheduling and Docket Control Order entered by this court on October 16, 2007, the deadlines for adding new parties and amending pleadings expired on February 8, 2008. RE/MAX's deadline for designating experts and providing reports was April 30, 2008 and the defendants' deadline is May 30. The discovery deadline is June 27, 2008. Pretrial motions are due by July 31, 2008; the joint pretrial order is due by September 12, 2008; and the final pretrial conference is set for September 19, 2008. (Docket Entry No. 18). No depositions have been taken, which RE/MAX asserts is due to the defendants' belated responses to the requests for admission and the filing of the motions at issue.

### II. The Requests for Admission

*1. The Legal Standard*

Rule 36 of the Federal Rules of Civil Procedure governs requests for admissions, allowing a party to "serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the [general scope of discovery] relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." [1] FED. R. CIV. P. 36(a). The Rule provides:

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.... A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.... [T]he court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.

FED. R. CIV. P. 36. The purpose of the rule is "to expedite the trial and to relieve the parties of the cost of proving facts that will not be disputed at trial." 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2252 (2d ed.1994); *see also* *Pickens v. Equitable Life Assurance Soc'y,* 413 F.2d 1390, 1393 (5th Cir.1969). "Rule 36(b) simultaneously emphasizes the importance of resolving an action on the merits while at the same time upholding a party's justified reliance on an admission in preparation for trial." *Altman v. Ingersoll–Rand Co.,* No. 05–956, 2008 WL 596066, at *3 (W.D.Pa. March 4, 2008).
District courts apply a two-part test in deciding whether to grant or deny a motion to withdraw or amend admissions. First, the court considers whether the withdrawal or amendment would promote the presentation of the merits of the action. Second, the court examines whether allowing the withdrawal would prejudice the party that obtained the admission. *See* *Adventis, Inc. v. Consol. Property Holdings, Inc.,* 124 Fed. Appx. 169, 173 (4th Cir.2005). In making the first assessment, a court should consider whether refusing to permit withdrawal or amendment would have the practical effect of eliminating any presentation of the merits of the case, whether the admission is contrary to the record of the case, whether the admission is no longer true because of changed circumstances, and whether a party has made an honest error. *Le v. Cheesecake Factory Rests. Inc.,* No. 06–20006, 2007 WL 715260, at *2 (5th Cir. May 6, 2007) (citing *Hadley v. United States,* 45 F.3d 1345, 1348 (9th Cir.1995); *N. La. Rehab. Ctr. Inc. v. United States,* 179 F.Supp.2d 658, 663 (W.D.La.2001); *Branch Banking & Trust Co. v. Deutz–Allis Corp.,* 120 F.R.D. 655, 658–59 (E.D.N.C.1988)); *see also* *Smith v. First Nat'l Bank,* 837 F.2d 1575, 1577 (11th Cir.1988); *Harmless v. Elec. Control Security, Inc.,* No. 1:07–cv–146–SEB–WTL, 2008 WL 686999, at *1 (S.D.Ind. March 10, 2008) (allowing defendants who responded to requests for admission one month late to withdraw their deemed admissions in part because there was "no question that allowing the Defendants to withdraw their admissions would promote the presentation of the merits of this case" and otherwise "the Defendants essentially will be prohibited from disputing the Plaintiff's claims on the merits"); *Altman,* 2008 WL 596066, at *3 ("[C]ourts generally seek to ascertain whether the admission is contrary to the evidence of record.").

***3** In answering the second question, a district court must determine whether withdrawal or amendment would prejudice the requesting party in maintaining or defending the action on the merits. "Courts have usually found that the prejudice contemplated by Rule 36(b) relates to special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission." *Am. Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke, P.C.,* 930 F.2d 1117, 1120 (5th Cir.1991). Losing "the benefit of not having to prove [a] case on the merits ... is not the type of prejudice that satisfies Rule 36(b)." *Harmless,* 2008 WL 686999, at *1. "Indeed, inasmuch as allowing a party to withdraw an admission will by its very nature always require the other party to prove something that he otherwise would not have had to prove, that alone cannot be sufficient prejudice to satisfy Rule 36(b)." *Id.; see also* *Gutting v. Falstaff Brewing Corp.,* 710 F.2d 1309, 1314 (8th Cir.1983) (finding that a party is not prejudiced by the increased expenses caused by the need for additional discovery to replace withdrawn admissions). "The prejudice contemplated by the Rule ... relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the

admissions.” *Perez v. Miami–Dade County,* 297 F.3d 1255, 1266 (11th Cir.2002).

“[E]ven when Rule 36(b)'s two-factor test has been satisfied, the district court ‘still has discretion to deny a request to withdraw or amend an admission.’ “ *Le,* 2007 WL 715260, at *2 (quoting *Carney v. IRS,* 258 F.3d 415, 419 (5th Cir.2001)); *see also* *Covarrubias v. Five Unknown INS/Border Patrol Agents,* 192 Fed. Appx. 247, 248 (5th Cir.2006) (quoting *Carney v. IRS,* 258 F.3d at 419) (“Even when the party seeking to withdraw or amend admissions establishes the two-factor test set forth under Rule 36(b), ‘a district court still has discretion to deny a request for leave to withdraw or amend an admission.’ ”); *Am. Auto.,* 930 F.2d at 1119 (“[W]hile the district court has considerable discretion over whether to permit withdrawal or amendment of admissions, that discretion must be exercised within the bounds of this two-part test.”). The Fifth Circuit has “determined that a court acts within its discretion in considering the fault of the party seeking withdrawal ... or its diligence in seeking withdrawal.” *Le,* 2007 WL 715260, at *2 (citing *Pickens v. Equitable Life Assurance Soc.,* 413 F.2d 1390, 1394 (5th Cir.1969) and *Covarrubias,* 192 Fed. Appx. at 248, respectively); *see also* *Carlson v. Freightliner LLC,* 226 F.R.D. 343, 361 (D.Neb.2004) (the court may consider “[t]he presence of improper conduct by the party moving to withdraw or amend an admission, and that party's lack of reasonable explanation for untimely discovery responses.”).

*2. Analysis*

***4** With one exception, the defendants have not shown that allowing withdrawal or amendment of the deemed admissions would promote the presentation of the merits. Many of the requests for admission are admitted in the March 11, 2008 responses at least to the “extent that the records of the U.S.P.T.O. substantiate the facts claimed.” (Docket Entry No. 23, Ex. B). The deemed admissions do not conclusively establish issues determinative of liability. There is no showing that the deemed admissions would be contrary to the record of the case. There is no showing that the deemed admissions are no longer true because of changed circumstances or that the substance of the admissions is the product of an honest error regarding the underlying facts of the dispute.

As to one of the requests for admission, the defendants' submissions do show that the deemed admission should be withdrawn to facilitate the presentation of the merits. The last request for admission, No. 28, apparently contains a typographical error; it is close to incomprehensible. (Docket Entry No. 23, Ex. B). Otherwise, the defendants have not shown that granting the motion to withdraw the deemed admissions would promote the presentation of the merits of the action. *See* *Le,* 2007 WL 715260, at *2.

On the other hand, RE/MAX has not shown that it will be prejudiced if the deemed admissions are withdrawn. RE/MAX argues prejudice because the “Defendants' belated responses are forcing Plaintiff to fit a number of items that must be addressed before the trial of this lawsuit into a much shorter time period than would have been available to Plaintiff had Defendants' timely responded to Plaintiff's [requests for admission]. Causing urgency in Plaintiff's preparation for trial, through no fault of Plaintiff, is prejudicial .” (Docket Entry No. 26 at 4). The discovery cutoff is June 27, 2008. Pretrial motions are due by July 31, 2008, the joint pretrial order is due by September, and the docket call is set for September 19, 2008. (Docket Entry No. 18). RE/MAX received the responses to its requests on March 11, 2008, more than three months before the discovery cutoff, four months before the deadline for pretrial motions, and six months before the pretrial order deadline. RE/MAX does not contend that it will be unable to comply with these deadlines. Nor does RE/MAX identify “special difficulties” it will face in completing discovery “caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission.” *Am. Auto.,* 930 F.2d at 1120. Mere inconvenience is not prejudice. *See* *Gutting,* 710 F.2d at 1314; *Harmless,* 2008 WL 686999, at *1. Although RE/MAX asserts that belated withdrawal of the deemed admissions would be prejudicial because “this action is not simply one of Defendants defending themselves, but instead includes Defendants trying to destroy Plaintiff's federal trademark rights” through counterclaims, (Docket Entry No. 26 at 3), the cases do not support drawing a distinction based on whether the party asserting prejudice is a defendant or plaintiff. *See* *Bryant v. Asset Acceptance. L.L.C.,* No. 07–13278, 2008 WL 784499, *2 (E.D.Mich. March 19, 2008) (granting plaintiff's motion for amendment in order “to let the case rise or fall on the merits to the extent possible”); *Harmless,* 2008 WL 686999, at *1 (granting defendant's motion for amendment). RE/MAX has failed to show that it would be prejudiced by the withdrawal of the defendants' admissions. This factor does not weigh against granting withdrawal or amendment.

***5** The defendants' three-month delay in moving for withdrawal or amendment and the reason given for the delay weigh against granting their motion. *See Le,* 2007 WL 715260, at *2. The defendants assert that they failed to file a timely response to the requests for admission sent on November 1, 2007 "due to Defendants' search for new counsel with more experience in trademark matters." The defendants state that they recently retained as *pro hac vice* counsel Erik M. Pelton of Erik M. Pelton & Associates, PLLC, "due to his experience with handling trademark matters." (Docket Entry No. 23 at 2; Docket Entry No. 24 at 2). RE/MAX has submitted a letter from this attorney to RE/MAX dated May 11, 2006 stating that he had "been retained by Trend Setter Realty of Houston, Texas regarding the allegations of infringement of the RE/MAX trademarks." (Docket Entry No. 26, Ex. A). This attorney is listed as "Of Counsel" in Trend Setter's August 31, 2007 answer. (Docket Entry No. 11 at 13). Although the defendants assert that this attorney's representation of the defendants "was limited in scope to responding to ... a cease and desist letter from Plaintiff, negotiating a resolution to the assertions brought forth in Plaintiffs' April 18, 2006 letter to Defendants, and registering Defendant Trend Setter Realty's logo trademark in the United States Patent and Trademark Office," and "was not "formally retain[ed] in this matter until February 13, 2008," (Docket Entry No. 27 at 2–3), that does not explain why a request for extension was not filed or why, given this attorney's involvement in the case as early as August 2007, a timely response was not filed.

Considering all the factors, the defendants' motion for leave to withdraw or amend the deemed admissions is denied except as to Request for Admission No. 28.

### III. The Interrogatories and Production Requests

*1. The Legal Standard*

"[A]s a general rule, when a party fails to object timely to interrogatories, production requests, or other discovery efforts, objections thereto are waived." *In re United States,* 864 F.2d 1153, 1156 (5th Cir.1989); *see also Jones v. Tex. Youth Com'n,* No. 9:07CV3, 2007 WL 4290000, at *1 (E.D.Tex. Dec. 3, 2007) ("If the responding party does not plan to comply [with a request for production under Rule 34], it must state the objection in a timely manner; otherwise, objections are waived."); *Polokoff v. Int'l Pantyhose, Inc.,* No. 96 Civ. 6100(HB)(HBP), 1997 WL 178621, at *1 (S.D.N.Y. April 11, 1997); *Krewson v. City of Quincy,* 120 F.R.D. 6, 7 (D.Mass.1988). "Any other result would ... completely frustrate the time limits contained in the Federal Rules and give a license to litigants to ignore the time limits for discovery without any adverse consequences." *Krewson,* 120 F.R.D. at 7 (quoting *Slauenwhite v. Bekum Maschinenfabriken, GMBH,* 35 F.R. Serv.2d 975 (D.Mass.1983)).

Under Rule 33(b) of the Federal Rules of Civil Procedure, a party must serve its answers and any objections to interrogatories within thirty days after being served with the interrogatories. Untimely objections are waived "unless the court, for good cause, excuses the failure." FED. R. CIV. P. 33(b)(4); *see also Albiso v. Block,* No. 93–55645, 1995 WL 257881, *5 (9th Cir. May 1, 1995) (emphasizing the "good cause" exception); *Paralikas v. Mercedes Benz, LLC,* No. CV 07–0918(ERK)(WDW), 2008 WL 111186, at * 1 (E.D.N.Y. Jan. 9, 2008) ("In cases where, as here, no good cause has been shown for the late responses, a finding of waiver is appropriate."). Courts examine the circumstances behind the failure to file a timely response to determine "whether it was inadvertent, defiant, or part of a larger calculated strategy of noncompliance"; consider subsequent actions by the party to ascertain whether "it was acting in good faith, as opposed to acting in a disinterested, obstructionist or bad faith manner"; and take into account any resulting prejudice and the need to preserve the integrity of the rules; and may consider any lesser appropriate sanction. *Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc. .,* 200 F.R.D. 255, 258 (M.D.N.C.2001); *accord Frontier–Kemper Constructors, Inc. v. Elk Run Coal Co.,* 246 F.R.D. 522, 526 (S.D.W.Va.2007).

***6** Under Rule 34(b)(2)(A), a party must respond in writing to a request for production within thirty days after being served with the request. FED. R. CIV. P. 34(b)(2)(A). "For each item or category, the response must either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons."[2] FED. R. CIV. P. 34(b)(2)(B). Courts have held that Rule 34 implicitly incorporates both the waiver and "good cause" provisions of Rule 33(b)(4). *See Doe v. District of Columbia,* No. Civ.A.03–1789 (GK/JMF), 2005 WL 1787683, at *5 (D.D.C.2005) ("Although the general rule, under Rule 34(b), is that failure to state a timely objection to a discovery request constitutes a waiver of that objection, upon a finding of good cause, a court may allow such an additional objection to stand."); *Drexel,* 200 F.R.D. at 258 ("Courts have long

viewed the discovery rules as an integrated mechanism to be read *in pari materia....* Rules 33(b)(4) and 34(b) should be so read.”); *Blumenthal v. Drudge,* 186 F.R.D. 236, 240 (D.D.C.1999) (finding that the “same principle [announced in Rule 33(b)(4) ] applies to written document requests under Rule 34(b)”).

Some courts have allowed untimely discovery objections even in the absence of a good-cause showing. The basis is a court's “discretion to decline to compel production of requested documents even if a timely objection has not been made ‘... when the request far exceeds the bounds of fair discovery (4)27’ ” *Krewson,* 120 F.R.D. at 7 (quoting *Slauenwhite,* 35 F.R. Serv.2d 975); *accord Kolenc v. Bellizzi,* No. 95 CIV. 4494 (LMM KNF), 1999 WL 92604, at *3 (S.D.N.Y. Feb.22, 1999).

In *Krewson,* objections to requests for the production of documents were served six weeks late and only after the requesting party filed a motion to compel. The court found that a request for “informant file information” far exceeded the bounds of fair discovery and declined to compel production of that information. The court also found that an objection that another request was “vague, unduly burdensome and is beyond the scope of allowable discovery” was “the type of objection that is waived by a failure to object.” *Krewson,* 120 F.R.D. at 7. Similarly, in *Kolenc,* the court refused to compel responses to improper discovery requests despite the fact that more than a year had passed since the requests had been made, finding that the requests far exceeded the bounds of fair discovery. The court refused to compel discovery of three categories of requests: first, a request for “all documents concerning oral communications defendants had respecting plaintiffs' finances,” because “plaintiffs have cast a wide net that is guaranteed to snare privileged material”; second, “[a]ll taped, electronic, or any other records or memorializations of any conversations between Defendants or any of them and Plaintiff concerning,” because “[t]his request is missing a word(s) and thus fails to identify the subject matter about which plaintiffs seek tapes, records, etc.”; and third, “[a]ll [d]ocuments and docket or similar number which relate to any lawsuit, complaint, arbitration, judgments, civil actions, administrative actions, or criminal actions to [sic],” because “[t]his request suffers from the same defect as the Category 2 request.” 1999 WL 92604, at *3–4. Another court has held that it would not be appropriate to find a privilege waiver when the document sought was clearly privileged and the objection was only a few days late. *See* *Young v. United States,* 149 F.R.D. 199, 206 (S.D.Cal.1993). In *Young,* although the court declined to decide whether a three-day delay in filing an objection constituted a waiver because the asserted privilege was inapplicable, the court also stated that “in this case due to the plaintiff's relatively short tardiness, the court would not find a waiver of a privilege if the request exceeded the bounds of fair discovery by seeking a document clearly privileged under the law.” *Id.*

*2. Analysis*

***7** Under the standard set by the case law, the defendants have not shown good cause for making untimely objections to the interrogatories and production requests. The defendants assert the same excuse for failing to timely object to the interrogatories as they assert for failing to timely respond to the requests for admission: “Defendants' search for new counsel with more experience in trademark matters.” As discussed above, the record shows that this attorney was involved much earlier and, even if he had not been, the absence of an experienced trademark attorney does not explain a failure to ask for an extension of time or provide information that did not call for expert trademark counsel.

Although the defendants have failed to show good cause, RE/MAX's requests for “[a]ll documents that were reviewed in order to respond to or that are identified in response to RE/MAX's First Set of Interrogatories” and “[a]ll documents concerning this litigation or concerning any Defendant's defense of the same” exceed the bounds of fair discovery because the requests cast “a wide net that is guaranteed to snare privileged material.” *See* *Kolenc,* 1999 WL 92604, at *3. The objections as to privilege or protection are not waived. With this exception, the defendants' motion to permit late filed objections is denied and the plaintiff's motion to compel is granted.

**IV. Conclusion**

The defendants' motion to withdraw or amend deemed admissions is granted as to Request No 28 and otherwise denied. The defendants' motion to permit untimely objections to RE/MAX's interrogatories and requests for production of documents is granted as to objections based on attorney-client privilege or work-product protection and otherwise denied.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2036816

## Footnotes

1 The language of Rule 36 was amended on December 1, 2007. The changes were “intended to be stylistic only.” *See* FED. R. CIV. P. 36 Committee Note (2007).

2 The language of Rules 33 and 34 was amended on December 1, 2007. These changes were “intended to be stylistic only.” *See* FED. R. CIV. P. 33, 34 Committee Note (2007).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.